## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| CORNING INCORPORATED,<br><br>    Plaintiff,<br><br>  v.<br><br>WILSON WOLF MANUFACTURING<br>CORPORATION and JOHN R. WILSON,<br><br>    Defendants. | Case No.<br><br>Trial by Jury Demanded |

## COMPLAINT FOR DECLARATORY JUDGMENT AND OTHER RELIEF

Plaintiff Corning Incorporated ("Corning") brings this action against Defendant Wilson Wolf Manufacturing Corporation ("Wilson Wolf") and John R. Wilson ("Wilson") (collectively, "Defendants"), and alleges as follows:

### NATURE OF THE ACTION

1. This is a civil action under 28 U.S.C. §§ 2201 and 2202 seeking declaratory judgments of patent non-infringement, invalidity, and unenforceability of U.S. Patent Nos. 9,441,192 ("the '192 Patent"), 8,697,443 ("the '443 Patent"), and 9,732,317 ("the '317 Patent") (collectively, the "Patents-in-Suit"), in addition to judgments of liability for monetary damages proximately caused by Defendants' unjustified tortious interference with Corning's prospective business advantage. Defendants' patent enforcement and litigation campaign, based on non-infringed, invalid, and unenforceable patents, is a wrongful attempt to interfere with Corning's products and services, to cause Corning financial and other cognizable harm, and to damage Corning's business relationships by falsely accusing Corning's customers and HYPERStack® users of infringing the Patents-

in-Suit.   Defendants' wrongful conduct has created a justiciable controversy between Corning and Defendants.

## PARTIES

2.      Corning is a corporation organized under the laws of the State of New York. Its principal place of business is located in Corning, New York.

3.      Wilson Wolf is a corporation organized under the laws of the State of Minnesota, with its principal place of business in New Brighton, Minnesota.

4.      John Wilson is a citizen of the State of Minnesota, with his principal residence in New Brighton, Minnesota.

## JURISDICTION AND VENUE

5.      Corning's claims for declaratory judgment of patent non-infringement, invalidity, and unenforceability arise under the patent laws of the United States, 35 U.S.C. §§ 101 *et seq*., and the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.  This Court has subject-matter jurisdiction over Corning's federal law claims under 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1338 (original jurisdiction over patent actions).  This Court has diversity jurisdiction under 28 U.S.C. § 1332 over Corning's state-law claims, and also has supplemental jurisdiction under 28 U.S.C. § 1367(a) over those claims, which so relate to Plaintiffs' federal claims that they form a part of the same case or controversy.

6.      Wilson Wolf has its principal place of business in Minnesota, conducts business within this District, and has availed itself of this Court's jurisdiction in related litigation. *See Wilson et al. v. Corning, Inc.*, No. 13-cv-00210-DWF-TNL (D. Minn.) (the "Minnesota Litigation").  The Minnesota Litigation remains pending before this Court,

with Wilson Wolf as an active litigant.  This Court therefore has personal jurisdiction over Wilson Wolf.

7.      John Wilson is a citizen of the State of Minnesota, with his principal residence in New Brighton, Minnesota.  On information and belief, he is the Chief Executive Officer of Wilson Wolf.

8.      Venue is proper in this District under 28 U.S.C. §§ 1391(b)(1) and 1391(b)(2), because Wilson Wolf resides in the District for purposes of 28 U.S.C. § 1391(c)(2) and because a substantial part of the events giving rise to the claims occurred, and a substantial part of the property that is the subject of this action, are situated within this District.

## THE CELL CULTURE VESSELS AT ISSUE

9.      Corning is one of the world's leading innovators in materials science. Included among the products manufactured and sold by Corning are cell culturing vessels. These are plastic vessels that allow research facilities, pharmaceutical companies, and hospitals to grow cells for therapeutic and drug development purposes.

10.     One of Corning's cell culturing vessels is marketed as the HYPERStack®. Corning has multiple valid and enforceable U.S. Patents covering the innovative features of the HYPERStack®.  The HYPERStack®, pictured below, uses gas-permeable film technology that allows the HYPERStack® vessel to be the most efficient, scalable cell culture vessel for adherent cell culture available today.  Features and benefits of the HYPERStack® include:

- More cells – 2.5x more cells per volumetric footprint

- Closed system – no open fluid manipulations

- Scalable product – multiple size offerings

- Ergonomic design – easier manipulation

- Fixed media volume – 0.2 mL/cm$^2$ fills vessel for optimal handling

- Innovative assembly – no adhesives, low particulate

- Less volumetric waste – less waste per growth area lowers overall costs

- Efficient use of liquid medium – a substance, frequently liquid, that is used

to provide nutrition to and support cell growth.



**PENDING MINNESOTA DISTRICT COURT LITIGATION**

11.     In 2013, Wilson Wolf and its owner John Wilson sued Corning in the

Minnesota Litigation, alleging a variety of claims arising out of or related to Corning's

development and sale of the HYPERStack® and the Corning HYPERFlask®.  Minnesota

Litigation, Doc. 1 (attached hereto as Exhibit D).  In particular, Wilson Wolf alleged that

the use, offer, and sale of Corning's HYPERStack® product directly and indirectly infringed Wilson Wolf's U.S. Patent No. 8,158,426 (the "'426 Patent") and U.S. Patent No. 8,158,427 (the "'427 Patent").  On March 17, 2015, the Minnesota District Court dismissed Wilson Wolf's patent infringement claims under the '426 and '427 Patents *with prejudice*, holding that "Plaintiffs' claims cannot succeed under the governing law." Minnesota Litigation Doc. 299, at 5.

12.     Five claims remain in the Minnesota Litigation.  In Counts I, II, and III (Inventorship), Wilson Wolf and John Wilson allege that the inventorship of three Corning patents related to the HYPERFlask® and/or HYPERStack® should be changed to add Wilson and/or other Wilson Wolf staff as the sole and/or joint inventor.  In Count IV (Breach of Contract), Wilson Wolf and John Wilson claim that Corning breached a confidentiality and non-disclosure agreement ("CDA") by filing three patent applications and commercializing and using technology disclosed to Corning under the CDA.  In Count VI (Misappropriation of Trade Secrets), Wilson Wolf and John Wilson claim that Corning misappropriated their trade secrets by including the purported trade secrets in Corning's patent applications.  The Court, however, has dismissed Count VI with prejudice to the extent it is based on misappropriation after April 21, 2005, when John Wilson published his alleged trade secrets to the world in a patent application, Provisional Application No. 60/509,651 (the "'651 Provisional"), published as WO 2005/035728.  The Court held that Wilson Wolf and Wilson had not established and could not claim any trade secret "separate from the information disclosed in their patents."  Minnesota Litigation Doc. 388 at 26.

13.     Subsequently, in an interference proceeding (the "Corning-Wilson Interference") before the Patent and Trademark Appeals Board ("PTAB"), the PTAB invalidated all challenged claims of Wilson's U.S Patent No. 8,809,044 ("the '044 Patent"), which was issued August 19, 2014, on the ground that it was anticipated by prior art.  The Court of Appeals for the Federal Circuit then affirmed that ruling.  The prior art on which the PTAB and Federal Circuit relied in their decision to invalidate the '044 Patent claims was available to the public long before Wilson first approached Corning.  Moreover, the concepts in the now-invalid claims of the '044 Patent also underlie all of the trade secrets and confidential information alleged in the Minnesota Litigation to have been misused by Corning.  Accordingly, Corning has now moved for summary judgment pursuant to Rule 56, Federal Rules of Civil Procedure, on the ground that the final PTAB judgment invalidating the '044 Patent claims precludes re-litigation of the same issues in the Minnesota Litigation.  Minnesota Litigation Doc. 580.

## WILSON WOLF'S CAMPAIGN OF LITIGATION
## AGAINST CORNING AND ITS CUSTOMERS OR END-USERS

14.     Having suffered invalidation of their key '044 Patent and facing failure in their existing litigation against Corning in the United States District Court for the District of Minnesota, Wilson Wolf and John Wilson launched a retaliatory litigation campaign against Corning's HYPERStack® end-users and customers.  Defendants threatened to sue Corning's customers and then filed lawsuits in December 2019 and January 2020 against three Corning customers or end-users (again, the "HYPERStack Users"): Brammer Bio, LLC ("Brammer Bio"); Sarepta Therapeutics, Inc. ("Sarepta"); Nationwide Children's

Hospital, Inc. ("NCH"); and The Research Institute at Nationwide Children's Hospital ("TRI") (together, "Children's Hospital"). Defendants' lawsuits allege that all three end-users' use of HYPERStack® infringed some or all of the Patents-in-Suit.

15.     Brammer Bio is a contract development and manufacturing organization that assists pharmaceutical companies in developing and commercializing gene therapies. It purchased HYPERStack® cell culture vessels from Corning and uses them in its business. On information and belief, Brammer Bio employs its HYPERStack® vessels solely for uses reasonably related to the development and submission of information under federal laws regulating the manufacture, use, or sale of drugs or veterinary biological products, including to the Food and Drug Administration ("FDA").

