# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Corning Incorporated,                                    Civil No. 20-700 (DWF/TNL)

            Plaintiff,

v.

                                     **MEMORANDUM OPINION**

Wilson Wolf Manufacturing Corporation             **AND ORDER**
and John R. Wilson,

            Defendants.

---

Kimball R. Anderson, Esq., Linda T. Coberly, Esq., Ivan Poullaos, Esq., Paula W. Hinton, Esq., and Robine K. M. Grant, Esq., Winston & Strawn LLP; Paul B. Hunt, Esq. and Jeff M. Barron, Esq., Barnes & Thornburg, LLP; and Annamarie Daley, Esq., Jones Day, counsel for Plaintiff.

Britta S. Loftus, Devan V. Padmanabhan, Esq., Michelle E. Dawson, Esq., Sri K. Sankaran, Esq., and Paul J. Robbennolt, Esq., Padmanabhan & Dawson, PLLC, counsel for Defendants.

---

# INTRODUCTION

Plaintiff Corning Inc. ("Corning" or "Plaintiff") filed a complaint seeking declaratory judgments of patent non-infringement, invalidity, and unenforceability of U.S. Patent Nos. 9,441,192 (the "'192 Patent"), 8,697,443 (the "'443 Patent"), and 9,732,317 (the "'317 Patent") (collectively, the "Patents-in-Suit"). (Doc. No. 1 ("Compl.").) This matter is before the Court on a Motion to Dismiss and to Stay Defendants' Deadline for Answering the Complaint brought by Defendants Wilson Wolf Manufacturing Corp. ("Wilson Wolf") and John R. Wilson ("Wilson") (collectively,

"Defendants").  (Doc. No. 20.)  Plaintiff opposes Defendants' motion.  (Doc. No. 27 ("Pl. Opp.").)  For the reasons set forth below, the Court grants in part and denies in part Defendants' motion to dismiss.

## BACKGROUND

Much of the factual background for the above-entitled matter is clearly and precisely set forth in the Court's March 22, 2016 Memorandum Order in the case captioned *Wilson et al. v. Corning Inc.*, Case No. 13-cv-210 (D. Minn. filed Jan. 25, 2013) (the "Minnesota Litigation").  (*See* Minnesota Litigation, Doc. No. 388.)  The allegations relevant to this order are discussed below and supplemented as necessary.

Wilson is the CEO of Wilson Wolf.  (Compl. ¶ 7.)  Wilson Wolf is a biotechnology firm that develops and manufactures cell-culture devices.  Corning is one of the world's leading innovators in materials science.  (*Id.* ¶ 9.)  Corning manufactures and sells cell culturing vessels.  (*Id.*)  One of Corning's cell culturing vessels is marketed as the HYPERStack.  (*Id.* ¶ 10.)  The HYPERStack uses gas-permeable film technology that allows the HYPERStack vessel to be the most efficient, scalable cell culture vessel for adherent cell culture available today.  (*Id.*)

## I.   The Minnesota Litigation

In 2013, Wilson Wolf and Wilson sued Corning in the Minnesota Litigation, alleging that Corning obtained Wilson Wolf's cell-culture technology under a confidentiality agreement and that Corning subsequently developed products using Wilson Wolf's technology.  (*Id.* ¶ 11; *see also*, *id.*, Ex. D.)  Among other claims, Wilson Wolf and Wilson alleged that the use, offer, and sale of Corning's HYPERStack product

2

directly and indirectly infringed U.S. Patent Nos. 8,158,426 (the "'426 Patent") and

8,158,427 (the "'427 Patent").)  (*Id*.)  On March 17, 2015, this Court dismissed the

claims for patent infringement of the '426 and '427 Patents with prejudice.  (*Id*.;

Minnesota Litigation, Doc. No. 299 at 5.)  Five claims remain in the Minnesota

Litigation, including claims for correction of inventorship, breach of contract, and

misappropriation of trade secrets.  (*Id*. ¶ 12.)

On December 26, 2017, the U.S. Patent and Trial Appeal Board ("PTAB")[1] issued

a decision and judgment in an interference proceeding (the "Corning-Wilson

Interference") invalidating all challenged claims of Wilson's U.S. Patent No. 8,809,044

(the "'044 Patent").  (*Id*. ¶ 13.)  Corning subsequently moved for summary judgment in

the Minnesota Litigation on the ground that the PTAB judgment precluded re-litigation of

the same issues in the Minnesota Litigation.  (*Id*.; *see also* Minnesota Litigation, Doc.

No. 580.)  On June 17, 2020, this Court denied Corning's motion.  (Minnesota Litigation,

Doc. No. 610.)

## II.    The Patents-in-Suit

Wilson Wolf is the purported owner of the Patents-in-Suit.  (Compl. ¶ 30; *see also*

*id*., Ex. A ("'192 Patent"), Ex. B ("'443 Patent"), Ex. C ("'317 Patent").)  Corning alleges

that the Patents-in-Suit are "related either by family or subject matter to the patents that

were asserted by Wilson Wolf and Wilson in the Minnesota Litigation."  (*Id*. ¶ 31.)

---

[1]      The PTAB is an administrative law branch of the U.S. Patent and Trademark
Office ("USPTO").

Corning also alleges that the Patents-in-Suit are related to the now-invalidated '044 Patent. (*Id*.)

### A.    The '192 and '443 Patents

The '192 Patent, entitled "Cell culture methods and devices utilizing gas permeable materials," was filed on July 27, 2015 and issued on September 13, 2016. ('192 Patent.) The '443 Patent, also entitled "Cell culture methods and devices utilizing gas permeable materials," was filed on April 2, 2010 and issued on April 15, 2014. ('443 Patent.) The '192 and '443 Patents both claim priority to U.S. Provisional Application No. 60/509,651 (the "'651 Provisional") and are both divisions of Application No. 10/961,814 (the "'814 Application").[2] (*See* '192 Patent; '443 Patent.) Corning alleges that the '192 and '443 Patents "generally concern and claim cell culture devices with a significantly greater medium height than was allegedly known in the prior art," (*id*. ¶ 37), and "share the same specification with, and concern the same alleged inventions as, Wilson Wolf's '426 and '427 Patents," (*id*. ¶ 32.) Corning further alleges that "[u]nder Wilson Wolf's apparent claim construction in the suits against the HYPERStack Users," the claims of the '192 and '443 Patents are "patentably indistinct" from the claims of the '426 and '427 Patents." (*Id*. ¶ 32.) Corning alleges that the European counterpart to the

---

[2]    Neither the '651 Provisional nor the '814 Application were attached to the Complaint as exhibits. Because the '651 Provisional and '814 Application are referenced and embraced by the Complaint, the Court considers these publicly available documents in its analysis. *See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

'192 and '443 Patents, EP2336293B1, "currently stands rejected by the European Patent Office in light of an opposition filed by Corning." (*Id.* ¶ 38.)

Corning alleges that, starting with the '651 Provisional and continuing throughout the prosecution of the '814 Application and the applications for the '192 and '443 Patents, Wilson Wolf "repeatedly argued that the claims were patentable at least in part because they required greater medium height than allegedly found in the prior art." (*Id.* ¶ 39.)

### B.    The '317 Patent

The '317 Patent, entitled "Highly efficient gas permeable devices and methods for culturing cells," was filed on July 2, 2014 as U.S. Patent Application No. 14/321,933 (the "'933 Application") and issued on August 15, 2017. ('317 Patent; *see also* Compl. ¶ 72.) The '317 Patent is a continuation of the '044 Patent, which claims the benefit of U.S. Provisional Patent Application Serial No. 60/873,347 (the "'347 Provisional"). (*Id.*; *see also* Compl. ¶ 72.) Corning alleges that the '317 Patent "shares the same specification with Wilson Wolf's '044 Patent and concerns the same alleged invention." (*Id.* ¶ 33.) Corning further alleges that "[u]nder Wilson Wolf's apparent claim construction in the suits against the HYPERStack Users," the claims of the '317 Patent are "patentably indistinct" from the claims of the '426 and '427 Patents." (*Id.* ¶ 32.)

