# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Corning Incorporated,                                    Civil No. 20-700 (DWF/TNL)

               Plaintiff,

v.

                                           **MEMORANDUM OPINION**

Wilson Wolf Manufacturing Corp.                            **AND ORDER**
and John R. Wilson,

               Defendants.

---

Ivan Poullaos, Esq., and Kimball R. Anderson, Esq., Winston & Strawn LLP; Jeff M. Barron, Esq., Barnes & Thornburg, LLP; Lora Mitchell Friedemann, Esq., and Nirmani Chethana Perera, Esq., Fredrickson & Byron, PA, counsel for Plaintiff.

Britta S. Loftus, Esq., Devan V. Padmanabhan, Esq., Michelle E. Dawson, Esq., Sri K. Sankaran, Esq., and Paul J. Robbennolt, Esq., Padmanabhan & Dawson, PLLC, counsel for Defendants.

---

# INTRODUCTION

Plaintiff Corning Inc. ("Corning" or "Plaintiff") filed an amended complaint seeking declaratory judgment of patent non-infringement, invalidity, and unenforceability of U.S. Patent Nos. 9,441,192 (the "'192 Patent"), 8,697,443 (the "'443 Patent"), and 9,732,317 (the "'317 Patent") (collectively, the "Patents-in-Suit"). (Doc. No. 73 ("Am. Compl.").) This matter is before the Court on a Partial Motion to Dismiss Amended Complaint brought by Defendants Wilson Wolf Manufacturing Corp. ("Wilson Wolf") and John R. Wilson ("Wilson") (together, "Defendants"). (Doc. No. 81.) Plaintiff

opposes Defendants' motion.  (Doc. No. 88 ("Pl. Opp.").)  For the reasons set forth

below, the Court grants in part and denies in part Defendants' motion to dismiss.

## BACKGROUND

### I.      The Patents-in-Suit

Wilson Wolf is the purported owner of the Patents-in-Suit.  (Am. Compl. ¶ 35; *see*

*also id.*, Ex. A ("'192 Patent"), Ex. B ("'443 Patent"), Ex. C ("'317 Patent").)  Corning

alleges that the Patents-in-Suit are "related either by family or subject matter to the

patents that were asserted by Wilson Wolf and Wilson in the Minnesota Litigation."  (*Id.*

¶ 36.)

#### A.      The '192 and '443 Patents

The '192 Patent, entitled "Cell culture methods and devices utilizing gas

permeable materials," was filed on July 27, 2015 and issued on September 13, 2016.

('192 Patent.)  The '443 Patent, also entitled "Cell culture methods and devices utilizing

gas permeable materials," was filed on April 2, 2010 and issued on April 15, 2014.  ('443

Patent.)  The '192 and '443 Patents both claim priority to U.S. Provisional Application

No. 60/509,651 (the "'651 Provisional") and are both divisions of Application

No. 10/961,814 (the "'814 Application").[1]  (*See* '192 Patent; '443 Patent.)  Corning

alleges that the '192 and '443 Patents "share the same specification with, and concern the

same alleged inventions as, Wilson Wolf's [U.S. Patent No. 8,158,426 (the "'426

---

[1]      Because the '651 Provisional and '814 Application are referenced and embraced
by the Complaint, the Court considers these publicly available documents in its analysis.
*See Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999).

Patent") and U.S. Patent No. 8,158,427 (the "'427 Patent")], which had been asserted against the use of Corning's HYPERStack® un the Minnesota Litigation." (*Id.* ¶¶ 15, 37.) Corning further alleges that "[u]nder Wilson Wolf's apparent claim construction in the suits against the HYPERStack Users," the claims of the '192 and '443 Patents are "patentably indistinct" from the claims of the '426 and '427 Patents." (*Id.* ¶ 37.)

### B.    The '317 Patent

The '317 Patent, entitled "Highly efficient gas permeable devices and methods for culturing cells," was filed on July 2, 2014 as U.S. Patent Application No. 14/321,933 (the "'933 Application") and issued on August 15, 2017. (*See* '317 Patent; *see also* Am. Compl. ¶ 111.) The '317 Patent is a continuation of the '044 Patent, which claims the benefit of U.S. Provisional Patent Application Serial No. 60/873,347 (the "'347 Provisional"). (*Id.*; *see also* Am. Compl. ¶ 111.) Corning alleges that "the claims of the '317 Patent are not patentably distinguishable from the claims of '044 Patent." (*Id.* ¶ 112.) Moreover, during the prosecution of the '933 Application, the Examiner issued a double patenting rejection finding that all pending claims of the '933 Application were not patentably distinct from the claims of the '044 patent. (*Id.* ¶ 112.) Instead of challenging the double patenting rejection, Wilson Wolf and Wilson filed a terminal disclaimer. (*Id.*)

## II.    General and Procedural History

Much of the factual background for the above-entitled matter is clearly and precisely set forth in the Court's March 22, 2016 Memorandum Order in the case

captioned *Wilson et al. v. Corning Inc.*, Case No. 13-cv-210 (D. Minn. filed Jan. 25,

2013) (the "Minnesota Litigation") (*see* Minnesota Litigation, Doc. No. 388), as well as

the Court's prior order granting in part and denying in part a motion to dismiss the

Complaint originally filed in this action. (Doc. No. 43 ("Oct. 2020 Order").)