16.     Sarepta is a U.S. commercial-stage, biopharmaceutical company focused on the discovery and development of therapeutics for rare neuromuscular diseases, including Duchenne muscular dystrophy. Sarepta uses Corning HYPERStack® cell culture vessels. On information and belief, Sarepta employs HYPERStack® vessels solely for uses reasonably related to the development and submission of information under federal laws regulating the manufacture, use, or sale of drugs or veterinary biological products, including to the FDA.

17.     NCH is a pediatric hospital located in Columbus, Ohio. TRI is the research arm of NCH, conducting ongoing research in biobehavioral health, cardiovascular and pulmonary health, childhood cancer and blood disease, clinical and translational research, gene therapy, injury research and policy, innovation in pediatric practice, microbial pathogenesis, molecular and human genetics, perinatal research, mathematical medicine,

and vaccines and immunity.  Children's Hospital utilizes HYPERStack® cell culture vessels in its business.  On information and belief, Children's Hospital employs its HYPERStack® vessels solely for uses reasonably related to the development and submission of information under federal laws regulating the manufacture, use, or sale of drugs or veterinary biological products, including to the FDA.

18.     On December 20, 2019, Wilson Wolf filed a lawsuit against Brammer Bio in the District of Delaware alleging that Brammer Bio infringes all three Patents-in-Suit "through its use of the Corning HYPERStack® cell culture device."  Complaint for Patent Infringement, *Wilson Wolf Mfg. Corp. v. Brammer Bio, LLC*, No. 1:19-cv-02315 (D. Del. Dec. 20, 2019) ¶ 27 ("Brammer Bio Complaint") (attached hereto as Exhibit E).

19.     On December 20, 2019, Wilson Wolf filed a lawsuit against Sarepta in the District of Delaware alleging that Sarepta infringes the '192 Patent and '443 Patent "through its use of cells and/or cell-derived products including viral vectors manufactured using the Corning HYPERStack cell culture device."  Complaint for Patent Infringement, *Wilson Wolf Mfg. Corp. v. Sarepta Therapeutics, Inc.*, No. 1:19-cv-02316 (D. Del. Dec. 2019) ¶ 24 ("Sarepta Complaint") (attached hereto as Exhibit F).

20.     On January 13, 2020, Wilson Wolf filed a lawsuit against Children's Hospital (NCH and TRI) in the Southern District of Ohio alleging that Children's Hospital infringes all three Patents-in-Suit through its "use of the Corning HYPERStack cell culture device." Complaint for Patent Infringement, *Wilson Wolf Mfg. Corp. v. Nationwide Children's Hosp., Inc. and The Research Institute at Nationwide Children's Hosp.*, No. 1:20-cv-00192

(S.D. Ohio Jan. 13, 2020) ¶ 27 ("Children's Hospital Complaint") (attached hereto as Exhibit G).

21.    When Wilson Wolf filed its infringement allegations against Corning's HYPERStack Users Brammer Bio, Sarepta, and Children's Hospital, Wilson Wolf knew, or should have known, that the Patents-in-Suit were unenforceable in light of Wilson Wolf's and Wilson's fraudulent conduct in obtaining the patents from the Patent and Trademark Office.  Wilson Wolf and Wilson also knew, or should have known, that the claims in the '044 Patent, which underlie the Patents-in-Suit, had been invalidated by the United States Patent Trial and Appeal Board and affirmed by the United States Court of Appeals for the Federal Circuit.  Wilson Wolf and Wilson also knew, or should have known, that patent infringement lawsuits against Corning's HYPERStack Users were barred by the Kessler doctrine.  *See Kessler v. Elred*, 206 U.S. 285 (1907); *Speedtrack, Inc. v. Office Depot, Inc.*, 791 F.3d 1317 (Fed. Cir. 2015).  And Wilson Wolf also knew, or should have known, that its patent infringement allegations against the HYPERStack Users were barred by the safe harbor established by 35 U.S.C. § 271(e)(1).

22.    Wilson Wolf has asserted its noninfringed, unenforceable, and invalid patents against the HYPERStack Users for the improper and unjustified purposes of interfering with Corning's existing and prospective business relationships with its customers.

23.    Corning is contractually obligated to indemnify and defend Brammer Bio and Children's Hospital against infringement claims involving HYPERStack®.  As a result of that obligation and of the allegations of infringement by Wilson Wolf against a Corning

product, there is an immediate and actual case or controversy between Corning and Defendants regarding the non-infringement, invalidity, and enforceability of the Patents-in-Suit as they pertain to Corning's HYPERStack® product.  Corning has a direct and substantial interest in defeating any patent infringement claims relating to HYPERStack® and any other Corning products identified by Wilson Wolf in the Brammer Bio, Sarepta, and Children's Hospital Complaints.

24.     Corning has suffered harm from Defendants' interference with Corning's customer relationships and anticompetitive conduct, including by incurring significant legal expenses to defend and indemnify customer and end-user defendants and by damage to its reputation for providing reliable cell culturing products that customers can use in their businesses without threat of litigation or an injunction that would disrupt their operations.

25.     Corning denies that any of its technology, including use of the HYPERStack® product as identified in the Brammer Bio, Sarepta, and Children's Hospital Complaints, infringes any claim of the Patents-in-Suit, either directly or indirectly, literally or by equivalents.

26.     In addition, Wilson Wolf has made incompatible requests for relief in the Minnesota Litigation and the cases against the HYPERStack® Users.  Wilson Wolf's Minnesota Litigation against Corning seeks disgorgement of all HYPERStack® profits. Wilson Wolf's actions against the HYPERStack® Users seek both damages *and* injunctive relief barring future use of HYPERStack®.

27.    Wilson Wolf cannot both recover duplicative damages from future HYPERStack® sales and obtain an injunction that would effectively preclude a portion of such sales.

28.    The controversy is between parties having adverse legal interests and is of such immediacy and reality to warrant issuance of a declaratory judgment under 28 U.S.C. § 2201(a) as to the alleged infringement of the Patents-in-Suit by the HYPERStack® product and its use, and the validity and enforceability of the Patents-in-Suit.

29.    Corning has therefore brought this action in Minnesota, where related litigation is pending and where Defendants' facilities and relevant witnesses are located, to obtain just and speedy resolution of this dispute, and to relieve Corning's customers and end-users of the burden of litigating Wilson Wolf's allegations against Corning technology. *See, e.g., Elecs. for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1347 (Fed. Cir. 2005) (supplier "entitled under the Declaratory Judgment Act to seek a timely resolution of ... threats of litigation and remove itself from 'the shadow of threatened infringement litigation'" (citation omitted)).

## THE PATENTS-IN-SUIT

30.    Wilson Wolf purports to be the owner of the '192 Patent, entitled "Cell culture methods and devices utilizing gas permeable materials," which issued on September 13, 2016; the '443 Patent, entitled "Cell culture methods and devices utilizing gas permeable materials," which issued on April 15, 2014; and the '317 Patent, entitled "Highly efficient gas permeable devices and methods for culturing cells," which issued on

August 15, 2017.  Copies of the '192 Patent, '443 Patent, and '317 Patent are attached hereto as Exhibits A, B, and C, respectively.

**The '192, '443 And '317 Patents Relate To One Another And To The Issues
Resolved By The PTAB And Federal Circuit In The Corning-Wilson Interference
And Pending In The Minnesota Litigation**

31.     The '192, '443 and '317 Patents, which were asserted by Wilson Wolf against Corning HYPERStack® users (the "HYPERStack Users"), are related either by family or subject matter to the patents that were asserted by Wilson Wolf and Wilson in the Minnesota Litigation.  They are also related to the '044 Patent in dispute in the Corning-Wilson Interference, certain claims of which the PTAB declared (and Federal Circuit affirmed) to be invalid.

32.     The '192 and '443 Patents share the same specification with, and concern the same alleged inventions as, Wilson Wolf's '426 and '427 Patents, which had been asserted against Corning in the Minnesota Litigation.  As noted above, the Court dismissed Wilson Wolf's patent infringement claims against Corning with prejudice in the Minnesota Litigation.  Under Wilson Wolf's apparent claim construction in the suits against the HYPERStack Users, claims of the '192 Patent, the '443 Patent, and the '317 Patent are patentably indistinct from claims of the '426 and '427 Patents.

33.     The '317 Patent shares the same specification with Wilson Wolf's '044 Patent and concerns the same alleged invention. As noted above, the PTAB and Federal Circuit have found all challenged claims of the '044 Patent invalid in light of the prior art in the Corning-Wilson Interference.

34.     Moreover, the '192, '443, and '317 Patents, according to Wilson Wolf and John Wilson, all contain the same information that purportedly reflect the Wilson Wolf trade secrets at issue in the Minnesota Litigation. As noted above, Corning has a motion for summary judgment pending in the Minnesota Litigation that asserts that Wilson Wolf's trade secret, CDA claims, and inventorship claims are barred by issue preclusion in view of the Corning-Wilson Interference. Indeed, as determined in the Corning-Wilson Interference, all of Wilson Wolf's alleged "secrets" were not invented by Wilson Wolf at all, but were in the prior art and publicly available years prior to Wilson Wolf's filing of the earliest applications to which the '192, '443, and '317 Patents claim priority.  The relationship of patents-in-suit to each other and to related patents is set forth below.