During the prosecution of the '933 Application, the Examiner issued a double patenting rejection finding that all pending claims of the '933 Application were not patentably distinct from the claims of the '044 Patent. (*Id.* ¶ 73.) Instead of challenging the double patenting rejection, Wilson Wolf and Wilson filed a terminal disclaimer. (*Id.*)

### III.    The Customer Suits

Corning alleges that, having suffered invalidation of the '044 Patent, Wilson Wolf and Wilson launched a retaliatory litigation against Corning's HYPERStack end-users and customers (the "Customer Suits").  (Compl. ¶ 14.)  In December 2019 and January 2020, Wilson Wolf filed lawsuits against Brammer Bio, LLC ("Brammer Bio"), Sarepta Therapeutics, Inc. ("Sarepta"), Nationwide Children's Hospital, Inc. ("NCH"), and The Research Institute at Nationwide Children's Hospital ("TRI") (collectively, the "HYPERStack Users").  (*Id*.)  Wilson Wolf alleges that the HYPERStack Users infringe some or all of the Patents-in-Suit.  (*Id*. ¶¶ 18-20.)

The HYPERStack Users utilize Corning's HYPERStack cell culture vessels in their businesses.  (*Id*. ¶¶ 15-17.)  Corning alleges, on information and belief, that the HYPERStack Users employs its HYPERStack vessels solely for uses reasonably related to the development and submission of information under federal laws regulating the manufacture, use, or sale of drugs or veterinary biological products, including to the Food and Drug Administration ("FDA").  (*Id*.)

Corning alleges that, when Wilson Wolf filed its lawsuits against the HYPERStack Users, Wilson Wolf knew, or should have known, that the Patents-in-Suit were unenforceable in light of Wilson Wolf's and Wilson's fraudulent conduct in obtaining the patents from the PTO.  (*Id*. ¶ 21.)  Corning also alleges that Wilson Wolf and Wilson knew, or should have known, that the claims in the '044 Patent, which allegedly underlie the Patents-in-Suit, had been invalidated by the PTAB.  (*Id*.)  Corning further alleges that Wilson Wolf and Wilson knew, or should have known, that patent

infringement lawsuits against the HYPERStack Users were barred by the *Kessler* doctrine and the safe harbor established by 35 U.S.C. § 271(e)(1).  (*Id*.)  Corning alleges that Wilson Wolf filed the lawsuits against the HYPERStack Users for the "improper and unjustified purposes of interfering with Corning's existing and prospective business relationships with its customers."  (*Id*. ¶ 22.)

## IV.   Corning's Allegations of Inequitable Conduct

Corning alleges four different categories of conduct that constitutes inequitable conduct by Wilson Wolf, Wilson, and/or their counsel.  These categories of conduct include:  (1)  Defendants misrepresented data in their patent examples relating to media height, (2) Defendants failed to disclose adverse data to the PTO, (3) Defendants submitted a biased expert declaration without informing the examiner of the bias, and (4) Defendants failed to disclose the '044 Patent interference and related documents to the examiner during the prosecution of the '317 Patent.

### A.   Misrepresentation of data

In the Complaint, Corning alleges that, in support of the alleged novelty of the claimed inventions, the '651 Provisional included test results "to assess the impact of medium height upon cell growth and antibody production."  (Compl. ¶ 42 (quoting '651 Provisional, specification at 27).)[3]  The test results and descriptions included in "Example 1" of the '651 Provisional, entitled "The Effect of Medium Height Upon Cell

---

[3]     The '651 Provisional was not attached to the Complaint as an exhibit but is publicly available on the USPTO's Public Patent Application Information Retrieval website.

Growth and Antibody Production," which Corning alleges is repeated in "substantially the same form in the '814 Application and the '443 and '192 Patents." (*Id*. ¶ 43.) Data from the experiments allegedly performed that support the results of Example 1 are included in Table Nos. 1-3. (*Id*.) The test results in Example 1 "generally show that increasing the height and/or amount of media in a cell culture vessel improves cell culture performance and antibody production." (*Id*.) The '651 Provisional includes additional Examples that allegedly reflect test results demonstrating that the addition of more media than was allegedly used in the prior art, and submerging scaffolding in media of purportedly greater than usual height, provided unexpected advantages in cell culture. (*Id*. ¶ 44.) Corning alleges that these Examples and test results are "repeated in substantially the same form in the '814 Application and the '443 and '192 Patents." (*Id*.)

Corning alleges that Wilson Wolf and Wilson were aware that "increased medium height would provide no advantages to and in fact could negatively affect certain cell types." (*Id*. ¶ 46.) Corning further alleges that the "results achieved with the types of cells used by Defendants in their experiments in the '192 and '443 Patents were not surprising and did not produce 'unexpected' results." (*Id*.) Corning alleges that Wilson Wolf, Wilson, and their counsel, including Burgess and Dickson, knew that the Examples were material to the prosecution of the '192 and '443 Patents (*id*. ¶ 49) but did not "qualify their claims of unexpected results or advantages from increased media height to exclude adherent cells" (*id*. ¶ 50).

8

### B.      Failure to disclose adverse data

In the Complaint, Corning alleges that, "[o]n information and belief, Wilson and Wilson Wolf had, among other things, other data, including data that did not show as favorable results (and/or showed detrimental results)." (Compl. ¶ 45.) In particular, Corning alleges that Wilson and Wolf were aware, based on "information provided by Corning in 2004," that increased medium height would provide "no advantages to and in fact could negatively affect certain cell types." (*Id*. ¶ 46.) For example, Corning alleges that adherent cells, which are a type of cell particularly suitable for use in Corning's HYPERFlask and HYPERStack products, do not benefit from or may be negatively affected by increased media height. (*Id*.)

The Complaint did not include the referenced "information provided by Corning in 2004." Corning submitted "[t]he actual data and information" as exhibits to its opposition brief. (*See* Pl. Opp. at 13 n.4; *see also* Doc. No. 29 ("Poullaos Decl.") ¶¶ 7-8, Exs. 5-6.)

### C.      Submittal of a biased expert declaration

In the Complaint, Corning alleges that Wilson Wolf and Wilson prosecuted U.S. Application No. 13/029,762 (the "'762 Application") "prior to and/or in parallel to the application for the '443 and '192 Patents." (Compl. ¶ 54.) Corning alleges that the '762 Application "concerns the same subject matter as the '443 and '192 Patents and includes a priority claim to the '651 Provisional and '814 Application." (*Id*.) Corning further alleges that the '762 Application "includes a substantially identical specification

disclosure as the '443 and '192 Patents." (*Id*.)  The '762 Application was assigned to the same examiner as the '192 and '443 Patents.  (*Id*. ¶ 55.)

During the prosecution of the '762 Application, Corning alleges that the examiner did not believe that "alleged requirement for greater media height rendered the claims patentable over the prior art." (*Id*. ¶ 57.)  To overcome the examiner's objection, Corning alleges that Wilson and his attorneys offered to submit an expert declaration regarding the unexpected results from the use of increased medium heights.  (*Id*. ¶¶ 57-58.)  On July 11, 2011, Corning alleges that Wilson Wolf, through Wilson, Burgess, and Dickson, submitted a declaration under 37 C.F.R. § 1.132 from Dr. Juan Vera (the "Vera Declaration") in support of the patentability of the '762 Application.  (*Id*. ¶ 59.)  The Vera Declaration identified Dr. Vera as an "Assistant Professor at Baylor College of Medicine" and an "expert in cell culture for adoptive cell therapy." (*Id*.)  Corning alleges that the Vera Declaration suggests that Dr. Vera had an arm's length relationship with Defendants because it stated that Dr. Vera "contacted" Defendants seeking information and "was subsequently provided gas permeable cell cultures devices and a copy of [the '814 Application]." (*Id*.)  However, Corning alleges that Dr. Vera was "not an independent, disinterested, outside expert" but instead was "Wilson Wolf's paid consultant and Wilson's collaborator." (*Id*. ¶ 62.)  Corning alleges that Wilson Wolf and Wilson intentionally "failed to disclose to the PTO the material fact that they were paying Dr. Vera for his declaration and funding his work." (*Id*.)