Wilson is the CEO of Wilson Wolf. (Am. Compl. ¶ 4.) Wilson Wolf is a

biotechnology firm that develops and manufactures cell-culture devices. Corning is one

of the world's leading innovators in materials science. (*Id*. ¶ 8.) Corning manufactures

and sells cell culturing vessels. (*Id*.) One of Corning's cell culturing vessels is marketed

as the HYPERStack, which is designed to facilitate adherent cell cultures. (*Id*. ¶ 13.)

Corning alleges that the HYPERStack uses gas-permeable film technology that allows

the HYPERStack vessel to be an efficient, scalable cell culture vessel for adherent cell

culture applications. (*Id*. ¶ 14.)

In 2013, Wilson Wolf and Wilson sued Corning in the Minnesota Litigation,

alleging that Corning obtained Wilson Wolf's cell-culture technology under a

confidentiality agreement and that Corning subsequently developed products using

Wilson Wolf's technology. (*Id*. ¶ 15; *see also*, *id*., Ex. D.) Among other claims, Wilson

Wolf and Wilson alleged that the use, offer, and sale of Corning's HYPERStack product

directly and indirectly infringed the '426 Patent and the '427 Patent. (*Id*.) On March 17,

2015, the Court dismissed the claims for patent infringement of the '426 and '427 Patents

with prejudice. (*Id*.; Minnesota Litigation, Doc. No. 299 at 5.) Five claims remain in the

Minnesota Litigation, including claims for correction of inventorship, breach of contract, and misappropriation of trade secrets.[2]  (*Id.* ¶ 16.)

On December 26, 2017, the U.S. Patent and Trial Appeal Board ("PTAB") issued a decision and judgment in an interference proceeding (the "Interference") invalidating all challenged claims of the '044 Patent on the ground that they were anticipated by prior art.  (*Id.* ¶ 18.)  That decision was affirmed by the Federal Circuit.  (*Id.*; citing *Wilson v. Martin*, 789 F. App'x 861 (Fed. Cir. 2019).)

On March 9, 2020, Plaintiff filed a Complaint for Declaratory Judgment and Other Relief against Defendants.  Plaintiff brought this action in response to three separate lawsuits filed by Defendants against Plaintiff's customers and end users, alleging infringement of the Patents-in-Suit from the use of Plaintiff's HYPERStack device.  In short, Corning alleges that, having suffered invalidation of the '044 Patent, Wilson Wolf and Wilson launched retaliatory litigation against Corning's HYPERStack end-users and customers.[3]  (*Id.* ¶ 19.)  In this litigation, Defendants allege that the HYPERStack Users

---

[2]    The Court dismissed Defendants' trade secret claim with prejudice insofar as it is based on misappropriation after April 21, 2005, the date Wilson published his alleged trade secrets to the world in a patent application.  (*Id.* ¶ 17; Minnesota Litigation, Doc. No. 388 at 26 (holding that Defendants had not established and could not claim any trade secret "separate from the information disclosed in their patents").)

[3]    In December 2019 and January 2020, Wilson Wolf filed lawsuits against Brammer Bio, LLC ("Brammer Bio"), Sarepta Therapeutics, Inc. ("Sarepta"), Nationwide Children's Hospital, Inc. ("NCH"), and The Research Institute at Nationwide Children's Hospital ("TRI") (collectively, the "HYPERStack Users").  (Am. Compl. ¶¶ 23-25.)

The HYPERStack Users utilize Corning's HYPERStack cell culture vessels in their businesses.  (*Id.* ¶¶ 20-22.)  Corning alleges, on information and belief, that the HYPERStack Users employ HYPERStack vessels solely for uses reasonably related to

infringe some or all of the Patents-in-Suit.  (*Id*.)[4]  Corning's original complaint asserted thirteen claims—three seeking declarations of noninfringement for each of the Patents-in-Suit from the use of Corning's HYPERStack device; three seeking declarations of invalidity of each of the Patents-in-Suit; three seeking declarations of unenforceability of each of the Patents-in-Suit due to inequitable conduct; one seeking a declaration that the accused infringement is subject to the Safe Harbor of 35 U.S.C. § 271(e)(1); two seeking declarations of claim preclusion; and one for Tortious Interference with Prospective Economic Advantage.

On May 7, 2020, Defendants filed a partial motion to dismiss the original complaint.  (Doc. No. 22.)  In the October 2020 Order, the Court granted in part and denied in part the motion.  Specifically, the Court dismissed without prejudice certain claims in Plaintiff's original Complaint:  (1) inequitable conduct based on the alleged provision of "misleading data" to the PTO; (2) inequitable conduct based on the alleged withholding of "other data" from the PTO; (3) inequitable conduct based on the alleged withholding of documents from the Interference from the PTO; (4) claim preclusion with respect to the '192 Patent and the '443 Patent; and (5) claim preclusion pursuant to the *Kessler* doctrine with respect to the '317 Patent.  The Court denied Defendant's motion to dismiss with respect to (1) Plaintiff's claims for inequitable conduct for submittal of the

the development and submission of information under federal laws regulating the manufacture, use, or sale of drugs or veterinary biological products, including to the Food and Drug Administration ("FDA").  (*Id*.)