CELL CULTURE METHODS AND DEVICES UTILIZING GAS PERMEABLE MATERIALS



ISLET CULTURE, SHIPPING AND INFUSION DEVICE / HIGHLY EFFICIENT GAS PERMEABLE DEVICES AND METHODS FOR CULTURING CELLS



**The '192 and '443 Patents**

35.    Wilson's '192 and '443 Patents both ultimately derive from the '651 Provisional, filed on October 8, 2003 – the provisional application in which Wilson published his own alleged trade secrets.  One year after the '651 Provisional was filed, Wilson filed U.S. Utility Application No. 10/961,814 ("the '814 Application"), from which the '443 and '192 Patents claim priority.  The '443 and '192 Patents issued on April 15, 2014, and September 16, 2016, respectively.

36.    Wilson Wolf and Wilson could have asserted the '443 Patent in the Minnesota Litigation before the District Court dismissed Wilson's patent infringement claims with prejudice on March 27, 2015, but Wilson Wolf and Wilson failed to do so.

37.    The '192 and '443 Patents generally concern and claim cell culture devices with a significantly greater medium height than was allegedly known in the prior art, as well as the use of gas permeable materials.

38.    The European counterpart to the '192 and '443 Patents, EP2336293B1, currently stands rejected by the European Patent Office in light of an opposition filed by Corning.

39.    In the United States, starting with the '651 Provisional, and continuing throughout the prosecutions of the '814 Application and the applications for the '192 and '443 Patents, Wilson Wolf and Wilson repeatedly argued that the claims were patentable at least in part because they required greater medium height than allegedly was found in the prior art.

40.   For example, claim 1 of the '192 Patent requires that "the uppermost location of said medium is elevated beyond 2.0 cm from the lowermost location of said medium[.]" *Id.*, col. 46, ll. 52-54.

41.   Similarly, the claims of the '443 Patent require, among other things, a cell culture device comprising a gas permeable material, scaffolds, and medium. *See, e.g., id.*, col. 44, ln. 59 – col. 45, ln. 7, col. 46, ll. 21-23, col. 46, ll. 24-39, and col. 46, ll. 63-65. Figure 13 of the '443 Patent provides one example of such a cell culture device wherein gas transfer is allegedly greater than the prior art to accommodate scaffolds (120D) in the interior of the device.  In this example, gas permeable material is on one side of the device (200) and medium fills the inside of the vessel.  The '443 Patent states that making the rear or other walls gas permeable can create more gas transfer capacity, having the effect of making it possible to further increase the footprint of gas permeable cell culture device 12. *Id.*, col. 30, ll. 49-52.

## *Fig. 13*



42.     Wilson Wolf and Wilson started stressing the importance of medium height and gas transfer capacity to their alleged invention from their earliest filing.  For example, in support of the alleged novelty of these purported inventions, the '651 Provisional included test results "to assess the impact of medium height upon cell growth and antibody production."  '651 Provisional, specification at p. 27; *see also id.* at pp. 27-29 ("Example 1").

43.     The test results and descriptions are included in "Example 1" of the '651 Provisional, entitled "The Effect of Medium Height Upon Cell Growth and Antibody Production," which is repeated in substantially the same form in the '814 Application and the '443 and '192 Patents.  *E.g.*, '443 Patent, col. 32, ln. 36-col. 35, ln. 32. Data from

experiments allegedly performed that support the results of Example 1 are also included in three tables reproduced in these applications and patents, Table Nos. 1-3. *Id.* The test results allegedly recorded in Example 1 generally show that increasing the height and/or amount of media in a cell culture vessel improves cell culture performance and antibody production.

44.     The '651 Provisional included additional Examples that purported to reflect test results demonstrating that the addition of more media than was allegedly used in the prior art, and submerging scaffolding in media of purportedly greater than usual height, provided unexpected advantages in cell culture. *See, e.g.*, '651 Provisional, specification at pp. 30-31 ("Example 3"), 31-32 ("Example 4"), and 32-34 ("Example 5"). These Examples and alleged test results were also repeated in substantially the same form in the '814 Application and the '443 and '192 Patents. *E.g.*, '443 patent, col. 36, ln. 46 – col. 40, ln. 21.

45.     On information and belief, Wilson and Wilson Wolf had, among other things, other data, including data that did not show as favorable results (and/or showed detrimental results).

46.     For example, Wilson Wolf and Wilson were aware, including from information provided by Corning in 2004, that increased medium height would provide no advantages to and in fact could negatively affect certain cell types. For example, adherent cells, which are a type of cell particularly suitable for use in Corning's HYPERFlask® and HYPERStack®, do not benefit from or may be negatively affected by the arrangements and increased media height touted by Wilson Wolf and Wilson to the PTO. Moreover, the

results achieved with the types of cells used by Defendants in their experiments in the '192 and '443 Patents were not surprising and did not produce "unexpected" results.

47.    Upon information and belief, the attorneys that assisted in the prosecution, including at least Daidre Burgess ("Burgess") and/or Thomas Dickson ("Dickson"), either knew or should have known of the omitted information and data.

48.    The attorneys that assisted in the prosecution, including Burgess and Dickson, either failed to properly investigate whether all relevant data had been collected and disclosed to the PTO, or failed to explain to Defendants their obligation to submit such data and information to the PTO.

49.    The omitted information and data were material to the prosecution, and Wilson, Wilson Wolf, and their counsel, including Burgess and Dickson, knew that the above-cited Examples in the '192 and '443 Patents and '651 Provisional and other applications, and/or the omitted data and information were material to the prosecution. The '192 and '443 Patents would not have issued had the omitted data and information been presented to the Examiner, or had the above-referenced Examples and data not been included.

50.    Yet Wilson Wolf, Wilson, and their counsel, including Dickson and Burgess, did not provide this information to the PTO or qualify their claims of unexpected results or advantages from increased media height to exclude adherent cells.

51.    To the contrary, Wilson Wolf is presently asserting that the '443 and '192 Patents are infringed in lawsuits against Corning's customers and HYPERStack users,

where adherent cells are used in the accused HYPERStack® device and cell culture processes.

52.     The single most reasonable inference from the omissions and misrepresentations described herein is that Defendants and their attorneys, including Burgess and Dickson, intended to deceive the PTO and the public.

53.     This was not the only time that Wilson and Wilson Wolf misrepresented or omitted data or information that undercut or contradicted their claims concerning the purported benefits of media height allegedly being greater than the media height used in prior art systems.

54.     For example, Wilson Wolf and Wilson prosecuted U.S. Application Serial No. 13/029,762 ("'762 Application") prior to and/or in parallel to the applications for the '443 and '192 Patents. The '762 Application concerns the same subject matter as the '443 and '192 Patents and includes a priority claim to the '651 Provisional and '814 Application, just like the '443 and '192 Patents do.  The '762 Application also includes a substantially identical specification disclosure as the '443 and '192 Patents, including each of the Examples discussed above.

55.     As with the '443 and '192 Patents, Wilson Wolf and Wilson asserted that the claims were patentable at least in part because they required greater medium height than allegedly was found in the prior art.  The '762 Application was assigned to the same Examiner at the PTO who was also assigned to the '443 and '192 Patents (Examiner Beisner).

56.    Wilson Wolf and Wilson, along with their counsel Burgess and Dickson, held a telephonic conference with Examiner Beisner on June 28, 2011 to discuss the patentability of the then-pending claims of the '762 Application.  At this time, and at all material times discussed below, the application for the '443 Patent was also pending before Examiner Beisner and the application for the '192 Patent had not yet been filed.

57.    Examiner Beisner's Interview Record, dated July 1, 2011, indicated that Examiner Beisner did not agree that the pending claims in the '762 Application were patentable or that the alleged requirement for greater media height rendered the claims patentable over the prior art.  Among other things, Examiner Beisner contended that the prior art rendered Wilson Wolf's and Wilson's claims to greater media height obvious under 35 U.S.C. § 103.  However, Examiner Beisner recorded that "Applicants and the Examiner discussed the possibility of filing a declaration under 37 CFR 1.132 to show unexpected results which would potentially overcome the 103 rejections of record." Wilson, Burgess, and Dickson were aware that submitting an independent declaration averring that using medium heights that exceeded 2.0 generated unexpected results would influence the Examiner's view of patentability of the claims and would be material to the PTO in assessing the patentability.