The Vera Declaration describes the purportedly unexpected "superiority" and "remarkable improvement over other methods" of the gas permeable devices that used

increased medium heights.  (*Id.* ¶ 59.)  The Vera Declaration describes additional experiments that "outperform" prior art cell culture methods.  (*Id.*)  Corning alleges that neither Wilson nor Dr. Vera explained to the examiner that the results were not "unexpected" or that such "superiority" did not apply to adherent cells.  (*Id.* ¶¶ 59, 67.)

**D.    Failure to disclose the '044 Patent interference and related documents**

In the Complaint, Corning alleges that, while the '933 Application was being prosecuted, the related '044 Patent was challenged in the Corning-Wilson Interference. (Compl. ¶ 74.)  The Corning-Wilson Interference involved Corning's U.S. Patent Application No. 14/814,267 to Martin et al. (the "Martin Application").  (*Id.*)

The PTAB formally declared the Corning-Wilson Interference on October 31, 2016.  (*Id.* ¶ 75.)  At this time, the examiner assigned to the '933 Application had issued a Final Rejection of all pending claims in the '933 Application.  (*Id.*)  As part of the examiner's rejection of the '933 Application, the examiner relied on (1) U.S. Patent No. 6,759,245 to Toner ("Toner"), which was the prior art reference that PTAB ultimately relied on when it invalidated certain claims of the '044 Patent in the Corning-Wilson Interference and (2) a patent application that included a disclosure of the Martin Application.  (*Id.*)

Corning alleges that neither Wilson, Wilson Wolf, nor any of their attorneys, including Brett Klein and Devan V. Padmanabhan, disclosed the Corning-Wilson Interference or any of the materials filed in the Corning-Wilson Interference to the examiner of the '933 Application.  (*Id.* ¶ 78.)  Corning also alleges that, although the public prosecution history indicates that the examiner of the '933 Application conducted

interference searches, the examiner never located the Corning-Wilson Interference and Wilson Wolf and Wilson never advised the examiner of its existence or omission.  (*Id.* ¶ 79.)

While the '933 Application was still being prosecuted, Corning alleges that the following documents were submitted in the Corning-Wilson Interference but not submitted to the examiner of the '933 Application:  (1) a motion that claimed that the '044 Patent was unpatentable as anticipated by Toner (the "Toner Motion"), (2) a motion that the '044 Patent was not entitled to the priority of the '347 Provisional (the "Priority Motion"), and (3) a declaration by Dr. Charles Crespi in support of the Toner Motion and Priority Motion (the "Crespi Declaration").  (*Id.* ¶¶ 81, 84.)  Corning alleges that these documents were material to, and contradicted, the positions advanced by Wilson Wolf, Wilson, and their attorneys during the prosecution of the '933 Application but Wilson Wolf, Wilson, and their attorneys failed to disclose the documents.  (*Id.* ¶¶ 82-83, 85.)

On April 7, 2017, the examiner of the '933 Application issued a Notice of Allowance.  (*Id.* ¶ 86.)  The examiner conducted another interference search but did not identify the Corning-Wilson Interference.  (*Id.*)  Wilson Wolf, Wilson, and their attorneys did not notify the examiner of the Corning-Wilson Interference or any of its contents. (*Id.*)  After the examiner issued a Notice of Allowance, Corning alleges that the following documents and testimony were submitted in the Corning-Wilson Interference:  (1) a deposition of Dr. Crespi, (2) Wilson Wolf and Wilson's oppositions to the Toner Motion and Priority Motion, (3) a deposition of Wilson, and (4) Corning's reply briefs in support of the Toner Motion and Priority Motion.  (*Id.* ¶¶ 87-90.)  Corning alleges that, once

again, Wilson Wolf, Wilson, and their attorneys failed to disclose these documents or

their existence to the examiner.  (*Id*.)  Corning alleges that this information was relevant

and material because Toner and Wilson's entitlement to the benefit of the '347

Provisional were also at issue in the prosecution of the '933 Application.  (*Id*. ¶¶ 92-93.)

## DISCUSSION

### I.    Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in

the complaint to be true and construes all reasonable inference from those facts in the

light most favorable to the complainant.  *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir.

1986).  In doing so, however, a court need not accept as true wholly conclusory

allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir.

1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City

of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).  A court deciding a motion to dismiss

may consider the complaint, matters of public record, orders, materials embraced by the

complaint, and exhibits attached to the complaint.  *See Porous Media Corp. v. Pall Corp.*,

186 F.3 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a

claim to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

570 (2007).  Although a complaint need not contain "detailed factual allegations," it must

contain facts with enough specificity "to raise a right to relief above the speculative

level."  *Id*. at 555.  As the Supreme Court reiterated, "[t]hreadbare recitals of the elements

of a cause of action, supported by mere conclusory statements," will not pass muster

under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550 U.S. at 556.

Inequitable conduct claims are held to the higher pleading standard required for claims of fraud or mistake under Federal Rule of Civil Procedure 9(b). *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009). "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). A pleading that "simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)." *Exergen*, 575 F.3d at 1326-27. Thus, Rule 9(b) "requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Id*. at 1327.

## II.   Analysis

### A.   Inequitable conduct

In Counts II, V, and VII, Plaintiff asserts several claims for inequitable conduct against Defendants. As a threshold matter, the parties disagree as to whether the *Therasense* standard applies, requiring a plaintiff to prove in its pleadings that the alleged intent to deceive is the "single most reasonable inference." (*See* Doc. No. 22 ("Def. Memo") at 13; Pl. Opp. at 20-21.) Subsequent to its *Therasense* decision, the Federal Circuit held that a "charge of inequitable conduct based on a failure to disclose will survive a motion to dismiss only if the plaintiff's complaint recites facts from which the court may reasonably infer that a specific individual both knew of invalidating

14

information that was withheld from the PTO and withheld that information with a specific intent to deceive the PTO." *Delano Farms Co. v. California Table Grape Com'n*, 655 F.3d 1337, 1350 (Fed. Cir. 2011) (citing *Exergen*, 575 F.3d at 1318, 1330)). Accordingly, the Court concludes that the *Exergen* standard is the appropriate standard for determining whether Plaintiff adequately pled its claims for inequitable conduct. *See also Cutsforth, Inc. v. LEMM Liquidating Co., LLC*, Civ. No. 12-1200, 2013 WL 2455979, at *4 n.9 (D. Minn. June 6, 2013) (applying the *Exergen* standard, "without any modification for the *Therasense* requirements," to a motion to dismiss); *Toro Co. v. MTD Prods. Inc.*, Civ. No. 10-756, 2011 WL 13138105, at *2 (D. Minn. Dec. 5, 2011).

"[I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen*, 575 F.3d at 1327. To sufficiently plead the "who" of the material misrepresentation or omission, a pleading must identify the "specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it." *Id*. at 1329. To sufficiently plead the "what" and "where" of the material misrepresentation or omission, a pleading must "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found." *Id*. In addition, a pleading must "identify the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record."

Finally, a pleading must also allege facts sufficient to "give rise to a reasonable inference of scienter, including both (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id.* at 1330. Pleading deceptive intent solely on information and belief is "permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.*

As discussed above, Plaintiff's claims for inequitable conduct can be categorized into four separate theories. The Court will address each theory in turn.

### 1.    Misrepresentation of data

Regarding its claims for inequitable conduct due to Defendants' misrepresentation of data, Plaintiff alleges that the '651 Provisional, from which the '192 and '443 Patents ultimately derive, included test data that "did not support the scope of Wilson's claims." (Compl. ¶¶ 110, 130.) Plaintiff alleges that, without this test data, the '192 and '443 Patents would not have been issued. (*Id.*) Plaintiff further alleges that the "results achieved with the types of cells used by Defendants in their experiments in the '192 and '443 Patents were not surprising and did not produce 'unexpected results.'" (*Id.* ¶ 46.) Plaintiff alleges that Defendants and their attorneys submitted this misleading data "with intent to deceive the PTO." (*Id.* ¶¶ 110, 130.)