[4]      Defendants could not bring these direct infringement claims against Corning because Corning is in the business of manufacturing products, not culturing cells.

Vera Declaration; (2) Plaintiff's tortious interference claim; and (3) all claims against Defendant Wilson.

On February 19, 2021, Plaintiff filed an Amended Complaint.  Again, Corning alleges that Defendants are engaged in a patent enforcement and litigation campaign that is based on non-infringed, invalid, and unenforceable patents.  (Am. Compl. ¶ 1.)  For example, Corning alleges that when Defendants filed lawsuits against the HYPERStack Users, Defendants knew, or should have known, that the Patents-in-Suit were unenforceable in light of Defendants' fraudulent conduct in obtaining the patents from the PTO.  (*Id.* ¶ 26.)[5]  Corning also alleges that Defendants knew, or should have known, that the claims in the '044 Patent, which allegedly underlie the Patents-in-Suit, had been invalidated by the PTAB.  (*Id.*)  Corning further alleges that Defendants knew, or should have known, that patent infringement lawsuits against the HYPERStack Users were barred by the *Kessler* doctrine and the safe harbor established by 35 U.S.C. § 271(e)(1). (*Id.*)  Corning also alleges that Defendants filed the lawsuits against the HYPERStack Users for the "improper and unjustified purposes of interfering with Corning's existing and prospective business relationships with its customers."  (*Id.* ¶ 27.)

---

[5]     In its Amended Complaint, Plaintiff does not assert a claim of inequitable conduct based on the provision of misleading data.  Plaintiff's allegations of inequitable conduct with respect to the '192 and '443 Patents are summarized in Counts Two and Five, (Am. Compl. ¶¶ 183-86 & 203-206), and the allegations of inequitable conduct with respect to the '317 Patent are summarized in Count Eight (*id.* ¶¶ 223-225).

Defendants now move to dismiss Corning's inequitable conduct claims based on the alleged withholding of adverse data and information from the Interference, as well as Corning's claim preclusion counts.

## DISCUSSION

### I.   Legal Standard

In deciding a motion to dismiss under Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inference from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged, *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court deciding a motion to dismiss may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint. *See Porous Media Corp. v. Pall Corp.*, 186 F.3 1077, 1079 (8th Cir. 1999).

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id.* at 555. As the Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S.

at 555).  In sum, this standard "calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the claim]."  *Twombly*, 550 U.S. at 556.

Inequitable conduct claims are held to the higher pleading standard required for claims of fraud or mistake under Federal Rule of Civil Procedure 9(b).  *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1326 (Fed. Cir. 2009).  "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b).  A pleading that "simply avers the substantive elements of inequitable conduct, without setting forth the particularized factual bases for the allegation, does not satisfy Rule 9(b)."  *Exergen*, 575 F.3d at 1326-27.  Thus, Rule 9(b) "requires identification of the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO."  *Id*. at 1327.[6]

To sufficiently plead the "who" of the material misrepresentation or omission, a pleading must identify the "specific individual associated with the filing or prosecution of the application . . . who both knew of the material information and deliberately withheld or misrepresented it."  *Id*. at 1329.  To sufficiently plead the "what" and "where" of the material misrepresentation or omission, a pleading must "identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found."  *Id*.  In addition, to sufficiently plead "why" the withheld references are "material" and "not cumulative," a pleading must

---

[6]     The Court previously concluded that the *Exergen* standard is the appropriate standard for determining whether Plaintiff adequately pled its claims for inequitable conduct.  (Oct. 2020 Order at 15.)

"identify the particular claim limitations, or combination of claim limitations, that are supposedly absent from the information of record." (*Id.*) A pleading must also allege facts sufficient to "give rise to a reasonable inference of scienter, including both (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id.* at 1330. Pleading deceptive intent solely on information and belief is "permitted under Rule 9(b) when essential information lies uniquely within another party's control, but only if the pleading sets forth the specific facts upon which the belief is reasonably based." *Id.*

## II.    Inequitable conduct

In Counts Two, Five, and Eight of the Amended Complaint, Plaintiff asserts claims for inequitable conduct. Counts Two and Five correspond with the related '192 and '433 Patents, respectively, and center on the alleged failure by Defendants to disclose adverse data to the Examiner that Defendants had in their possession, including data generated by Defendants. Count Eight alleges inequitable conduct concerning the '317 Patent and centers on allegations that Defendants failed to disclose to the Examiner the existence of, and documents related to, the co-pending Interference before the PTAB.\

### A.    Failure to disclose adverse data

Regarding its claims for inequitable conduct due to Defendants' failure to disclose adverse data, Plaintiff alleges that, during the prosecution of the '192 and '443 Patents, Defendants withheld data from the Examiner that undercut the assertions that they were making about the effects of their allegedly inventive greater media height in the '192 and '433 patents. In its original complaint, Corning alleged that Defendants had data that did

10

not show favorable results (and/or showed detrimental results).  This data included information that increased medium height would not provide advantages to and could negatively affect certain cell types.  The Court dismissed the claim as originally pled without prejudice because Corning failed to plead the circumstances of Defendants' alleged failure to disclose data with sufficient particularity.  (Oct. 2020 Order at 22-23.)