58.    On information and belief, Wilson and Burgess personally had a further telephone conference with Examiner Beisner on July 8, 2011, in which they further discussed the possibility of filing one or more declarations under 37 C.F.R. § 1.132. Examiner Beisner did not prepare an interview summary of this further telephone conference, but Wilson Wolf's Amendment dated July 11, 2011 "thank[s] the Examiner

for the courtesy extended to its undersigned representative and inventor John Wilson in a second telephone interview on July 8, 2011." July 11, 2011 Amendment, p. 8.  Wilson Wolf continues: "During the telephone interview, a proposed declaration per 37 C.F.R. 1.132 regarding unexpected results was discussed." *Id.*

59.    Examiner Beisner already had the Examples, discussed above, in the '762 Application's disclosure, which purported to demonstrate that increased medium height generated positive and unexpected results.  Those self-reported Examples were not sufficient, however, to convince Examiner Beisner to withdraw his rejections under 35 U.S.C. § 103.  On July 11, 2011, Wilson Wolf, through Wilson, Burgess, and Dickson, also submitted a Declaration under 37 C.F.R. § 1.132 from Dr. Juan Vera (the "Vera Declaration") to support the prosecution of the '762 Application.  The Vera Declaration identified Dr. Vera as an "Assistant Professor at Baylor College of Medicine" and an "expert in cell culture for adoptive cell therapy."  Vera Declaration, ¶¶ 1, 3.  The Vera Declaration suggests that Dr. Vera's relationship with Defendants was arm's length, stating that Vera "contacted" Defendants seeking information "and was subsequently provided gas permeable cell culture devices and a copy of U.S. Patent Application 10/961,814."  *Id.*, ¶ 5.    The Vera Declaration describes the purportedly unexpected "superiority" and "remarkable improvement over other methods" of "the gas permeable devices provided by Wilson Wolf Manufacturing with methods in which medium height was beyond 2.0 cm." *Id.*, ¶ 8.  The Vera Declaration continues and describes additional experiments that allegedly "outperform" prior art cell culture methods.  *E.g., id.*, ¶ 11; *see also id.*, ¶¶ 10-13.

60.     Examiner Beisner had every reason to believe that the Vera Declaration reflected the opinion of an independent, disinterested, outside expert.

61.     Wilson Wolf, Wilson, Burgess, and Dickson also knew that Examiner Beisner expected and believed the Vera Declaration to reflect the opinion of an independent, outside expert. At the same time that Wilson Wolf, Wilson, Burgess, and Dickson submitted the Vera Declaration, they also submitted a declaration from Wilson himself, under 37 CFR § 1.132 (the "Wilson Declaration").  The Wilson Declaration also touted the alleged unexpected benefits of increased medium height.  There would have been no purpose in submitting the Vera Declaration along with Wilson's own declaration, unless Wilson Wolf and Wilson expected and intended the Vera Declaration to be perceived as reflecting the opinions of an independent, disinterested outside expert.

62.     Unknown to Examiner Beisner and the PTO, however, Dr. Vera was not an independent, disinterested, outside expert who happened to contact Wilson Wolf and Wilson for information.  Dr. Vera was, in fact, Wilson Wolf's paid consultant and Wilson's collaborator. Wilson Wolf and Wilson intentionally failed to disclose to the PTO the material fact that they were paying Dr. Vera for his declaration and funding his work.  The PTO therefore did not know about the strong potential for bias in Dr. Vera's opinion.

63.     The attorneys who assisted in the prosecution, including Burgess and Dickson, either failed to properly investigate whether there was a relationship between Vera and Defendants, or failed to explain to Defendants their obligation to inform the PTO that Vera was not an independent expert but was rather a paid consultant and business collaborator.

64.     The attorneys that assisted in the prosecution, including Burgess and Dickson, knew or should have known of the relationship between Vera and Defendants.

65.     The attorneys that assisted in the prosecution, including Burgess and Dickson, failed to fulfill their obligations to the PTO by failing to inform the PTO of the relationship between Vera and Defendants.

66.     The Vera Declaration was "but-for" material to the prosecution (the '192 and '443 Patents would not have issued but for the submission of the Vera Declaration), and Wilson Wolf, Wilson, and the attorneys who assisted in the prosecution, including Burgess and Dickson, knew that the Vera Declaration was material to the prosecution.

67.     Also unknown to Examiner Beisner, but known at the time to Wilson Wolf and Wilson, were the material and significant differences of the effects of increased distance from the gas source on adherent cells.  Notably, the Wilson Declaration and Vera Declaration also did not distinguish between adherent cell types and other cell types.  Rather, both declarations and the pending claims broadly reference all cell types.  At the time that Wilson Wolf and Wilson submitted the Wilson Declaration and the Vera Declaration, however, Wilson Wolf and Wilson knew, at a minimum, that there were material differences relating to the purported benefits of increased medium height on adherent cell culture.  On information and belief, Wilson Wolf's and Wilson's omission of this material information was deliberate and intended to deceive Examiner Beisner – not just as to the '762 Application but as to all of the applications that were (or would be) pending before him, including the applications that issued as the '443 and '192 Patents.  This is so especially given the repeated insistence by Wilson Wolf and Wilson (as shown

above) that the purportedly greater medium height and gas transfer capacity in the claimed invention was a point of novelty, as compared to the medium height and gas transfer capacity allegedly found in the prior art, and without distinguishing between adherent or non-adherent cells.

68.    Thus, there has been a pattern by Wilson Wolf and Wilson in misstating the benefits of increased medium height and gas transfer capacity while failing to disclose material information that undercuts the evidence for such benefits, all for the purpose of securing patent rights without regard for factual or ethical obstacles. From the test results reported in the Examples, to the Vera and Wilson Declarations, to the failure to distinguish between different types of cells (*e.g.*, adherent cells), Wilson Wolf and Wilson have repeatedly and materially misstated the alleged benefits of increasing media height and gas transfer capacity—including, but not limited to, their claims that it generates unexpected and beneficial results for all cell types (including adherent cells).

69.    The '443 and '192 Patents are within the same patent family as the application where Examiner Beisner accepted the Vera Declaration, and both patents issued after the declaration was submitted, thereby satisfying the threshold requirements to apply the doctrine of infectious unenforceability to them.  Examiner Beisner was also the examiner on all three applications, and on information and belief, he relied on the Vera Declaration in connection with all three prosecutions.

70.    In their pattern of misleading the PTO regarding the benefits of increased medium height and gas transfer capacity, and in omitting material information, Wilson Wolf, Wilson, and their counsel, including Burgess and Dickson, acted with specific intent

to deceive the PTO in order to obtain issuance of the '192 and '443 Patents. But for the deceptive conduct of Wilson Wolf, Wilson, and the attorneys that assisted in the prosecution, including Burgess and Dickson, neither patent would have been issued by the Patent Office.

71.    The single most reasonable inference for the acts, omissions, and misrepresentations concerning the supposed benefits of increased medium height and gas transfer capacity and the Vera Declaration described herein is that the Defendants and their attorneys, including Burgess and Dickson, intended to deceive the PTO and the public.

### The '317 Patent

72.    The '317 Patent issued on August 15, 2017, from U.S. Patent Application Serial No. 14/321,933 ("the '933 Application"), filed on July 2, 2014, which is a continuation of U.S. Patent Application Serial No. 11/952,848, filed on December 7, 2007, now the '044 Patent, issued August 19, 2014, which claims benefit of U.S. Provisional Patent Application Serial No. 60/873,347 ("'347 Provisional"), filed on December 7, 2006.

73.    In fact, on November 30, 2015, the Examiner issued a double patenting rejection finding that all pending claims of the '933 Application were not patentably distinct from the claims of the '044 Patent, among other rejections. Wilson and Wilson Wolf did not challenge the Examiner's double patenting rejection of the claims of the '933 Application in view of the '044 Patent. Instead, Wilson and Wilson Wolf obviated the rejection by filing a terminal disclaimer on May 26, 2016.

74.    While the '933 Application was being prosecuted (and, therefore, before the '317 Patent issued), the related '044 Patent was challenged in the Corning-Wilson

Interference. The Corning-Wilson Interference involved Corning's U.S. Patent Application Serial No. 14/814,267 to Martin et al. (the "Martin Application"). Among several other issues in the Corning-Wilson Interference was whether it was Wilson Wolf or Corning who first invented the subject matter of the '044 Patent, and whether that subject matter was patentable at all.

75.    The PTAB formally declared the Corning-Wilson Interference on October 31, 2016. At the time the PTAB declared the interference, the separate Patent Examiner assigned to Wilson Wolf's '933 Application had issued a Final Rejection of all pending claims in the '933 Application. Among the Patent Examiner's grounds for rejecting Wilson Wolf's '933 Application were: (a) the prior art reference that Corning alleged—and ultimately succeeded in proving, both before the PTAB and on appeal—invalidated the majority of the claims of the related '044 Patent (the "Toner Reference"); and (b) a patent application found to be prior art that included the disclosure of Corning's Martin Application itself.

76.    Mr. Wilson was an active participant in the Corning-Wilson Interference. Among other things, Mr. Wilson submitted an unsuccessful declaration in support of the alleged patentability of the challenged claims of the '044 Patent during the Corning-Wilson Interference, and sat for a deposition in the Corning-Wilson Interference.

77.    Mr. Wilson and Wilson Wolf were also represented in the Corning-Wilson Interference by the same law firm (Winthrop & Weinstine, P.A.) that represented them before the Patent and Trademark Office ("PTO") in the prosecution of the '933 Application. Attorneys including Brett Klein and Devan V. Padmanabhan were associated

with the Winthrop & Weinstine firm, and represented Wilson and Wilson Wolf before the PTO in relation to the prosecution of the '317 Patent and '933 Application.  Likewise, attorneys including Brett Klein and Devan V. Padmanabhan were associated with the Winthrop & Weinstine firm, and represented Wilson and Wilson Wolf before the PTAB in the Corning-Wilson Interference.