Defendants argue that Plaintiff's claim for inequitable conduct fails to satisfy the pleading standard for inequitable conduct because Corning merely alleges that the data "did not support the scope of the claims," not that the data was incorrect or falsified.

16

(Def. Memo. at 13.)  Defendants argue that Plaintiff's allegations do not identify any information that Wilson Wolf withheld or explain why the PTO could not have evaluated the data submitted in the specifications to determine if it supported the scope of the claims.  (*Id*. at 13-14.)  Defendants argue that Plaintiff's claim may be appropriate as an invalidity argument, but not as a claim for inequitable conduct.  (*Id*. at 14.)

Plaintiff responds that it alleges that Defendants and their attorneys engaged in "misrepresentations" when they claimed that their data demonstrated "unexpected results."  (Pl. Opp. at 11 (citing Compl. ¶¶ 46, 52.)  Plaintiff points to its allegations that the results of Defendants' experiments were not surprising and did not produce unexpected results—instead, the results were no different from what "conventional wisdom" would have taught at the time.  (*Id*. at 12 (citing Compl. ¶¶ 46, 49-52).)

Defendants counter that Plaintiff's allegation that the experiments were not surprising and did not produce unexpected results is "precisely the type of vague assertion that *Exergen* was designed to eliminate."  (Doc. No. 33 ("Reply") at 2.)  Defendants argue that the Court should reject Plaintiff's "bare assertions" and "bald allegations."  (*Id*.)

Assuming all well-pled facts in Plaintiff's Complaint to be true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to plead facts sufficient to state plausible claims for inequitable conduct based on the alleged misrepresentation of data.  *See Twombly*, 550 U.S. at 570.  In particular, the Court concludes that Plaintiff fails to plead facts sufficient to infer that Defendants had knowledge of the purported misrepresentations of data.  Here, the

purported misrepresentation is that the '192 and '443 Patents "included purported test data that did not support the scope of Wilson's claims"—specifically, the Examples 1, 3, 4, and 5. (Compl. ¶¶ 110, 130; *see also id*. ¶¶ 43-44.) Plaintiff, however, does not plead facts sufficient to infer that Defendants were aware that the referenced examples did not support the scope of the '192 and '443 Patents' claims. While Plaintiff does allege that "the results achieved with the types of cells used by Defendants in their experiments in the '192 and '443 Patents were not surprising and did not produce 'unexpected' results" (*id*. ¶ 46), Plaintiff's allegation does not support an inference that Defendants knew, or subjectively believed, that the results of the experiments were not surprising and did not produce unexpected results. *See Exergen Corp.*, 575 F.3d at 1328 ("[T]he registrant's knowledge of MUFFLER KING, standing alone, was not enough to infer that the registrant also subjectively believed that the mark was confusingly similar to SPEEDY MUFFLER KING."). At best, Plaintiff's allegation leads to the inference that *Plaintiff* believes that the results of the experiments were not surprising and did not produce unexpected results. Moreover, Plaintiff's allegations that Defendants and their attorney submitted misleading data "with intent to deceive the PTO" (Compl. ¶¶ 110, 130) are merely conclusory allegations. Such allegations do not satisfy the scienter requirements for pleading inequitable conduct.[4] *Id*. at 1327.

---

[4]     To the extent Plaintiff argues that Defendants' knowledge of the misrepresentation of data can be inferred from the information provided by Corning in 2004, the Court concludes that such allegations are also insufficient. The information allegedly provided by Corning in 2004 relates to Corning's own tests, not Defendants' experiments. (*See* Pl. Opp. at 13.) Plaintiff's separate theory of inequitable conduct based on the failure to disclose these tests is addressed below.

Accordingly, the Court grants, without prejudice, Defendants' motion to dismiss as to Plaintiff's claim for inequitable conduct based on the misrepresentation of data.

### 2.    Failure to disclose adverse data

Regarding its claims for inequitable conduct due to Defendants' failure to disclose adverse data provided by Corning, Plaintiff alleges that, during the prosecution of the '192 and '443 Patents, Defendants "excluded data that did not show [] favorable results (and/or showed detrimental or contrary results)."  (Compl. ¶¶ 110, 130; *see also id.* ¶ 45 ("On information and belief, Wilson and Wilson Wolf had, among other things, other data, including data that did not show as favorable results (and/or showed detrimental results).").)  Plaintiff alleges that Wilson Wolf and Wilson "were aware, including from information provided by Corning in 2004, that increased medium height would provide no advantages to and in fact could negatively affect certain cell types."  (*Id.* ¶ 46.) Plaintiff alleges that Defendants and their attorneys excluded this contrary data "with intent to deceive the PTO."  (*Id.* ¶¶ 110, 130.)

Defendants argue that Plaintiff fails to identify any alleged omitted data.  (Def. Memo. at 14.)  Defendants argue that Plaintiff's allegation based on information and belief is insufficient because Plaintiff does not allege the facts upon which its belief is based.  (*Id.*)  Defendants further argue that Plaintiff's reference to "information provided by Corning in 2004" is insufficient because Plaintiff does not allege the source of the information provided, to whom the information was allegedly provided, or the claims and claim limitations to which the information is relevant.  (*Id.* at 14-15.)  Finally, Defendants argue that Plaintiff fails to sufficiently allege that Wilson Wolf or its counsel had a

specific intent to deceive because Plaintiff alleges "several possible explanations" for Defendants' actions, which prohibits a finding that an intent to deceive was the "single most reasonable inference." (*Id*. at 15.)

Plaintiff responds that it specifically alleged that Corning supplied Wilson and Wilson Wolf with data in 2004 that showed that "***adherent cells*** . . . do ***not*** benefit or may be negatively affected by the arrangements and increased media height touted by Wilson Wolf and Wilson to the PTO." (Pl. Opp. at 13 (emphasis in original).) In a footnote, Plaintiff states that the "actual data and information has also been the subject of discovery by Wilson Wolf in the [Minnesota] Lawsuit." (*Id*. at 13 n.4.) Plaintiff also attached two exhibits to its declaration in support of its opposition: Exhibit 5, which Plaintiff describes as "results of testing data from July 2004," and Exhibit 6, which Plaintiff describes as "results of testing data from December 2004." (*Id*. (citing Poullaos Decl., Exs. 5-6).) Plaintiff argues that it is "axiomatic" that information contradicting the patentee's *ex parte* statements to the examiner is material. (*Id*. at 14 (citing *Apotex Inc. v. UCB, Inc.*, 763 F.3d 1354, 1361-62 (Fed. Cir. 2014); *Monsanto Co. v. Bayer Bioscience N.V.*, 514 F.3d 1229, 1240 (Fed. Cir. 2008).) Plaintiff argues that Defendants' alleged misconduct is worsened by the fact that Defendants are involved in Customer Suits involving products that use adherent cells—the type of cells Plaintiff alleges do not benefit from Defendants' invention. (*Id*.) Finally, Plaintiff argues that its allegations in paragraphs 49-52 sufficiently allege an intent to deceive. (*Id*. at 15.) Plaintiff argues that it alleges that Wilson, Wilson Wolf, and their counsel knew the omitted data and information were material to the prosecution, yet "did not provide this information to the

20

PTO."  (*Id.* (citing Compl. ¶¶ 49-51).)  Plaintiff further points to its allegation that "[t]he single most reasonable inference from the omissions and misrepresentations described herein is that Defendants and their attorneys, including Burgess and Dickson, intended to deceive the PTO and the public."  (*Id.* (citing Compl. ¶ 52).)