Corning asserts that its Amended Complaint now contains sufficient additional details describing the identity of who was involved in the alleged inequitable conduct, the identity of the withheld data, the circumstances under which those data were communicated to Defendants, and how those data were directly relevant (and contradictory) to the assertions and claims that Defendants were making to the PTO. (*See, e.g.*, Am. Compl. ¶¶ 73-89.)

Defendants maintain that Plaintiff's Amended Complaint still fails to identify any failure to disclose withheld information with sufficient particularity.  (Doc. No. 83 ("Defs. Mem.") at 9.)  Defendants argue that Plaintiff's allegations, even as amended, do not provide factual allegations regarding essential details of the claim—namely, that Corning does not identify the alleged data that was generated by Defendants, does not identify the testing during which such data was generated, and does not identify the nature of the data itself.  Instead, Defendants argue that the allegations are based solely on information and belief and do not suffice.  In addition, Defendants argue that Corning has failed to plead facts sufficient to support a finding that the Corning data and information was material because they do not identify the claims that would have been rendered unpatentable if the information was provided to the PTO.  Defendants further

submit that Plaintiffs have failed to allege facts that would show that Defendants knew of

the alleged materiality of the information and then deliberately withheld the information

from the PTO.  Defendants argue that there is no allegation that Defendants

commissioned, requested, observed, validated, evaluated, or relied on Plaintiff's internal

testing, and it had no obligation to disclose to the PTO unsolicited and unverified test

results.  (Defs. Mem. at 11-12.)

Corning responds that its amended allegations are sufficient to state a claim.

Corning alleges that during the prosecution of the '192 and '443 Patents, Defendants

repeatedly argued that the claims were patentable at least in part because they required

greater medium height than allegedly was found in the prior art[7] and stressed the

importance of medium height and gas transfer capacity to their alleged invention.  (Am.

Compl.  ¶¶ 73-89).  Corning alleges that "[b]ased on the disclosure of the patents

themselves, one example of a device that [Defendants] believe and have contended can

satisfy the requirement of a cell culture device comprising a gas permeable material,

scaffolds, and medium is a device having the design arrangement reflected" in Figure 13

of both the '443 and '192 Patent, and that in this example, "gas permeable material is on

one side of the device (wall 200) and medium fills the inside of the vessel," which "can

---

[7]     For example, Corning alleges that claim 1 of the '192 Patent requires that "the
uppermost location of said medium is elevated beyond 2.0 cm from the lowermost
location of said medium."  (Am. Compl. ¶ 65 (citing '192 Patent at col. 46, ll. 52-54).)
And with respect to the '443 Patent, Corning alleges that the claims "require, among
other things, a cell culture device comprising a gas permeable material, scaffolds, and
medium."  (*Id.* ¶ 68 (citing '442 Patent at col. 44, ll. 59- col. 45, ll. 7; col. 46, ll. 21-23,
col. 46, ll. 24-39, and col. 46, ll. 63-65).)

create more gas transfer capacity, having the effect of making it possible to further increase the footprint of gas permeable cell culture device 12." (*Id*. ¶ 69.)

Corning also alleges on information and belief, that despite Defendants' repeated arguments that the claims were patentable at least in part because they required greater medium height than what was found in the prior art, Defendants possessed data that did not show favorable results—or showed detrimental results—of certain gas permeable arrangements and increased medium heights. (*Id*. ¶¶ 76- 82; *see also id*. ¶¶ 83, 184 & 204 (alleging that Defendants excluded data from the '651 Provisional, from which the '192 Patent and '443 Patent ultimately derive, that did not show favorable results (and/or showed detrimental or contrary results).) For example, Plaintiff alleges that Corning supplied Defendants with data in 2004 and 2005 that showed that increased medium height would provide no advantage and could negatively affect methods of culturing certain cell types, specifically, that "the culturing of adherent cells, which are a type of cell particularly suitable for use in Corning's HYPERFlask® and HYPERStack®, does not benefit or may be negatively affected by the gas permeable arrangements and increased media height touted by Wilson Wolf and Wilson to the PTO." (Am. Compl. ¶ 77 & Exs. K, L.) Corning further alleges that, from the data and communications, Defendants were aware that "using gas permeable material as part of one or more walls on the exterior of a scaffolded cell culture vessel, like that depicted in Figure 13 of the '192 and '443 Patents, did not provide enough oxygen transfer to allow for the culture of healthy adherent cells on the scaffolds of the vessel, including adherent cells anchored on scaffolds in the interior of the device." (*Id*. ¶ 78.)