78.    However, neither Mr. Wilson, Wilson Wolf, nor any of their attorneys, including Brett Klein and Devan V. Padmanabhan, disclosed the Corning-Wilson Interference or any of the materials filed therein to the Examiner of the '933 Application. Indeed, as discussed in further detail below, there is no indication anywhere on the public prosecution history of the '933 Application that Wilson, Wilson Wolf, or their aforementioned attorneys ever disclosed the Corning-Wilson Interference or any of the materials filed therein to the Examiner of the '933 Application at any time while the '933 Application was pending or prior to its issuance as the '317 Patent.

79.    Moreover, although the public prosecution history indicates that the Examiner of Wilson Wolf's '933 Application conducted several searches for interferences during the time that the Corning-Wilson Interference was active and Wilson Wolf's '933 Application was pending, that same public prosecution history indicates that the Examiner never located the Corning-Wilson Interference and that Wilson Wolf and Wilson never advised the Examiner of its existence or omission.

80.    On December 8, 2016, Wilson Wolf and the named inventor of the '933 Application—Defendant John Wilson—along with attorney Brett Klein conducted an *ex parte* interview with the Examiner of the '933 Application.  That same day, Wilson Wolf

and Mr. Wilson, through Brett Klein, submitted a Request for Continued Examination and a Declaration from Mr. Wilson that attempted to overcome the Examiner's rejections of all pending claims based on, *inter alia*, the Toner Reference and the disclosure of the Martin Application.

81.    On the very same day, Corning submitted a Motion List in the Corning-Wilson Interference.  Corning's Motion List included (i) a motion that the claims of the '044 Patent were unpatentable as anticipated by the Toner Reference under 35 U.S.C. § 102(b) (the "Toner Motion"), and (ii) a motion that Wilson Wolf's '044 Patent was not entitled to priority benefit of the '347 Provisional under 35 U.S.C. § 112 (the "Priority Motion").  Although Wilson Wolf, Wilson, and their attorneys were served with these documents on the respective dates indicated above, Wilson Wolf, Wilson, and their aforementioned attorneys, including Brett Klein and Devan Padmanabhan, chose not to disclose any of these Interference papers to the Examiner prior to the issuance of the '933 Application as the '317 Patent.

82.    Particularly in view of Defendants' present infringement contentions, both the Toner Motion and the Priority Motion were material to, and contradicted, the positions advanced by Wilson Wolf, Mr. Wilson, and their aforementioned attorneys in the December 8, 2016 interview with the '933 Application's Examiner, the Request for Continued Examination, and Mr. Wilson's Declaration.

83.    Although Wilson Wolf, Wilson, and their aforementioned attorneys were served with Corning's Motion List on the very day of their interview with the '933 Application's Examiner, Wilson Wolf, Wilson, and their aforementioned attorneys chose

not to disclose either the existence of the Corning-Wilson Interference or any filings from the Corning-Wilson Interference to the Examiner.

84.     On February 15, 2017, Corning filed the Toner Motion and the Priority Motion in the Corning-Wilson Interference, both supported by a declaration by Dr. Charles Crespi.

85.     Particularly in view of Defendants' present infringement contentions, the Toner Motion, the Priority Motion, and Dr. Crespi's declaration were material to, and contradicted, the positions advanced by Wilson Wolf, Mr. Wilson, and their aforementioned attorneys in the December 8, 2016 interview with the '933 Application's Examiner, the Request for Continued Examination, and Mr. Wilson's Declaration.  Indeed, the Toner Motion and Dr. Crespi's declaration were the primary grounds for the PTAB's determination—affirmed by the Federal Circuit on appeal—that all challenged claims of the related '044 Patent were invalid.  Yet Wilson Wolf, Wilson, and their attorneys chose not to disclose any of these papers or the existence of the Corning-Wilson Interference to the '933 Application's Examiner at any point in the course of the examination, despite the fact that they were undoubtedly relevant and material to the patentability of that application.

86.     On April 7, 2017, the Examiner of Wilson Wolf's '933 Application issued a Notice of Allowance.  The Examiner also conducted another interference search but, once again, did not identify the Corning-Wilson Interference.  Wilson Wolf, Wilson, and their attorneys also did nothing to advise the Examiner of the Corning-Wilson Interference or any of its contents.

87.     Wilson Wolf deposed Dr. Crespi on April 13, 2017 in the Corning-Wilson Interference, after the Examiner issued a Notice of Allowance for the '933 Application but while the application was still pending.  Particularly in view of Defendants' present infringement contentions, the deposition was material to, and contradicted, the positions advanced by Wilson Wolf, Mr. Wilson, and their attorneys in the December 8, 2016 interview with the '933 Application's Examiner, the Request for Continued Examination, and Mr. Wilson's Declaration that was the basis for the Examiner's Notice of Allowance. Yet Wilson Wolf, Wilson, and their attorneys chose not to disclose the existence or the content of Dr. Crespi's deposition to the '933 Application's Examiner.

88.     Wilson Wolf and Wilson filed their oppositions to the Toner Motion and the Priority Motion on May 5, 2017.  The '933 Application was still pending before the Examiner.  The oppositions were supported by a declaration from Wilson, also dated May 5, 2017.  The Toner Motion, the Priority Motion, Dr. Crespi's declaration, and Dr. Crespi's deposition are addressed in Wilson Wolf's and Wilson's opposition brief and Wilson's declaration.  Once again, Wilson Wolf, Wilson, and their attorneys still did not disclose any of this information to the '933 Application's Examiner.

89.     Wilson was deposed in the Corning-Wilson Interference on May 13, 2017. Wilson's deposition was material to, and Wilson was challenged on, positions advanced by Wilson Wolf, Mr. Wilson, and their attorneys in the December 8, 2016 interview with the '933 Application's Examiner, the Request for Continued Examination, and Mr. Wilson's associated declaration. Still, Wilson Wolf, Wilson, and their attorneys did not disclose the Corning-Wilson Interference or its contents to the Examiner.

-31-

90.     Corning filed its reply briefs in support of its Toner Motion and Priority Motion in the Corning Wilson Interference on June 14, 2017.  Yet again, Wilson Wolf, Wilson, and their attorneys did not disclose the Corning-Wilson Interference or its contents to the Examiner.

91.     In fact, at no time did Wilson Wolf, Wilson, or their law firm – which represented Wilson Wolf both in the Corning-Wilson Interference and the prosecution of the '933 Application – disclose the Corning-Wilson Interference or its contents to the Examiner prior to the '933 Application's issuance as the '317 Patent on August 15, 2017.

92.     Such non-disclosures took place despite the fact that patentability over the Toner Reference was concurrently at issue in Wilson Wolf's '933 Application.  In fact, Wilson Wolf's and Wilson's basis for establishing patentability over Toner Reference in their '933 Application hinged on a claim feature (ambient gas in contact with the gas permeable shelves) that was directly addressed in one of the Crespi declarations and Corning's Toner Motion regarding patentability of the related '044 Patent claims over the Toner reference.  The relevance and materiality of the information regarding Toner is supported by the PTAB's ruling that the '044 Patent claims are unpatentable over Toner, and by the Federal Circuit's affirmance of that decision.

93.     Wilson's entitlement to the benefit of the '347 Provisional was also at issue during prosecution of the '933 Application, just as it also was at issue in the Corning-Wilson Interference. The claims of the '933 Application were rejected for obviousness based on U.S. Patent Application Publication No. 2007/0026516 to Martin ("Martin '516 Publication"), and Wilson chose to remove that reference by filing a Rule 131 declaration

based on a portion of a grant application which, as noted by Wilson's accompanying remarks in his December 8, 2016 Amendment, formed the '347 Provisional. In these remarks, Wilson pointed out that (by virtue of the grant application portions it contained) the '347 Provisional was a constructive reduction to practice of the claimed invention in the '933 Application. This enabled Wilson to antedate the Martin '516 Publication.

94. Corning, however, had filed the Priority Motion in the Corning-Wilson Interference challenging Wilson's contention to the Examiner of the '933 Application that the '347 Provisional contained the supporting disclosure that Wilson claimed was present in his Rule 131 declaration. Instead of providing this Interference information to the Examiner for the '933 Application, Wilson Wolf, Wilson, and their attorneys chose to let the Examiner decide patentability based solely on what Wilson Wolf, Wilson, and their attorneys chose to submit, without considering the countervailing arguments and sworn testimony from the Corning-Wilson Interference.

95. But for Wilson Wolf's, Wilson's, and their attorneys' failure to disclose relevant and material information regarding the Corning-Wilson Interference, the Examiner would not have permitted the '317 Patent to issue. Among other things, the materiality of this information is demonstrated by the PTO's decision to reject claims that Corning presented in its U.S. Patent Application Serial No. 15/671,485 to Martin et al. (the "Corning Application"), which were not patentably distinct from those of Wilson Wolf's '933 Application. In fact, Corning submitted these claims in its own patent application in an attempt to provoke an Interference with the '317 Patent, just as Corning had done with regard to Wilson Wolf's '044 Patent. Apprised of the entire record, the Examiner of the

Corning Application *rejected* claims substantially identical to the claims that the Examiner of Wilson's '933 Application allowed to issue as the '317 Patent because Wilson Wolf and Wilson *withheld* the same information.