Defendants counter that Plaintiff's "vague allegations" that Wilson Wolf failed to disclose information provided by Corning on an unspecified date in 2004 is insufficient to state a claim for inequitable conduct.  (Reply at 3.)  Defendants argue that Plaintiff's belated attempt to provide the Court with two documents purportedly given to Wilson Wolf is also insufficient because the documents are not in the Complaint or embraced by the Complaint.  (*Id.*)  Defendants argue that, even if the Court considers the two documents, there was no obligation to disclose unsolicited, unverified, and unverifiable third-party data to the PTO.  (*Id.*)  Defendants argue that Plaintiff's allegations regarding intent to deceive are insufficient because Plaintiff's own pleadings allege two possible explanations for Wilson Wolf's failure to disclose Corning's purported test data:  (1) that Wilson Wolf knew that the information was material and deliberately withheld, and (2) that Wilson Wolf mistakenly did not submit the information because its attorneys failed to explain the obligation to submit such information.  (*Id.* at 4 (citing Compl. ¶¶ 48-49).)

Assuming all well-pled facts in Plaintiff's Complaint to be true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to plead facts sufficient to state plausible claims for inequitable

conduct based on the alleged failure to disclose adverse data.  *See Twombly*, 550 U.S. at 570.

First, the Court concludes that Plaintiff has failed to plead the circumstances of the purported failure to disclose "other data" with sufficient particularity.  Plaintiff alleges, on information and belief, that "Wilson and Wilson Wolf had, among other things, other data, including data that did not show as favorable results (and/or showed detrimental results)."  (Compl. ¶ 45.)  Plaintiff's vague allegation related to such "other data" clearly lacks the requisite particularity to state a claim for inequitable conduct.  *See Exergen*, 575 F.3d at 1327.

Second, the Court concludes that Plaintiff has failed to plead the circumstances of the purported failure to disclose "information provided by Corning in 2004" with sufficient particularity.  Plaintiff alleges that Defendants were "aware, including from information provided by Corning in 2004, that increased medium height would provide no advantages to and in fact could negatively affect certain cell types."  (*Id.* ¶ 46.)  This allegation fails to sufficiently state the specific who, what, when, and where of the alleged material omission.  Plaintiff attempts to compensate for this lack of detail by submitting two documents that it asserts are "results of testing data" that were given to Wilson and Wilson Wolf "at meetings in 2004."  (Pl. Opp. at 13.)  Presumably, Plaintiff believes that consideration of these documents is appropriate because the Complaint purportedly embraces these documents.  *See Porous Media Corp.*, 186 F.3 at 1079. While the Court is skeptical of Plaintiff's attempt to incorporate two documents based on a vague allegation related to "information provided by Corning in 2004," the Court finds

that it does not need to reach the question.  Regardless of whether the Complaint

sufficiently embraces the two documents, the Court concludes that the documents

themselves do not provide additional details sufficient to compensate for the Complaint's

lack of allegations related to the who, what, when, and where of the purported meetings

in 2004.

Accordingly, the Court grants, without prejudice, Defendants' motion to dismiss

as to Plaintiff's claim for inequitable conduct based on the failure to disclose adverse

data.

### 3.    Submittal of a biased expert declaration

Regarding its claims for inequitable conduct due to Defendants' submittal of a

biased expert declaration, Plaintiff alleges that Defendants and their attorneys "submitted

materially false and misleading declarations in the prosecution of the related '762

Application."  (Compl. ¶¶ 111-31.)  During the prosecution of the '762 Application,

Plaintiff alleges that Wilson and his attorneys submitted the Vera Declaration to

overcome the examiner's objections and to support the patentability of the '762

Application.  (*Id*. ¶¶ 57-59.)  Plaintiff alleges that, despite the Vera Declaration's attempt

to portray Dr. Vera as a disinterested party, Dr. Vera was "not an independent,

disinterested, outside expert" but instead was "Wilson Wolf's paid consultant and

Wilson's collaborator."  (*Id*. ¶ 62.)  Plaintiff alleges that Wilson Wolf and Wilson

intentionally failed to disclose Dr. Vera's relationship with Wilson Wolf and Wilson to

the PTO.  (*Id*.)  Plaintiff also alleges that Wilson and Dr. Vera failed to explain to the

examiner that the test results were not "unexpected" or that such "superiority" did not apply to adherent cells.  (*Id*. ¶¶ 59, 67.)

Defendants argue that Plaintiff's claim for inequitable conduct fails to satisfy the pleading standard for inequitable conduct because Plaintiff's factual allegations do not suggest that the Vera Declaration was material to the '192 and '443 Patents.  (Def. Memo. at 16.)  Because the Vera Declaration was submitted during the prosecution of a related patent, Defendants argue that there is no evidence that the examiner considered the declarations in connection with the '192 and '443 Patents.  (*Id*.)  Defendants also argue that Plaintiff's allegations of but-for materiality "on information and belief" are insufficient because Plaintiff provides no facts upon which the alleged belief is based. (*Id*.)  Defendants further argue that Plaintiff fails to identify the claims and claim limitations to which the misleading declaration is relevant or where in the declaration the alleged misleading information can be found.  (*Id*. at 16-17.)  Defendants argue that Plaintiff's allegation that the '192 and '443 Patents are within the same patent family as the '762 Application is insufficient to invoke the doctrine of infectious unenforceability. (*Id*. at 16 n.2.)  Finally, Defendants argue that Plaintiff's allegations that Wilson Wolf's counsel "knew or should have known of the relationship between Vera and Defendants," "either failed to properly investigate," or "failed to explain to Defendants their obligation to inform the PTO that Vera was not an independent expert" are incompatible with a conclusion that an intent to deceive is the "single most reasonable inference."  (*Id*. at 17.)

Plaintiff responds that it has sufficiently alleged the materiality of the Vera Declaration, the omitted information about Dr. Vera's bias, and the omitted information

24

about adherent cells.  (Pl. Opp. at 17.)  According to Plaintiff, "'it is material to an examiner's evaluation of the credibility and content of affidavits to know of any significant relationship between an affiant and an applicant.'"  (*Id*. at 17-18 (quoting *Nilssen v. Osram Sylvania, Inc.*, 504 F.3d 1223, 1230 (Fed. Cir. 2007).)  Plaintiff also points to its allegation that the '192 and '443 Patents issued after the examiner accepted the Vera Declaration as proof of but-for materiality.  (*Id*. at 18 (citing Compl. ¶ 69).)  Plaintiff argues that once the Defendants overcame the examiner's rejection for the '762 Application, it would have been "unnecessary for the Examiner to require them to do so over and over for every subsequent member of the family of patents, including the later '192 and '443 patents."  (*Id*.)  Plaintiff argues that it has sufficiently alleged the doctrine of infectious unenforceability because it alleges that the Examiner relied on the Vera Declaration "in connection with all three prosecutions."  (*Id*. at 19 n.5 (citing Compl. ¶ 69).)  Plaintiff further argues that it has specifically pointed to the claims and claim limitations to which the Vera Declaration is relevant—i.e., claim limitations related to increased media height.  (*Id*. (citing Compl. ¶¶ 37, 40).)  Finally, Plaintiff argues that, at the pleading stage, it does not need to prove that intent to deceive is the "single most reasonable inference."  (*Id*. at 20-21.)  Instead, Plaintiff argues that its allegations that Wilson and Wilson Wolf knew of the misrepresentation and omissions are sufficient at this stage.  (*Id*. at 21.)

Defendants counter that Plaintiff's allegation, "on information and belief," that the examiner "relied on the Vera Declaration in connection with all three prosecutions" is insufficient because Plaintiff has not pled facts to support such an inference.  (Reply

at 5.)  Defendants also argue that the same allegation is insufficient to support a claim of

infectious unenforceability.  (*Id*.)  Finally, Defendants argue that, because Plaintiff

alleges that one possibility is that Wilson Wolf's counsel may have failed to explain their

obligation to inform the PTO that Vera was not an independent expert, Plaintiff has not

sufficiently alleged intent to deceive.  (*Id*. at 6.)

Assuming all well-pled facts in Plaintiff's Complaint to be true, and construing all

reasonable inferences in the light most favorable to Plaintiff, the Court concludes that

Plaintiff has pled facts sufficient to state plausible claims for inequitable conduct based

on the submittal of the Vera Declaration.