Corning further asserts that it has alleged the identity of who was involved, namely that "individuals at Corning who provided the foregoing information to Wilson and Wilson Wolf and were involved in the recited exchange of data included at least Dr. Allison Tanner, Dr. Todd Upton and Ron Verkleeren." (Am. Comp. ¶ 79.)  More specifically, Plaintiff alleges that the information was provided to at least Wilson directly in meetings and phone calls that occurred in 2004 and 2005.  (*Id*.)  Finally, Plaintiff argues that it has sufficiently alleged an intent to deceive.  Plaintiff alleges that Wilson, Wilson Wolf, and their counsel knew the omitted data and information were material to the prosecution, were obligated to disclose the adverse data to the PTO, yet did not do so. (Am. Compl. ¶¶ 82-89.)  Plaintiff further points to its allegation that "[t]he single most reasonable inference from the omissions and misrepresentations described herein is that Defendants intended to deceive the PTO and the public."  (Am. Compl. ¶ 89.)

Assuming all well-pled facts in Plaintiff's Amended Complaint to be true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court again concludes that the allegations are insufficient to state plausible claims for inequitable conduct based on the alleged failure to disclose adverse data.  *See Twombly*, 550 U.S. at 570.  While Plaintiff has pleaded additional facts regarding the circumstances of the purported failure to disclose other data, the allegations fail to demonstrate why any of the allegedly withheld data would have rendered the claims unpatentable as they are merely conclusory in that regard.  Corning argues that the data shows that Defendants' invention does not work as well as represented.  Corning, however, does not allege that the invention does not work.  Nor does Corning put forth sufficient grounds for how the

information rendered the invention unpatentable if the alleged data had been disclosed to the Examiner.  In addition, Plaintiff has not alleged that Defendants controlled, requested, or evaluated the accuracy of Corning's testing or data that was allegedly provided to Defendants and has failed to otherwise plead facts that would demonstrate that Defendants knew any of this data was material and deliberately withheld it from the PTO. Instead, Corning alleges that "[g]iven these discussions and disclosures to Wilson, and given Wilson's experience in interpreting results of experiments into cell growth, and given the data generated from his own experiments, Wilson knew" that increased medium height would provide no advantages.  (Am. Compl. ¶ 82.)[8]  These allegations are insufficient.

Accordingly, the Court grants Defendants' motion to dismiss as to Plaintiff's claim for inequitable conduct based on the failure to disclose adverse data.  Because Plaintiff has already amended its allegations on this Count once before, the Court dismisses this claim with prejudice.

**B.     Failure to disclose the Corning-Wilson Interference**

Corning alleges that the '317 Patent is unenforceable due to inequitable conduct because during its prosecution, Defendants withheld from the Examiner of the '317 Patent the existence of and information from the filings in the contemporaneous Interference that resulted in the invalidation of the related '044 Patent.  (Am Compl.

---

[8]     Corning also relies on newly submitted documents.  (Doc. No. 90 ("Barron Decl.") ¶¶ 4-10 (Ex. B-H).)  However, there has been no showing that any of these documents are properly considered on a motion to dismiss.  *See Porous v. Pall*, 186 F.3d at 1079.  And even if they were proper, the documents are not properly authenticated.

¶¶ 111-171, 224 (noting the invalidation of the related '044 Patent over the Toner reference).)  The '044 Patent issued roughly three years before the '317 Patent and the '044 Patent was challenged in the Interference while the '933 Application was being prosecuted.  (*Id.* ¶ 115.)  In the Amended Complaint, Corning alleges that Defendants and their attorneys failed to disclose, with the intent to deceive, Interference materials despite the knowledge that motions made in the Interference (the Priority Motion and the Toner Motion) were material to, and contradicted, positions advanced in the prosecution.  (Am. Compl. ¶ 224.)  In the October 2020 Order, the Court concluded that Plaintiff failed to plead sufficient facts to support this claim, explaining that Plaintiff failed to plead the what and the where of the alleged inequitable conduct and to identify claims that would not have issued if the material had been submitted.  (Oct. 2020 Order at 28-31.)

Plaintiff argues that the new allegations in its Amended Complaint are sufficiently detailed.  Specifically, Corning alleges that the interference proceeding related to the parent patent of the '317 Patent (the '044 Patent), and that the '317 Patent and the '044 Patents are so closely related that the Examiner initially rejected the '317 Patent on double patenting grounds over the '044 Patent (*i.e.*, the '317 Patent was not patentably distinct from that of the '044 Patent).   (*Id.* ¶¶ 111-112.)  Plaintiff further alleges that when the PTAB placed the '044 Patent into an interference proceeding, the arguments and evidence submitted therein were directly relevant to the '933 Application (later issued as the '317 Patent), and further that Defendant actively pursued the prosecution of the '317 Patent at the same time as it was participating in the Interference. (*Id.* ¶¶ 116-121.)  Corning alleges that, in both proceedings, Defendants argued that their