96.     Wilson Wolf's, Wilson's, and their attorneys' deceptive intent in failing to disclose material information to the Examiner is further demonstrated by Wilson Wolf's, Wilson's, and their attorneys' conduct in prosecuting U.S. Patent Application Serial No. 15/643,621 (the "'621 Application"), filed July 7, 2017, which is a continuation of the '933 Application.  In that application, patentability over Toner and U.S. Patent Publication No. 2018/0355300 ("Martin '300 Publication") (of which the application corresponding to the Martin '516 Publication is an ancestor through a series of divisionals and continuations) has been raised as issues by the Examiner.  Winthrop & Weinstine, including Brett Klein, represented Wilson Wolf and Wilson with respect to the filing of the '621 Application.  Subsequently, a Power of Attorney change was submitted in the '621 Application appointing Devan Padmanabhan's current firm, referred to as the "Padda Law Group" (also known as Padmanabhan & Dawson, PLLC) of 45 South 7th Street, Suite 2315 in Minneapolis, MN, as Wilson Wolf's and Wilson's attorneys.  However, Wilson Wolf, Wilson, and their attorneys still have not filed an information disclosure statement providing the PTO with the motion papers submitted in the Corning-Wilson Interference, nor the decisions of the PTAB and Federal Circuit invalidating the '044 Patent.  Further, Wilson has again submitted his Rule 131 declaration to antedate the rejection based on the Martin '300 Publication.  The '621 Application remains pending, even though the claims currently stand rejected by the PTO.

97.     The single most reasonable inference for the omissions and failures to disclose described herein is that Defendants and their attorneys, including Brett Klein and Devan Padmanabhan, intended to deceive the PTO and the public into allowing the '317 Patent.

**COUNT ONE:**
**DECLARATION OF NON-INFRINGEMENT**
**OF THE '192 PATENT BY SAREPTA, BRAMMER BIO, NCH, AND TRI**

98.     Corning incorporates by reference and realleges paragraphs 1 through 97 above, as if fully set forth herein.

99.     Corning, through the manufacture, use, and/or sale of Corning's HYPERStack® cell culture device or any other Corning device or apparatus, has not infringed and does not infringe, induce infringement, or contribute to the infringement of any enforceable claim of the '192 Patent, either literally or under the doctrine of equivalents.

100.    The Corning HYPERStack® cell culture device, as used by Sarepta, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '192 Patent, either literally or under the doctrine of equivalents.

101.    The Corning HYPERStack® cell culture device, as used by Brammer Bio, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '192 Patent, either literally or under the doctrine of equivalents.

102.    The Corning HYPERStack® cell culture device, as used by NCH, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '192 Patent, either literally or under the doctrine of equivalents.

103.    The Corning HYPERStack® cell culture device, as used by TRI, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '192 Patent, either literally or under the doctrine of equivalents.

104.    For example, each claim of the '192 Patent requires that the device is "not compartmentalized by a semi-permeable membrane." *See* claims 1, 8, 18, and 25 of the '192 Patent.  Corning's HYPERStack® cell culture device does not meet at least this limitation as recited in the claims and described in the specification of the '192 Patent.

105.    Further, each claim of the '192 Patent requires that the "uppermost location" of the medium is "elevated beyond 2.0 cm" or "more than 2.0 cm above" the "lowermost location" of the medium. *See* claims 1, 8, 18, and 25 of the '192 Patent.  Corning's device does not meet at least these claim limitations as recited in the claims and described in the specification of the '192 Patent.

106.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

107.    A judicial declaration of non-infringement, either literally or under the doctrine of equivalents, is necessary and appropriate so that Corning and its customers and end-users may ascertain their rights regarding the '192 Patent.

## COUNT TWO:
## DECLARATION OF UNENFORCEABILITY OF THE '192 PATENT

108.    Corning incorporates by reference and realleges paragraphs 1 through 107 above, as if fully set forth herein.

109.    Wilson Wolf's '192 Patent is unenforceable by reason of inequitable conduct by Defendants and their attorneys, including Burgess and Dickson, during its prosecution.

110.    For example, as alleged with particularity above, the '651 Provisional from which the '192 Patent ultimately derives included purported test data that did not support the scope of Wilson's claims, without which the '192 Patent would not have issued, and from which Defendants excluded data that did not show as favorable results (and/or showed detrimental or contrary results).  Defendants and their attorneys submitted that misleading data and excluded the contrary data with intent to deceive the PTO.

111.    In addition, as detailed with particularity above, Defendants and their attorneys submitted materially false and misleading declarations in the prosecution of the related '762 Application.  On information and belief, the patent Examiner relied on those declarations in issuing the '192 Patent, and but for those declarations, the '192 Patent would not have issued.

112.    A judicial declaration of unenforceability is necessary and appropriate so that Corning and its customers and end-users may ascertain their rights regarding the '192 Patent.

## COUNT THREE:
## DECLARATION OF INVALIDITY OF THE '192 PATENT

113.    Corning incorporates by reference and realleges paragraphs 1 through 112 above, as if fully set forth herein.

114.    In the alternative, the claims of Wilson Wolf's '192 Patent are invalid for failure to satisfy one or more of the requirements of patentability specified by Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, and 112.

115.    For example, to the extent the use of Corning's HYPERStack® cell culture device is found to infringe one or more claims of the '192 Patent, then the '192 Patent is invalid as anticipated and/or obvious at least in light of: U.S. Patent No. 6,759,245; U.S. Patent No. 6,455,310; U.S. Patent No. 5,714,384; and/or Barbera-Guillem E., "Overcoming cell culture barriers to meet the demands of cell biology and biotechnology," *American Biotechnology Laboratory* (May 2001).

116.    In addition, at least the following limitations in the claims of the '192 Patent lack written description support, enablement, and/or are indefinite: "semi-permeable membrane" and "non porous gas permeable material."

117.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

118.    Corning is entitled to a judicial declaration that the claims of the '192 Patent are invalid.

**COUNT FOUR:**
**DECLARATION OF NON-INFRINGEMENT**
**OF THE '443 PATENT BY SAREPTA, BRAMMER BIO, NCH, AND TRI**

119.    Corning incorporates by reference and realleges paragraphs 1 through 118 above, as if fully set forth herein.

120.    Corning, through the manufacture, use, and/or sale of Corning's HYPERStack® cell culture device or any other Corning device or apparatus, has not infringed and does not infringe, induce infringement, or contribute to the infringement of any enforceable claim of the '443 Patent, either literally or under the doctrine of equivalents.

121.    The Corning HYPERStack® cell culture device, as used by Sarepta, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '443 Patent, either literally or under the doctrine of equivalents.

122.    The Corning HYPERStack® cell culture device, as used by Brammer Bio, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '443 Patent, either literally or under the doctrine of equivalents.

123.    The Corning HYPERStack® cell culture device, as used by NCH, does not infringe and has not infringed, induced infringement, or contributed to the infringement of

any enforceable claim of the '443 Patent, either literally or under the doctrine of equivalents.

124.    The Corning HYPERStack® cell culture device, as used by TRI, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '443 Patent, either literally or under the doctrine of equivalents.

125.    For example, each of the claims of the '443 Patent require a device that comprises at least two "scaffolds."  *See* claims 1 and 26 of the '443 Patent.  Corning's device does not meet at least this claim limitation as recited in the claims and described in the specification of the '443 Patent.

126.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

127.    A judicial declaration of non-infringement, either literally or under the doctrine of equivalents, is necessary and appropriate so that Corning and its customers and end-users may ascertain their rights regarding the '443 Patent.

## COUNT FIVE:
## DECLARATION OF UNENFORCEABILITY OF THE '443 PATENT

128.    Corning incorporates by reference and realleges paragraphs 1 through 127 above, as if fully set forth herein.

129.    Wilson Wolf's '443 Patent is unenforceable by reason of inequitable conduct by Defendants and their attorneys, including Burgess and Dickson, during its prosecution.

130.    For example, as detailed with particularity above, the '651 Provisional from which the '443 Patent ultimately derives included purported test data that did not support the scope of Wilson's claims, without which the '443 Patent would not have issued, and from which Defendants excluded data that did not show as favorable results (and/or showed detrimental or contrary results).  Defendants and their attorneys submitted that misleading data and excluded the contrary data with intent to deceive the PTO.

131.    In addition, as detailed with particularity above, Defendants and their attorneys submitted materially false and misleading declarations in the prosecution of the related '762 Application.  On information and belief, the patent Examiner relied on those declarations in issuing the '443 Patent, and but for those declarations, the '443 Patent would not have issued.

132.    A judicial declaration of unenforceability is necessary and appropriate so that Corning and its customers and end-users may ascertain their rights regarding the '443 Patent.