First, the Court concludes that Plaintiff has pled sufficient facts to allow the Court

to infer that the examiner relied on the Vera Declaration in connection with all three

prosecutions.  Plaintiff alleges that Defendants asserted the same argument for

patentability—i.e., that the claims required greater medium height than allegedly was

found in the prior art—in the prosecution of the '762 Application and the prosecutions of

the '192 and '443 Patents.  (Compl. ¶ 55.)  Plaintiff also alleges that the examiner for the

'762 Application was the same examiner assigned to the '192 and '443 Patents.  (*Id*.)

Moreover, Plaintiff alleges that the examiner of the '762 Application and Defendants had

several discussions related to the novelty of Defendants' claims for greater medium

height.  (*Id*. ¶¶ 57-58.)  Plaintiff alleges, on information and belief, that the examiner

relied on the Vera Declaration in connection with all three prosecutions.  (*Id*., ¶ 69.)  At

this stage, the Court finds that this is a reasonable inference.

Second, the Court concludes that Plaintiff has sufficiently identified the claims and claim limitations to which the Vera Declaration is relevant and where in the Vera Declaration the alleged misleading information can be found.  Plaintiff identifies claim 1 of the '192 Patent as a claim that includes a limitation related to medium height.  (Compl. ¶ 40.)  In addition, Plaintiff identifies several claims in the '443 Patent that require "a cell culture device comprising a gas permeable material, scaffolds, and medium."  (*Id.* ¶ 41.) Plaintiff also points to specific parts of the Vera Declaration that describes the benefits of medium height and additional experiments.  (*Id.* ¶ 59.)  Thus, the Court finds that Plaintiff has sufficiently pled the "what" and "where" of the inequitable conduct.  *See Exergen*, 575 F.3d at 1329.

Third, the Court concludes that Plaintiff has alleged facts sufficient to plead the doctrine of infectious unenforceability.  "[A] breach of the duty of candor early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application."  *Fox Indus., Inc. v. Structural Preservation Sys., Inc.*, 922 F.2d 801, 804 (Fed. Cir. 1990).  Inequitable conduct may render unenforceable all patent claims that have "an immediate and necessary relation" to that conduct.  *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245-46 (1933).  Here, the Court concludes that Plaintiff has pled sufficient facts to allow this Court to conclude that the alleged misconduct during the prosecution of the '726 Application has an immediate and necessary relation to the claims of the '192 and '443 Patents.  As discussed above, Plaintiff has plausibly alleged that the examiner relied on the misleading Vera

Declaration during the prosecution of the '192 and '443 Patents.  At this stage, the Court finds that Plaintiff's allegations related to infectious unenforceability are sufficient.

Finally, the Court concludes that Plaintiff has pled facts sufficient to infer an intent to deceive.  As discussed above, the Court concludes that, at this stage, Plaintiff does not need to establish that the intent to deceive is the "single most reasonable inference." Here, Plaintiff alleges that Defendants knew that Dr. Vera was Wilson Wolf's paid consultant and Wilson's collaborator and intentionally failed to disclose these facts to the PTO.  (Compl. ¶ 62.)  While Plaintiff also allege that Defendants' attorneys "either failed to properly investigate whether there was a relationship between Vera and Defendants, or failed to explain to Defendants their obligation to inform the PTO" (*id.* ¶ 64), the Court concludes that this allegation does not prohibit a reasonable inference that Defendants knew of Dr. Vera's biases and intentionally failed to disclose this information to the PTO.

Accordingly, the Court denies Defendant's motion to dismiss as to Plaintiff's claims for inequitable conduct based on the submittal of a biased expert declaration.

### 4.      Failure to disclose the Corning-Wilson Interference

Regarding its claim for inequitable conduct due to Defendants' failure to disclose the Corning-Wilson Interference and related documents, Plaintiff alleges that Defendants and their attorneys failed to disclose the existence of the Corning-Wilson Interference to the examiner of the '317 Patent.  (Compl. ¶ 150.)  Plaintiff alleges that Defendants and their attorneys failed to disclose this information with the "intent to deceive the Patent Office, despite actual knowledge that patentability over Toner was directly at issue in the prosecution of the '933 Application."  (*Id.*)

28

Defendants argue that Plaintiff's allegations are baseless because the examiner of the '317 Patent was the same examiner responsible for the '044 Patent, which was the subject of the Corning-Wilson Interference.  (Def. Memo. at 17-18.)  Defendants note that notice of the Corning-Wilson Interference was included in the '044 Patent's file history.  (*Id.* at 18.)  Defendants further argue that, because the Manual of Patent Examining Procedure ("MPEP") states that interference searches should not be placed in the application file, there is no basis for Plaintiff's allegation that the examiner was unaware of the Corning-Wilson Interference.  (*Id.*)  Defendants also argue that, because the examiner of the '317 Patent already had Toner and the Martin Application, Defendants had no obligation to disclose the Corning-Wilson Interference.  (*Id.* at 18-19.)  Defendants argue that Plaintiff fails to identify any information that was relevant to the '317 Patent's examiner, the specific portions of documents where such information can be found, or the claims of the '317 Patent to which the information is relevant.  (*Id.* at 19.)

Plaintiff responds that the Corning-Wilson Interference was "directly applicable" to the '317 Patent because the '317 Patent and '044 Patent are "closely related."  (Pl. Opp. at 21-22.)  Plaintiff points to the fact that the examiner initially rejected the '317 Patent on double patenting grounds over the '044 Patent and the fact that Defendants "did not challenge that finding."  (*Id.* at 21.)  Plaintiff states that, although the examiner of the '317 Patent was also the examiner of the '044 Patent, the examiner was ***not*** involved in the Corning-Wilson Interference.  (*Id.* at 23.)  Plaintiff argues that the examiner would have wanted to know of the existence of a contrary interpretation of Toner.  (*Id.*)

29

Plaintiff further argues that an overlap of examiners does not relieve an applicant of its duty to disclose.  (*Id*.)  Plaintiff argues that it is the "expert ***interpretation*** and contentions regarding the prior art, not the prior art itself, that was the material information withheld."  (*Id*. at 25 (emphasis in original).)  Thus, Plaintiff argues that Defendants should have disclosed the Toner Motion, Priority Motion, and Crespi Declaration because they refuted Defendants' arguments for the patentability of the '317 Patent.  (*Id*. at 25-26.)

Defendants counter that Plaintiff's claim for inequitable conduct fails because the references at issue in the Corning-Wilson Interference were considered by the examiner during the prosecution of the '317 Patent.  (Reply at 6.)  Defendants also reply that a "mere list of interference documents" is insufficient to satisfy Plaintiff's pleading burden.  (*Id*. at 7.)

Assuming all well-pled facts in Plaintiff's Complaint to be true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to plead facts sufficient to state plausible claims for inequitable conduct based on the failure to disclose the Corning-Wilson Interference.  *See Twombly*, 550 U.S. at 570.

First, the Court concludes that Plaintiff has failed to plead the ***what*** and ***where*** of the alleged inequitable conduct.  *Exergen*, 575 F.3d at 1329.  Although Plaintiff points to its allegations regarding the Toner Motion, Priority Motion, and Crespi Declaration, Plaintiff does not identify "where in those references the material information is found."

*Id*. At this stage, it is not enough for Plaintiff to assert, without more, that several documents generally contain material information.

Second, the Court finds that the Complaint fails to adequately identify *what* claims would not have been issued if the purportedly material information had been submitted to the PTO. *Id*. Notably, while the Complaint contains some allegations related to relevant claim limitations in the '192 and '443 Patents (discussed above), the Complaint does not contain any allegations related to relevant claim limitations in the '317 Patent. Instead, the Complaint appears to rely on the fact that the '317 Patent is related to the now-invalidated '044 Patent. That, however, is not legally sufficient to state a claim. The fact that two patents are related does not give rise to a reasonable inference that the two patents rise and fall together. *See Comair Rotron, Inc. v. Nippon Densan Corp.*, 49 F.3d 1535, 1539 (Fed. Cir. 1995). Neither does the fact that Defendants filed a terminal disclaimer or did not object to the examiner's double patenting rejection. *See Quad Envtl. Techs. Corp. v. Union Sanitary Dist.*, 946 F.2d 870, 874 (Fed. Cir. 1991) ("[T]he filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection. It is improper to convert this simple expedient of 'obviation' into an admission or acquiescence or estoppel on the merits.").