patents were distinguishable from a prior art reference – the Toner reference.  (*Id.* ¶ 116.)
Both proceedings dealt with the specific issue of whether the Toner reference disclosed
"ambient gas" in contact with the claimed gas-permeable shelves.  (*Id.* ¶ 136.)  Corning
argues that the materials it submitted to the PTAB in the Interference were directly
relevant to Defendant's prosecution of the '317 Patent and contradicted Defendants'
contentions to the Examiner, and yet Defendants did not provide the materials to the
Examiner.  Thus, Corning contends that when Defendants were representing to the
Examiner that their invention was distinguishable from the Toner Reference, they were in
possession of materials showing that it was not distinguishable.  Corning maintains that
this failure to provide the materials constituted a breach of their duty of candor that
obligated the disclosure of the information in the *ex parte* prosecution of the '317 Patent.
(*See generally* Am. Comp. ¶¶ 115-171.)  Corning also argues that the withheld materials
from the interference proceeding also undercut and contradicted a sworn declaration that
Wilson submitted during the '317 Patent's prosecution.  Corning alleges that Wilson's
declaration was highly misleading and contradicted by the Interference papers that
Defendants failed to provide to the '317 Patent's Examiner.  (*Id.* ¶¶ 127-139.)

Corning asserts that its Amended Complaint now contains sufficient additional
details.  For example, Corning asserts that it has alleged the what and where of the
inequitable conduct relating to the '317 Patent—claims 1-9 would not have issued if the
material information from the co-pending interference had been submitted.  (*Id.* ¶¶
135-152.)  In addition, the Amended Complaint cites to materials and information that
the PTAB relied on to invalidate Defendants' '044 Patent, and that the Examiner should

have reached the same result with the '317 Patent if presented with the interference information.  Moreover, Corning alleges that "neither Wilson, Wilson Wolf, nor any of their attorneys . . . disclosed the ['044] Interference or any of the materials filed therein to the Examiner." (*Id*. ¶ 120.)  Further, the Amended Complaint contains allegations that, even if the relevant prior art references in the Interference were already before the Examiner of the '317 Patent, neither the expert interpretation and contentions regarding the prior art that Defendants put forth in the Interference were provided to the Examiner. Corning maintains that this information was material and not cumulative of the information before the Examiner.  (*Id*. ¶¶ 128-131 (detailing motions challenging the claims of the '044 Patent).)

Defendants argue that Plaintiff's allegations on this claim continue to fall short because Corning has failed to identify where in the references the material information is found and which claims would not have issued if the allegedly omitted information had been provided to the Examiner.  Again, Defendants point out that there is no allegation that the Examiner was not aware of the Interference proceeding, and further that the Examiner of the '317 Patent was the same examiner responsible for the '044 Patent, which was the subject of the Interference.  (Defs. Mem. at 13.)  Defendants again note that notice of the Interference was included in the '044 Patent's file history.  (*Id*.) Defendants further argue that, because the Manual of Patent Examining Procedure states that the results of interference searches should not be placed in the application file, it is reasonable to conclude, based on the allegations, that the Examiner was aware of the Interference.  (*Id*.)  Defendants also argue that the examiner of the '317 Patent already

had both the Toner and the Martin references, and that Defendants had no obligation to disclose information regarding those references from the filings in the Interference to the Examiner.  (*Id*. at 15.)  Because the Examiner had had everything necessary (the Toner and Martin references) to evaluate the patentability of the '317, Defendants maintain that any information would have been cumulative to the information in the Examiner's possession.  (*Id*.)  In addition, Defendants argue that the alleged failure to disclose Corning's Priority Motion from the Interference or Corning's allegations regarding other prior art references in the Interference are insufficient to state a claim for inequitable conduct because Corning does not identify which claims would not have issued because of the allegedly undisclosed information and the reason they would not have issued, and that Corning fails to identify any information from these documents that would not have been cumulative.  (*Id*.)

Assuming all well-pled facts in Plaintiff's Amended Complaint to be true, and construing all reasonable inferences in the light most favorable to Plaintiff, the Court again concludes that Plaintiff has failed to plead facts sufficient to state plausible claims for inequitable conduct based on the failure to disclose the Interference.  *See Twombly*, 550 U.S. at 570.  The Court again finds that the Amended Complaint fails to adequately identify what claims would not have issued if the purportedly material information had been submitted to the Examiner because Plaintiff has not alleged that the Examiner was unaware of the Interference and that the allegedly undisclosed information was not cumulative of the references that were already before the Examiner.  For this reason,

Corning has failed to state a claim for inequitable conduct on these grounds.  *See, e.g.*, *Exergen*, 575 F.3d 1212, 1328 (Fed. Cir. 2009).

Accordingly, the Court grants, with prejudice, Defendants' motion to dismiss Plaintiff's claim of inequitable conduct related to the '317 Patent.

## III.   Claim preclusion and the *Kessler* doctrine

In the October 2020 Order, the Court granted Defendants' motion to dismiss regarding Plaintiff's claims for a declaration of claim preclusion and preclusion under the *Kessler* doctrine.  (Oct. 2020 Order at 36.)  The Court dismissed the claims without prejudice.  (*Id.*)  The Court explained that the allegations in the original Complaint failed to state a claim for declaratory relief of claim preclusion or the *Kessler* doctrine, noting that separate patents describe separate inventions and that it cannot be presumed that related patents rise and fall together.  (*Id.* at 35.)  In addition, the Court concluded that the Complaint's allegations that the '192, '443, and '317 Patents include claims that, "under Defendants' apparent claim construction in the suits against the HYPERStack Users, are patentably indistinct from those of the '426 and '427 Patents" were merely conclusory allegations, such that the allegations are insufficient to state a claim for relief.  (*Id.* at 35-36.)