### COUNT SIX:
### DECLARATION OF INVALIDITY OF THE '443 PATENT

133.    Corning incorporates by reference and realleges paragraphs 1 through 132 above, as if fully set forth herein.

134.    In the alternative, the claims of Wilson Wolf's '443 Patent are invalid for failure to satisfy one or more of the requirements of patentability specified by Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, and 112.

135.   For example, to the extent the use of Corning's HYPERStack® cell culture device is found to infringe one or more claims of the '443 Patent, then the '443 Patent is invalid as anticipated and/or obvious at least in light of: U.S. Patent No. 6,759,245; U.S. Patent No. 6,455,310; U.S. Patent No. 5,714,384; and/or Barbera-Guillem E., "Overcoming cell culture barriers to meet the demands of cell biology and biotechnology," *American Biotechnology Laboratory* (May 2001).

136.   In addition, at least the following limitations in the claims of the '443 Patent lack written description support, enablement, and/or are indefinite, especially as Wilson Wolf appears to read them: "scaffolds" and "said ambient gas making contact with said gas permeable material."

137.   As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

138.   Corning is entitled to a judicial declaration that the claims of the '443 Patent are invalid.

### COUNT SEVEN:
### DECLARATION OF NON-INFRINGEMENT
### OF THE '317 PATENT BY BRAMMER BIO, NCH, and TRI

139.   Corning incorporates by reference and realleges paragraphs 1 through 138 above, as if fully set forth herein.

140.   Corning, through the manufacture, use, and/or sale of Corning's HYPERStack® cell culture device or any other Corning device or apparatus, has not infringed and does not infringe, induce infringement, or contribute to the infringement of

any enforceable claim of the '317 Patent, either literally or under the doctrine of equivalents.

141.    The Corning HYPERStack® cell culture device, as used by Brammer Bio, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '317 Patent, either literally or under the doctrine of equivalents.

142.    The Corning HYPERStack® cell culture device, as used by NCH, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '317 Patent, either literally or under the doctrine of equivalents.

143.    The Corning HYPERStack® cell culture device, as used by TRI, does not infringe and has not infringed, induced infringement, or contributed to the infringement of any enforceable claim of the '317 Patent, either literally or under the doctrine of equivalents.

144.    For example, each of claims 1-5 of the '317 Patent requires an apparatus comprising "only one compartment."  *See* claim 1 of the '317 Patent.  However, Corning's device does not meet at least the limitation requiring "only one compartment," as recited in claims 1-5 and described in the specification of the '317 Patent.

145.    In addition, each of claims 6-9 of the '317 Patent requires a "housing" and a "housing defining a plurality of gas permeable shelves."  *See* claim 6 of the '317 Patent. However, Corning's device does not meet at least the limitations requiring a "housing" or

a "housing defining a plurality of gas permeable shelves," as recited in claims 6-9 and described in the specification of the '317 Patent.

146.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

147.    A judicial declaration of non-infringement, either literally or under the doctrine of equivalents, is necessary and appropriate so that Corning and its customers and end-users may ascertain their rights regarding the '443 Patent.

**COUNT EIGHT:**
**DECLARATION OF UNENFORCEABILITY OF THE '317 PATENT**

148.    Corning incorporates by reference and realleges paragraphs 1 through 147 above, as if fully set forth herein.

149.    Wilson Wolf's '317 Patent is unenforceable by reason of inequitable conduct by Defendants and their attorneys, including Brett Klein and Devan Padmanabhan, during its prosecution.

150.    For example, as detailed with particularity above, when prosecuting the '933 Application from which the '317 Patent ultimately issued, Defendants along with their attorneys, including Brett Klein and Devan Padmanabhan, failed to disclose to the Examiner the existence of contemporaneous Interference proceedings that resulted in the invalidation of the related '044 Patent over the Toner reference.  Defendants and their attorneys failed to disclose that information with intent to deceive the Patent Office, despite actual knowledge that patentability over Toner was directly at issue in the prosecution of

the '933 Application.  The '317 Patent would not have issued but for Defendants' failure to disclose.

151.    A judicial declaration of unenforceability is necessary and appropriate so that Corning and its customers and end-users may ascertain their rights regarding the '317 Patent.

**COUNT NINE:**
**DECLARATION OF INVALIDITY OF THE '317 PATENT**

152.    Corning incorporates by reference and realleges paragraphs 1 through 151 above, as if fully set forth herein.

153.    In the alternative, the claims of Wilson Wolf's '317 Patent are invalid for failure to satisfy one or more of the requirements of patentability specified by Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, and 112.

154.    For example, to the extent the use of Corning's HYPERStack® cell culture device is found to infringe one or more claims of the '317 Patent, then the '317 Patent is invalid as anticipated and/or obvious at least in light of: U.S. Patent No. 6,759,245; U.S. Patent Publication No. 2002/0110905; U.S. Patent Publication No. 2007/0026516; U.S. Patent Publication No. 2005/0106717; U.S. Patent No. 6,455,310; and/or WO 01/92642.

155.    In addition, to the extent the use of Corning's HYPERStack® cell culture device is found to infringe one or more claims of the '317 Patent, claims of the '317 Patent are invalid under 35 U.S.C. §§ 102(f) and/or 102(g) (as they existed prior to the America Invents Act) because the listed inventors of the '317 patent did not invent the subject matter of those claims, and before such alleged invention was made by Wilson and others, it was

made in this country by another inventor, including but not limited to Gregory Martin and

Allison Tanner of Corning, who have not abandoned, suppressed, or concealed it.

156.    In addition, at least the following limitations in claims 1-5 of the '317 Patent

lack written description support, enablement, and/or are indefinite: "only one

compartment"; "opposing surface"; "a manifold that connects each culture space"; "the

outside surface"; and "with projections."

157.    Similarly, at least the following limitations in claims 6-9 of the '317 Patent

lack written description support, enablement, and/or are indefinite: "the housing defining

a plurality of gas permeable shelves, each having an inside surface and an outside surface";

"opposing surface located a distance away"; "and defining a culture space"; "a manifold

that connects the culture spaces"; and "projections."

158.    As a result of the allegations described in the preceding paragraphs, there

exists a controversy of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment.

159.    Corning is entitled to a judicial declaration that the claims of the '317 Patent

are invalid.

**COUNT TEN:**
**DECLARATION OF APPLICATION OF**
**SAFE HARBOR UNDER 35 U.S.C. § 271(E)(1)**

160.    Corning incorporates by reference and realleges paragraphs 1 through 159

above, as if fully set forth herein.

161.    The accused conduct of Brammer Bio as to which Defendants allege

infringement of the Patents-in-Suit consists solely of uses reasonably related to the

development and submission of information to the Food and Drug Administration or other laws regulating the manufacture, use, or sale of drugs or veterinary biological products. The accused conduct of Brammer Bio is therefore not an act of infringement under the safe harbor provided by 35 U.S.C. § 271(e)(1).

162.    The accused conduct of Sarepta as to which Defendants allege infringement of the '192 and '443 Patents consists solely of uses reasonably related to the development and submission of information to the Food and Drug Administration or other laws regulating the manufacture, use, or sale of drugs or veterinary biological products.  The accused conduct of Sarepta is therefore not an act of infringement under the safe harbor provided by 35 U.S.C. § 271(e)(1).

163.    The accused conduct of NCH as to which Defendants allege infringement of the Patents-in-Suit consists solely of uses reasonably related to the development and submission of information to the Food and Drug Administration or other laws regulating the manufacture, use, or sale of drugs or veterinary biological products.  The accused conduct of NCH is therefore not an act of infringement under the safe harbor provided by 35 U.S.C. § 271(e)(1).

164.    The accused conduct of TRI as to which Defendants allege infringement of the Patents-in-Suit consists solely of uses reasonably related to the development and submission of information to the Food and Drug Administration or other laws regulating the manufacture, use, or sale of drugs or veterinary biological products.  The accused conduct of TRI is therefore not an act of infringement under the safe harbor provided by 35 U.S.C. § 271(e)(1).

165.    On information and belief, Defendants knew or should have known that the HYPERStack Users' accused conduct fell within the § 271(e)(1) safe harbor and elected to proceed with the allegations without regard to their lack of merit.

166.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

167.    Corning is entitled to a judicial declaration that the allegedly infringing conduct of each HYPERStack User consists of non-infringing acts under § 271(e)(1).

### COUNT ELEVEN:
### DECLARATION OF CLAIM PRECLUSION

168.    Corning incorporates by reference and realleges paragraphs 1 through 167 above, as if fully set forth herein.

169.    The doctrine of claim preclusion bars a party from bringing a claim when a court of competent jurisdiction has rendered final judgment on the merits of the claim in a previous action on the same claims.  Any claims or defenses that were raised or could have been raised in that action are extinguished.  *See Hallco Mfg. Co. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001).  These extinguished claims include all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.  *Acumed LLC v. Stryker Corp.*, 525 F.3d 1319, 1324 (Fed. Cir. 2008).

170.    In the Minnesota Litigation, Wilson Wolf and Wilson sued Corning for infringement of the '426 and '427 Patents.  On March 17, 2015, the district court dismissed

Wilson Wolf's and Wilson's infringement claims with prejudice, because the district court determined that "Plaintiffs' claims cannot succeed under the governing law."  Minnesota Litigation Doc. 299, at 5.   Because the claims were dismissed with prejudice, their resolution was a final determination on the merits.