Accordingly, the Court grants, without prejudice, Defendants' motion to dismiss Plaintiff's claim of inequitable conduct related to the '317 Patent.

### B.    Claim preclusion and the *Kessler* doctrine

In Count XI, Plaintiff asserts a claim for a declaration of claim preclusion. (Compl. ¶¶ 168-73.)  "The general concept of claim preclusion is that when a final judgment is rendered on the merits, another action may not be maintained between the parties on the same 'claim,' and defenses that were raised or could have been raised in that action are extinguished."  *Hallco Mfg. Co., Inc. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001) (citing Restatement (Second) of Judgments, §§ 18-19)).  Claim preclusion applies when "'(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action.'"  *Elbert v. Carter*, 903 F.3d 779, 782 (8th Cir. 2018) (quoting *Costner v. URS Consultants, Inc.*, 153 F.3d 667, 673 (8th Cir. 1998)).[5]  When the first and second suit involve different patents, claim preclusion will apply "only if the scope of the asserted patent claims in the two suits is essentially the same."  *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1167 (Fed. Cir. 2018).  "[C]laims which are patentably indistinct are essentially the same."  *Id.*

In Count XII, Plaintiff asserts a claim for a declaration of preclusion under the *Kessler* Doctrine.  (Compl. ¶¶ 174-77.)  The *Kessler* Doctrine "bars a patent infringement action against a customer of a seller who has previously prevailed against the patentee

---

[5]      In assessing claim preclusion, regional circuit law applies.  *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1165 (Fed. Cir. 2018).  Whether a particular cause of action in a patent case is the same as another cause of action, however, has "special application to patent cases" and, thus, is governed by Federal Circuit law.  *Id.*

because of invalidity or noninfringement of the patent." *SpeedTrack, Inc. v. Office Depot, Inc.*, 791 F.3d 1317, 1322 (Fed. Cir. 2015) (citing *MGA Inc. v. Gen. Motors Corp.*, 827 F.2d 729, 734 (Fed. Cir. 1987)).  The *Kessler* Doctrine "fills the gap between [the claim and issue] preclusion doctrines," "allowing an adjudged ***non-infringer*** to avoid repeated harassment for continuing its business as usual post-final judgment in a patent action where circumstances justify that result." *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1056 (Fed. Cir. 2014) (emphasis in original).  While the *Kessler* Doctrine is typically applied against previously adjudicated patents, the *Kessler* Doctrine may still apply to unadjudicated patents if the previously adjudicated patent and the unadjudicated patents are "patentably indistinct." *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1170 (Fed. Cir. 2018).

Plaintiff alleges that "[i]n the Minnesota Litigation, Corning obtained dismissal with prejudice of Defendants' claims that the HYPERStack product infringed the '426 and '427 Patents."  (Compl. ¶ 176; *see also id*. ¶ 170.)  Plaintiff also alleges that the '443 Patent and '192 Patent "derive from the same '651 Provisional Application as the '426 and '427 Patents, share the same specification, and, under Defendants' apparent claim construction in the suits against the HYPERStack Users, include claims that are patentably indistinct from those of the '426 Patent and '427 Patent."  (Compl. ¶ 176; *see also id*. ¶¶ 32, 171.)  Plaintiff further alleges that the '317 Patent "derives from the same '347 Provisional Application as the '044 Patent (claims of which have now been invalidated), and also includes claims that, under Defendants' apparent claim construction in the suit against the HYPERStack Users, are patentably indistinct from

those of the '426 Patent and '427 Patent." (*Id.*, ¶ 172; *see also id.* ¶¶ 32, 176.) Plaintiff alleges that "Defendants' allegations of infringement against Corning's HYPERStack® Customers and end-users are therefore based on the same transactional facts as their dismissed claims against Corning." (*Id.*, ¶ 176.) Thus, Plaintiff asserts that the *Kessler* Doctrine precludes Defendants' claims against the HYPERStack Users. (*Id.* ¶ 177.)

Defendants argue that the fact that '192 and '443 Patents "share the same specification" with the '426 and '427 Patents is the sole factual allegation in the Complaint and that such an allegation is "legally insufficient to support its claim preclusion counts." (Def. Memo. at 23.) Defendants further argue that the Complaint contains no allegation that the '317 Patent shares a specification with the '426 and '427 Patents, as the '317 Patent derives from a separate patent family. (*Id.* at 23 n.6.) Plaintiff responds that the Complaint includes additional allegations, including that the '192 and '443 Patents "***include claims that***, under Defendants' apparent claim construction in the suits against the HYPERStack Users, ***are patentably indistinct from those of the '426 Patent and '427 Patent***." (Reply at 30 (emphasis in original).) Plaintiff further responds that the Complaint alleges that the '317 Patent "***also includes claims that***, under Defendants' apparent claim construction in the suits against the HYPERStack Users, ***are patentably indistinct from those of the '426 Patent and '427 Patent***." (*Id.* at 30-31 (emphasis in original).) Defendants counter that the identified allegations are "conclusory allegations that the claims are patentably indistinct" and, thus, Plaintiff's claim preclusion counts should be dismissed. (Reply at 8-9.)

Assuming all facts in Plaintiff's Complaint to be true and construing all reasonable inferences from those facts in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to plead enough facts to state claims to relief that is plausible on its face. *See Twombly*, 550 U.S. at 570. First, the Court concludes that the Complaint's allegations that the '192 and '443 Patents "derive from the same '651 Provisional Application as the '426 and '427 Patents" and "share the same specification" as the '426 and '427 Patents is insufficient to state a claim for declaratory relief of claim preclusion or the *Kessler* Doctrine. *See SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1166 (Fed. Cir. 2018) (finding that the fact that the asserted patents "all share a common specification and terminal disclaimer to a common parent" was insufficient to sustain the district court's holding of claim preclusion). Indeed, separate patents "describe 'separate and distinct [inventions],' and it can not be presumed that related patents rise and fall together." *Comair*, 49 F.3d at 1539; *see also Kearns v. Gen. Motors Corp.*, 94 F.3d 1553, 1556 (Fed. Cir. 1996) ("[E]ach patent, by law, covers a[n] independent and distinct invention.").

Second, the Court concludes that the Complaint's allegations that the '192, '443, and '317 Patents include claims that, "under Defendants' apparent claim construction in the suits against the HYPERStack Users, are patentably indistinct from those of the '426 and '427 Patents" are merely conclusory allegations, unsupported by any factual allegations in the Complaint. For example, the Complaint contains no factual allegations that identifies Defendants' apparent claim construction or provide sufficient factual basis for the Court to plausibly infer that such a claim construction would render the '192,

'443, and '317 Patents patentably indistinct from the '426 and '427 Patents. Such allegations are insufficient to state a claim for relief. *See Iqbal*, 556 U.S. at 681 ("[T]he allegations are conclusory and not entitled to be assumed true."); *see also Twombly*, 550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").

Thus, based on the allegations in Plaintiff's Complaint, the Court finds that the Complaint fails to state a claim for declaratory relief for claim preclusion or a claim for declaratory relief under the *Kessler* Doctrine. Accordingly, the Court dismisses Counts Eleven and Twelve without prejudice. *See Finnegan v. Suntrust Mortgage*, 140 F. Supp. 3d 819, 832 (D. Minn. 2015) ("Motions to dismiss pursuant to Rule 12(b)(6) are generally without prejudice, 'where there is no evidence of persistent pleading failures.'") (quoting *Holmseth v. City of East Grand Forks*, Civ. No. 14-2970, 2015 WL 4488424, at *20 (D. Minn. July 23, 2015)).