Plaintiffs now reassert those claims in Counts Eleven and Twelve, respectively, with expanded factual allegations.  (Am. Compl. ¶¶ 38-51 & Exs. H, I, J (claim charts), 243-252, 253-257.)[9]  Defendants move to dismiss both claims again, pointing out that

---

[9]      Plaintiff asserts that its claim charts set out a limitation-by-limitation basis for how the patents are indistinct from each other considering the prior art.  (Pl. Opp. at 29.)

neither count states a traditional assertion of claim preclusion (i.e., where the claim was raised and adjudicated previously).  Instead, in both Counts, Plaintiff alleges that Defendants are barred from asserting the claims of the Patents-in-Suit against the direct infringers because the Court held in the Minnesota Litigation that Plaintiff does not infringe two different patents—the '426 and '427 Patents.[10]  While the '422 and '192 Patents were not asserted in the Minnesota Litigation, they derive from the same '651 Provisional Application as the '426 and '427 Patents.

"The general concept of claim preclusion is that when a final judgment is rendered on the merits, another action may not be maintained between the parties on the same 'claim,' and defenses that were raised or could have been raised in that action are extinguished."  *Hallco Mfg. Co., Inc. v. Foster*, 256 F.3d 1290, 1294 (Fed. Cir. 2001) (citing Restatement (Second) of Judgments, §§ 18-19)).  Claim preclusion applies when "'(1) the first suit resulted in a final judgment on the merits; (2) the first suit was based on proper jurisdiction; (3) both suits involve the same parties (or those in privity with them); and (4) both suits are based upon the same claims or causes of action.'"  *Elbert v. Carter*, 903 F.3d 779, 782 (8th Cir. 2018) (citation omitted).[11]  When the first and second suit

---

[10]     In the Minnesota Litigation, Defendants sued Plaintiff for infringement of the '426 and '427 Patents.  The Court dismissed Defendants' infringement claims with prejudice after determining that "Plaintiffs' claims cannot succeed under the governing law."  (Doc. No. 299 at 5.)

[11]     In assessing claim preclusion, regional circuit law applies.  *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1165 (Fed. Cir. 2018).  Whether a particular cause of action in a patent case is the same as another cause of action, however, has "special application to patent cases" and, thus, is governed by Federal Circuit law.  *Id.*

involve different patents, claim preclusion will apply "only if the scope of the asserted patent claims in the two suits is essentially the same." *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1167 (Fed. Cir. 2018). "[C]laims which are *patentably indistinct* are essentially the same." *Id*. (emphasis added).

The *Kessler* Doctrine "bars a patent infringement action against a customer of a seller who has previously prevailed against the patentee because of invalidity or noninfringement of the patent." *SpeedTrack, Inc. v. Office Depot, Inc.*, 791 F.3d 1317, 1323 (Fed. Cir. 2015) (citation omitted). The *Kessler* Doctrine "fills the gap between [the claim and issue] preclusion doctrines," "allowing an adjudged *non-infringer* to avoid repeated harassment for continuing its business as usual post-final judgment in a patent action where circumstances justify that result." *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1056 (Fed. Cir. 2014) (emphasis in original). While the *Kessler* Doctrine is typically applied against previously adjudicated patents, the *Kessler* Doctrine may still apply to unadjudicated patents if the previously adjudicated patent and the unadjudicated patents are "*patentably indistinct*." *SimpleAir, Inc.*, 884 F.3d at 1170 (emphasis added).[12]

---

[12]     Defendant submits that two claims are patently indistinct in the context of a claim preclusion analysis when they are "essentially the same." Plaintiff alleges that the patent claims at issue are patently indistinct (and "essentially the same") "if they would have been anticipated and/or obvious over the claims of the '426 Patent and the '427 Patent, in view of the knowledge of a person of ordinary skill in the art and the relevant prior art." (Am. Compl. ¶ 38.) In *SimpleAir*, the Federal Circuit explained that "claims that are patentably indistinct are essentially the same." 884 F.3d at 1167. The Federal Circuit also recognized that the inquiry into whether claims are "patentably indistinct" is rooted in the doctrine of obviousness-type double patenting. *Id*. at 1167-68. Thus, it is appropriate to look to the doctrine of obviousness when considering whether claims are patently indistinct.