171.   Although the '443 Patent and '192 Patent were not asserted in the Minnesota Litigation, they derive from the same '651 Provisional Application as the '426 and '427 Patents, share the same specification, and include claims that, under Defendants' apparent claim construction in the suits against the HYPERStack Users, are patentably indistinct from those of the '426 Patent and '427 Patent.   Defendants' allegations of infringement against Corning's HYPERStack® customers and end-users are therefore based on the same transactional facts as their dismissed claims against Corning.   *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018).   Accordingly, all such allegations relating to conduct on or before March 17, 2015 are barred by the doctrine of claim preclusion.

172.   Although the '317 Patent was not asserted in the Minnesota Litigation, it derives from the same '347 Provisional Application as the '044 Patent (claims of which have now been invalidated), and also includes claims that, under Defendants' apparent claim construction in the suits against the HYPERStack Users, are patentably indistinct from those of the '426 Patent and '427 Patent.   Defendants' allegations of infringement against Corning's HYPERStack® customers and end-users are therefore based on the same transactional facts as their dismissed claims against Corning.   *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018).   Accordingly, all such allegations relating to conduct on or before March 17, 2015 are barred by the doctrine of claim preclusion.

173.   As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Defendants' claims against the HYPERStack Users are barred by claim preclusion.

## COUNT TWELVE:
## DECLARATION OF PRECLUSION UNDER THE KESSLER DOCTRINE

174.   Corning incorporates by reference and realleges paragraphs 1 through 173 above, as if fully set forth herein.

175.   The Kessler doctrine "bars a patent infringement action against a customer of a seller who has previously prevailed against the patentee because of invalidity or noninfringement of the patent." *SpeedTrack, Inc. v. Office Depot, Inc.*, 791 F.3d 1317, 1322 (Fed. Cir. 2015) (citing *MGA Inc. v. Gen. Motors Corp.*, 827 F.2d 729, 734 (Fed. Cir. 1987)).

176.   In the Minnesota Litigation, Corning obtained dismissal with prejudice of Defendants' claims that the HYPERStack® product infringed the '426 and '427 Patents. Under the Kessler doctrine, HYPERStack® now carries a "limited trade license" for use in commerce by Corning and its customers and end-users, free and clear of additional claims of infringement based on the '426 and '427 Patents and any Wilson Wolf patents that are "patentably indistinct" from them.  Although the '443 Patent and '192 Patent were not asserted in the Minnesota Litigation, they derive from the same '651 Provisional Application as the '426 and '427 Patents, share the same specification, and, under Defendants' apparent claim construction in the suits against the HYPERStack Users,

include claims that are patentably indistinct from those of the '426 Patent and '427 Patent. And although the '317 Patent was not asserted in the Minnesota Litigation, it derives from the same '347 Provisional Application as the '044 Patent (claims of which have now been invalidated), and also includes claims that, under Defendants' apparent claim construction in the suits against the HYPERStack Users, are patentably indistinct from those of the '426 Patent and '427 Patent.  Defendants' allegations of infringement against Corning's HYPERStack® customers and end-users are therefore based on the same transactional facts as their dismissed claims against Corning.  *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018).  Accordingly, all such allegations relating to conduct after the date that Wilson Wolf's infringement claims were dismissed with prejudice (March 17, 2015) are barred by the Kessler doctrine.

177.    As a result of the allegations described in the preceding paragraphs, there exists a controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Defendants' claims against the HYPERStack Users are barred by the Kessler doctrine.

## COUNT THIRTEEN:
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

178.    Corning incorporates by reference and realleges paragraphs 1 through 177 above, as if fully set forth herein.

179.    The above-described lawsuits filed against Corning's HYPERStack customers and end-users constitute sham litigation, in that they are objectively baseless and

were filed without regard to their substantive merits, with the specific intention of disrupting Corning's relationships with its customers and end-users and with the intent of wrongfully extorting money from Corning.  On information and belief, Defendant John Wilson owns and controls Wilson Wolf.  He is the principal inventor on the Patents-in-Suit and principally responsible for the inequitable conduct that resulted in the issuance of the patents-in-suit.  He personally stands to benefit financially and professionally if he succeeds in shutting down Corning's HYPERStack® business with his sham litigation.  He personally directed and is legally responsible for the assertion of the aforesaid sham litigation against Corning's HYPERStack Users.

180.   Defendants' lawsuits are objectively baseless because Wilson Wolf filed them with knowledge that its patents were wrongfully procured via fraud on the PTO and so are unenforceable.  A reasonable litigant could not have expected success on the merits in an action alleging infringement of patents known to have been fraudulently procured.

181.   Defendants' lawsuits against Corning's HYPERStack Users are also objectively baseless because Defendants filed them with knowledge that if broadly construed, the asserted patents are invalid, and if properly construed, they are not infringed by the customers' and end-users' use of HYPERStack®.  A reasonable litigant could not have expected success on the merits in an infringement action in these circumstances.

182.   Defendants' lawsuits against Corning's HYPERStack® customers and end-users are also objectively baseless because Defendants filed them with knowledge that the Patents-in-Suit are, under Defendants' apparent claim construction in the suits against the HYPERStack® Users, patentably indistinct from the patents asserted and then dismissed

with prejudice in the Minnesota Litigation, such that under the Kessler doctrine, the HYPERStack® has the status of a noninfringing device.  A reasonable litigant could not have expected success on the merits in an infringement action in these circumstances.

183.   Defendants' lawsuits against Corning's HYPERStack® customers and end-users are also objectively baseless because Defendants filed them with knowledge that the customers' and end-users' use of HYPERStack® is non-infringing under the safe harbor for research in 35 U.S.C. § 271(e)(1).  A reasonable litigant could not have expected success on the merits in an infringement action in these circumstances.

184.   Defendants filed the objectively baseless customer and end-user lawsuits in bad faith, with the specific intention of interfering directly with Corning's relationships with its HYPERStack® customers and end-users.

185.   Corning has existing business relationships with the defendants in the customer and end-user lawsuits, all of whom are direct or indirect purchasers and users of the HYPERStack® product, and, but for Defendants' baseless suits, would continue to increase their purchases of Corning's HYPERStack® products in the future.

186.   Defendants filed their lawsuits with knowledge of Corning's business relationships with its customers and users and the specific intention to cause those customers and users to discontinue their use of HYPERStack® and to discourage them and other customers from purchasing HYPERStack®.

187.   Corning has been and will continue to be harmed by Defendants' interference with Corning's business relationships.  Corning is contractually obligated to indemnify certain of its customer defendants, and has already incurred and will continue to incur

significant expenses in their defense.   In addition, the natural and intended result of Defendants' lawsuits against Corning's customers and end-users is harm to Corning's reputation as a provider of reliable cell culturing devices, to the detriment of its existing and prospective relationships with its customers and users, and to cause existing HYPERStack® users to reduce their future use of Corning's HYPERStack® product and inhibit prospective users from utilizing HYPERStack®, all resulting in damages to Corning.

188.   But for Defendants' tortious interference, Corning would not have suffered any of these harms.

## PRAYER FOR RELIEF

For the reasons given, Corning respectfully requests judgment in its favor and against Defendants as follows:

A.   A declaration that Corning's HYPERStack® product, as used by Sarepta, Brammer Bio, NCH, and TRI, has not infringed and does not infringe, either directly, indirectly, or by equivalents, any valid and enforceable claim of the '192 Patent, the '443 Patent, or the '317 Patent;

B.   A declaration that the '192 Patent, the '443 Patent, and the '317 Patent, and any related patents and applications, are unenforceable by reason of fraud on the PTO and inequitable conduct;

C.   A declaration that the '192 Patent, the '443 Patent, and the '317 Patent are invalid for failure to satisfy one or more of the requirements of patentability specified by Title 35 of the United States Code, including but not limited to §§ 101, 102, 103, and 112;

D.     A judgment that Defendants' conduct with respect to the '192 Patent, the '443 Patent, and the '317 Patent constituted tortious interference with Corning's prospective business advantage; and that Corning is entitled to compensatory and punitive damages.

E.     An injunction against Defendants, and all persons acting on their behalf or in concert with them, restraining them from further prosecuting or instituting any action alleging that the Corning HYPERStack® product, or others' use thereof, infringes any of the '192, '443, or '317 Patents;

F.     A declaration that this case is exceptional, and that Corning is entitled to an award of reasonable attorneys' fees pursuant to 35 U.S.C. § 285; and

G.     Any such other relief as the Court may deem just and fair.

## DEMAND FOR JURY TRIAL

H.     Corning demands a jury trial on all matter so triable.

Respectfully submitted,

Dated:  March 9, 2020          _/s/ Annamarie Daley_____
                               Annamarie Daley MN (No. 158112)
                               JONES DAY
                               90 South Seventh Street
                               Suite 4950
                               Minneapolis, MN 55402:
                               Telephone: (612) 217-8844
                               Fax: (844)-345-3178
                               adaley@jonesday.com