## C.    Tortious interference

In Count XIII, Plaintiff asserts a claim for tortious interference with prospective economic advantage. A claim for tortious interference is preempted by federal patent laws unless the plaintiff can show that the patent holder acted in bad faith. *See Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018); *see also Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1355 (Fed. Cir. 1999) ("[W]e hold that bad faith is a prerequisite to Exzec's state-law tortious interference claim; without it, the claim is preempted by patent law."). The bad faith standard has an objective and subjective component. *800 Adept, Inc. v. Murex Securities, Ltd.*, 539 F.3d 1354, 1369

36

(Fed. Cir. 2008), *cert. denied*, 555 U.S. 1175 (2009). "The objective component requires a showing that the infringement allegations are 'objectively baseless.'" *Id.* (citation omitted). "The subjective component relates to a showing that the patentee in enforcing the patent demonstrated subjective bad faith." *Id.*

Defendants argue that Plaintiff's claim for tortious interference based on alleged inequitable conduct should be dismissed because Plaintiff fails to state a claim for inequitable conduct. (Def. Memo. at 22.) Defendants also argue that Plaintiff's claim for tortious interference based on the Customer Suits should be dismissed because Plaintiff merely alleges conclusory statements. (*Id.*)

Plaintiff points to the allegations in the Complaint that Defendants' infringement claims in the Customer Suit are objectively baseless because Defendants knew that "if broadly construed, the asserted patents are invalid, and if properly construed, they are not infringed by the customers' and end-users' use of HYPERStack®." (Pl. Opp. at 24 (citing Compl. ¶ 181).) Plaintiff also argues that it has pled detailed facts related to its claims that the Customer Suits are barred by the Kessler Doctrine and the safe harbor under 35 U.S.C. § 271(e)(1).

Assuming all well-pled facts in Plaintiff's Complaint to be true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court concludes that Plaintiff has pled facts sufficient to state a plausible claim for tortious interference. As discussed above, the Court concludes that at least one of Plaintiff's claims of inequitable conduct will survive Defendants' motion.

Accordingly, the Court denies Defendants' motion to dismiss as to Plaintiff's claim for tortious interference.

**D.    Claims against John R. Wilson**

Plaintiff's Complaint asserts all claims against both Wilson Wolf and Wilson. (Compl. ¶¶ 98-188.)  Defendants argue that, because Wilson Wolf owns the Patents-in-Suit and is the sole plaintiff in the Customer Suits, Wilson is not a proper defendant in this case and, thus, all claims against Wilson should be dismissed.  (Def. Memo. at 24.) Defendants further argue that the Complaint's allegations in the tortious interference claim that Wilson "owns and controls Wilson Wolf," is "principally responsible for the inequitable conduct that resulted in the issuance of the patents-in-suit," "personally stands to benefit financially and professionally" if Wilson Wolf succeeds in its Customer Suits, and "personally directed and is legally responsible for the assertion of the aforesaid sham litigation" are insufficient to support a piercing of the corporate veil.  (*Id.* at 24-25.)

Plaintiff responds that it is not attempting to pierce the corporate veil.  (Pl. Opp. At 32.)  Instead, Plaintiff argues that it "seeks to hold John Wilson directly (and not vicariously) liable for his own conduct" based on Wilson's conduct during the prosecution of the '192, '443, and '317 Patents.  (*Id.*)  In support of its proposition, Plaintiff relies on two district court cases:  *Indiana Forge v. Miller Veneers*, 736 F. Supp. 2d 1201 (S.D. Ind. 2010) and *Armament Sys. & Procedures, Inc. v. Emissive Energy Corp.*, C.A. No. 06-833, 2007 WL 2572304 (E.D. Wis. Sept. 5, 2007).  Plaintiff also argues that Wilson's inclusion in the claim for tortious interference is proper because

Wilson "personally stands to benefit financially and professionally if he succeeds in shutting down Corning's HYPERStack business with his sham litigation." (*Id*. at 33.)

Defendants counter that the fact that Wilson "stands to benefit" from the Customer Suits does not establish a tortious interference claim against Wilson individually. (Reply at 9.) Defendants argues that the cases Plaintiff relies on are nonbinding and that the fact that Plaintiff may seek attorneys' fees cannot establish a cause of action against Wilson. (*Id*. at 10.)

At this stage, the Court concludes that Plaintiff has pled sufficient facts to include Wilson as a defendant for its surviving claims of inequitable conduct and tortious interference. Plaintiff alleges that Wilson was individually responsible for portions of the alleged inequitable conduct before the PTO. Plaintiff also seeks, as part of its request for relief, an award of reasonable attorneys' fees under 35 U.S.C. § 285. The Court agrees with the other district courts' reading of Supreme Court and Federal Circuit precedent that, in such a scenario, an individual may properly be named as a defendant. *See Indiana Forge*, 736 F. Supp. 2d at 1205-06; *Armament Sys.*, 2007 WL 2572304, at *3-4.

Accordingly, the Court denies Defendant's motion to dismiss as to Plaintiff's claims against Wilson.

### E.    Motion to stay Defendants' deadline to answer

Defendants request that this Court stay Defendants' obligation to answer the allegations in the Complaint pending the disposition of this motion. (Def. Memo. at 26-27.) Defendants assert that many courts have found that a party should not file a partial answer during the pendency of a motion to dismiss. (*Id*. at 26 (citing cases).)

While Plaintiff acknowledges that there are times when judicial efficiency can be served by staying a defendant's deadline to answer, Plaintiff argues that this case is not such a circumstance. (Pl. Opp. at 34-35.)

In this case, the Court agrees that a stay of Defendants' obligation to answer the Complaint pending the disposition of this motion is appropriate. The Court finds that judicial efficiency is best served by a single answer, rather than piecemeal partial answers. Accordingly, the Court grants Defendants' motion to stay the deadline to answer the Complaint pending the disposition of Defendants' motion to dismiss. Because the Court has now ruled on Defendants' motion to dismiss, Defendants have until 14 days after the date of this Order to answer the Complaint.

## CONCLUSION

For the reasons discussed above, the Court finds that Plaintiff has failed to allege sufficient facts to state a plausible claim for inequitable conduct for misrepresentation of data, failure to disclose adverse data, and failure to disclose the Corning-Wilson Interference. The Court also finds that Plaintiff has failed to allege sufficient facts to state plausible claims for a declaration of claim preclusion and preclusion under the *Kessler* doctrine. At this stage in the litigation, the Court finds that Plaintiff has alleged sufficient facts to state a plausible claim for inequitable conduct for submittal of the Vera Declaration. The Court also finds that Plaintiff has alleged sufficient facts to state a plausible claim for tortious interference. The Court further finds that Defendant Wilson is properly a defendant at this time. Finally, the Court finds that a stay of Defendants'

deadline to answer the Complaint pending the disposition of Defendants' motion to dismiss is appropriate.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. No. [20]) is **GRANTED IN PART** and **DENIED IN PART** consistent with the memorandum above as follows:

1.   The Court **GRANTS** Defendants' Motion to Dismiss regarding Plaintiff's claims for inequitable conduct for misrepresentation of data, failure to disclose adverse data, and failure to disclose the Corning-Wilson Interference.

2.   The Court **DENIES** Defendants' Motion to Dismiss regarding Plaintiff's claims for inequitable conduct for submittal of the Vera Declaration.

3.   The Court **GRANTS** Defendants' Motion to Dismiss regarding Plaintiff's claims for a declaration of claim preclusion and preclusion under the *Kessler* doctrine.

4.   The Court **DENIES** Defendants' Motion to Dismiss regarding Plaintiff's claim for tortious interference.

5.   The Court **DENIES** Defendants' Motion to Dismiss regarding all claims against Defendant Wilson.

6.     The Court **GRANTS** Defendants' Motion to Stay the Deadline for Answering the Complaint.  Defendants have until 14 days after this Order to answer the Complaint.

Dated:  October 6, 2020                    s/Donovan W. Frank
                                           DONOVAN W. FRANK
                                           United States District Judge