The central question here is whether Plaintiff has sufficiently alleged that the relevant claims are patentably indistinct.  Plaintiff contends that the expanded allegations of the Amended Complaint show how the claims of the Patents-in-Suit are patentably indistinct from the related patents that were litigated in Plaintiff's favor—the '426 Patent and the '427 Patent.  Specifically, Plaintiff alleges that "[i]n the Minnesota Litigation, Corning obtained dismissal with prejudice of Defendants' claims that the HYPERStack product infringed the '426 and '427 Patents."  (Am. Compl. ¶ 255.)[13]  Plaintiff also alleges that although they were not asserted in the Minnesota Litigation, the '443 Patent and '192 Patent "derive from the same '651 Provisional Application as the '426 and '427 Patents, share the same specification, and, to the extent the use of the HYPERStack device is found to infringe, include claims that are patentably indistinct from those of the '426 Patent and '427 Patent."  (Am. Compl. ¶ 37.)  Plaintiff further alleges that "the '317 Patent shares the same specification with [the '044 Patent] and concerns the same alleged invention."  (*Id*. ¶ 53.)  In addition, Plaintiff submits that the claims of the '192, '443, and '317 Patents are patentably indistinct from the '426 Patent and the '427 Patent under Defendants' apparent claim constructions in their lawsuits against Corning's customers, which involve the same Corning vessel that was at issue in the Minnesota Litigation.  (*Id*. ¶¶ 36-51.)  In support, Plaintiff provides claim charts wherein they allege that each of the limitations of the independent claims of the Patents-in-Issue are either present in one or

---

[13]    Plaintiff alleges that under the *Kessler* doctrine, the HYPERStack product "now carries a 'limited trade license' for use in commerce by Corning and its customers and end-users, free and clear of additional claims of infringement based on the '426 and '427 Patents and any Wilson Wolf patents that are 'patentably indistinct' from them."  (*Id*.)

more claims of the related patents.  (*Id*. ¶¶ 39, 43, 48, Exs. H, I, J.)  In addition, Plaintiff alleges that "[t]o the extent that there are any differences in the independent claims of [the Patents-in-Suit] the claims of the [related patents] as written, those differences are anticipated and/or obvious" in light of the prior art, again attaching claim charts with alleged demonstration of how they are patentably indistinct.  (*Id*. ¶¶ 40, 44, 49.)

While the Court found that the allegations of the original Complaint contained no factual allegations that identify Defendants' apparent claim construction or provide sufficient factual basis for the Court to plausibly infer that such a claim construction would render the '192, '443, and '317 Patents patentably indistinct from the '426 and '427 Patents, that deficit in allegations has been corrected.  Namely, Corning has laid out factual allegations that plausibly show how claims of the '192 Patent, '443 Patent, and the '317 Patent are patentably indistinct from the '426 and '427 Patents.  Accordingly, the Court denies the motion to dismiss Counts Eleven and Twelve.[14]

---

[14]     The Court notes the posture leading to the dismissal of the infringement claims in the Minnesota Litigation.  Wilson Wolf filed a motion to voluntarily dismiss the infringement claims under 35 U.S.C. § 271(b), citing the Supreme Court's decision in *Limelight Networks, Inc. v. Akamai Technologies, Inc.*, 134 S. Ct. 2111 (2011). (Minnesota Litigation, Doc. No. 299 at 3.)  In *Akamai*, the Supreme Court held that "a defendant [was] not liable for inducing infringement under [35 U.S.C.] § 271(b) when no one . . . directly infringed under 35 U.S.C. § 271(a) or any other statutory provision." *Akamai*, 134 S. Ct. at 2114, 2117.  In addition, the Supreme Court held that there can be no liability for inducing infringement where all claimed steps in a method patent are not performed by a single person.  *Id*. at 2117.  The parties agreed, and the Court confirmed, that Wilson Wolf's infringement claims against Corning related to the '426 and '427 Patents could not succeed under the governing law.  (Doc. No. 299 at 3.)  Defendants argue that the '426 and '427 Patent claims required the step of "forming a cell culture device"—a step that was performed by Corning, but not its customers, thus precluding liability because all claimed steps in the method patents were not performed by a single person, and that the Patents-in-Suit here do not require someone to "form" a cell-culture

## CONCLUSION

For the reasons discussed above, the Court finds that Plaintiff has failed to allege sufficient facts to state a plausible claim for inequitable conduct for failure to disclose adverse data and failure to disclose the Interference.  The Court, however, also finds that Plaintiff has alleged sufficient facts to state plausible claims for a declaration of claim preclusion and preclusion under the *Kessler* doctrine.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss (Doc. No. [81]) is **GRANTED IN PART** and **DENIED IN PART** consistent with the memorandum above as follows:

1.     The Court **GRANTS** Defendants' Motion to Dismiss regarding Plaintiff's claims for inequitable conduct.

2.     The Court **DENIES** Defendants' Motion to Dismiss regarding Plaintiff's claims for a declaration of claim preclusion and preclusion under the *Kessler* doctrine.

3.     Counts Two, Five and Eight of the Amended Complaint (Doc. No. [73]) are **DISMISSED WITH PREJUDICE**.

Dated:  September 17, 2021                    s/Donovan W. Frank
                                                          DONOVAN W. FRANK
                                                          United States District Judge

---

device.  (Defs. Mem. at 19-20.)  Whether or not this difference means that the claims of the Patents-in-Suit are not "patentably indistinct" from the claims of the '426 and '427 Patents is properly considered on summary judgment or at trial.