# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Corning Incorporated,                                      Civil No. 20-700 (DWF/TNL)

          Plaintiff,

v.                                                         **MEMORANDUM**
                                                           **OPINION AND ORDER**

Wilson Wolf Manufacturing
Corporation. and John R. Wilson,

          Defendants.

---

George C. Lombardi, Esq., Ivan Poullaos, Esq., Kimball R. Anderson, Esq., Linda T. Coberly, Esq., Paula W. Hinton, Esq., Robine Grant, Esq., and Sandra A. Edwards, Esq., Winston & Strawn LLP; Jeff M. Barron, Esq., Barnes & Thornburg, LLP; Grant D. Fairbairn, Esq., and Kelsey McElveen, Esq., Fredrickson & Byron, PA, counsel for Plaintiff.

Britta S. Loftus, Esq., Devan V. Padmanabhan, Esq., Erin O. Dungan, Esq., Mariah L. Reynolds, Esq., Michelle E. Dawson, Esq., Sri K. Sankaran, Esq., and Paul J. Robbennolt, Esq., Padmanabhan & Dawson, PLLC, counsel for Defendants.

---

# INTRODUCTION

This matter is before the Court on the following motions:  Defendants'[1] Motion for Partial Summary Judgment (Doc. No. 422); Defendants' Motion to Exclude Certain Expert Testimony (Doc. No. 431); Defendants' Motion to Dismiss Remaining Claims of the Amended Complaint Relating to the '192 and '443 Patents (Doc. No. 439); Corning's Motion to Exclude Expert Testimony (Ludington) (Doc. No. 426); Corning's Motion to

---

[1]     The Court refers to Plaintiff Corning, Inc. as "Corning" and to Defendants Wilson Wolf Manufacturing Corporation ("Wilson Wolf") and John R. Wilson ("Wilson") as "Defendants."

Exclude Expert Testimony (Wilson and Dr. Cosman) (Doc. No. 446); and Corning's

Motion for Summary Judgment on Claims VII and IX:  Noninfringement and Invalidity

of the '317 Patent (Doc. No. 458).

For the reasons set forth below, the Court:  (1) grants Defendants' Motion to

Dismiss Remaining Claims Relating to the '192 and '443 Patents; (2) grants in part and

denies in part as moot Corning's Motion for Summary Judgment on Claims VII and IX:

Noninfringement and Invalidity of the '317 Patent; (3) denies Defendants' Motion for

Partial Summary Judgment; (4) denies Defendants' Motion to Exclude Certain Expert

Testimony; (5) denies Corning's Motion to Exclude Expert Testimony (Ludington); and

(6) grants in part and denies in part Corning's Motion to Exclude Expert Testimony

(Wilson and Dr. Cosman).

## BACKGROUND

This case is related to *John Wilson et al. v. Corning, Inc.*, Civ. No. 13-210 (D.

Minn.) (the "2013 Lawsuit").  The facts of this case have been extensively set forth in

this case and the 2013 Lawsuit.[2]  Both suits involve technologies for cell culture, over

which the parties have been litigating for years.

---

[2]      In the 2013 Lawsuit, Defendants sued Corning, alleging that Corning obtained
Defendants' technology under a confidentiality agreement and that Corning subsequently
developed its HYPERStack and HYPERFlask products using that technology.  The Court
dismissed the patent infringement claims in the '2013 Lawsuit.  (2013 Lawsuit, Doc.
No. 299.)  The patents involved in that case were Defendants' U.S. Patent No. 8,158,426
(the '426 Patent) and U.S. Patent No. 8,158,427 (the '427 Patent).  The Court also
dismissed Defendants' trade secret claim insofar as it was based on alleged
misappropriation after April 21, 2005, the date when Wilson's patent applications
published.  (2013 Lawsuit, Doc. No. 388.)  And on September 25, 2023, the Court issued
extensive Findings of Fact and Conclusions of Law after a multi-week court trial on

Relevant to this case, in or around December 2019 and early 2020, Wilson Wolf filed three federal patent infringement actions against customers and end-users of Corning's HYPERStack product, alleging that the use of Corning's HYPERStack product (or the use of cells manufactured using the HYPERStack product) directly infringes the claims of one or all of the patents-in-suit—U.S. Patent No. 9,441,192 (the "'192 Patent"), U.S. Patent No. 8,697,443 (the "'443 Patent") (together, the "Method Patents"), and U.S. Patent No. 9,732,317 (the "'317 Patent") (the "Apparatus Patent") (collectively, the "patents-in-suit").  Specifically, Defendants[3] filed lawsuits against Brammer Bio, LLC, Sarepta Therapeutics, Inc., Nationwide Children's Hospital, Inc., and The Research Institute at Nationwide Children's Hospital (collectively, the "HYPERStack Users"). (Doc. No. 73 ("Am. Compl.") ¶¶ 23-25.)[4]  Before Defendants filed the Customer Lawsuits, Defendants' counsel sent a letter to a judge who had served as a mediator between the parties requesting that he pass the information along to Corning.  (Doc. No. 192; Doc. No. 224 at 22-29.)  The Court previously determined that the letter was

---

Defendants' remaining claims.  (2013 Lawsuit, Doc. No. 1007 ("2013 FOF" & "2013 COL").)  Those findings are discussed in more detail below.

[3]     While Wilson Wolf brought the Customer Lawsuits, for ease of reference, the Court refers to Defendants as the plaintiff in that case.

[4]     The Method Patents describe and claim methods of culturing cells in a static cell-culture device that incorporates gas-permeable material.  The claims of the '192 Patent require that the uppermost location of medium in the device be more than 2.0 cm above the lowermost location of the medium.  The claims of the '443 Patent require that the static cell-culture device have at least two scaffolds at different elevations.  The Apparatus Patent claims a "static cell growth apparatus" with a number of features, including a plurality of gas-permeable shelves on which cells grow inside a "culture space."

3

evidence of a threatened lawsuit.  (Doc. No. 285 at 14 n.7.)  In that letter, counsel for

Defendants explained that Defendants had won issuance of the patents-in-suit and that

Defendants would sue Corning's customers over the HYPERStack device unless Corning

agreed to settle.  (Doc. No. 192 ¶¶ 4-9.)

### Corning's HYPERStack Product

The HYPERStack Users utilize Corning's HYPERStack cell-culture vessels in

their businesses.  (Am. Compl. ¶¶ 15-17.)  The HYPERStack product is a cell-culture

device for static cell culture.  More specifically, it is a multi-layered, stackable, scalable

cell-culturing device.  (Doc. No. 463 ("Cosman Infringement Report") at Ex. C at 9-10.)[5]

Each layer consists of an individual cell-culture compartment—a "stackette"—that has a

rigid frame made up of a top plate and sidewalls.  (*Id.*)  A thin, gas-permeable film is

welded across the bottom of each frame.  (*Id.*)  The stackettes in the HYPERStack

product do not sit within any outer casing or enclosure.

On July 26, 2005, two Corning inventors, Greg Martin and Dr. Allison Tanner,

filed a provisional patent application (the '896 provisional application) for a Multilayered

Cell Culture Apparatus, and on May 11, 2006, a non-provisional application, for the

invention (together, the "Martin Application").  (Doc. No. 462-17.)  The PTO published

the non-provisional patent application on February 1, 2007.  (Doc. No. 462-14.)

---

[5]     Some exhibits are attached to multiple declarations.  For convenience, the Court
cites to only one attached exhibit.

### *Wilson's '044 and '317 Patents and Underlying Applications*

In 2017, Wilson's U.S. Patent No. 8,809,044 (the "'044 Patent") was invalidated, the history of which the Court will briefly summarize below. In December 2007, Wilson pursued patent protection for a multi-layer device ("MLD") by filing U.S. Patent App. No. 11/952,848 (the "'848 Application").[6] The '848 Application produced the '044 Patent and later, the '317 Patent. (Doc. No. 462-3 (the "'044 Patent") and Doc. No. 462-4 ("the '317 Patent")). The '044 Patent includes claims relating to a static cell-culture device having multiple gas-permeable shelves. The '848 Application also produced the '317 Patent through a "continuation" application that Wilson based on the '848 Application. Both the '044 Patent and the '317 Patent include claims relating to a static cell-culture device having multiple gas-permeable shelves, which Corning claims is an attempt to cover its HYPER products.

With respect to the '317 Patent, the Examiner issued a "double-patenting rejection," finding that the application contained claims that were "not patentably

---

[6]    A year earlier, on December 7, 2006, Wilson filed U.S. Provisional Patent App. No. 60/873,347 (the "'347 Application"), which focused on a single-layer design ("SLD") for the culture and shipping of islet cells. (Doc. No. 462-10 at WW000634 ("Throughout this disclosure, the device is referred to as the single layer gas permeable device (SLD)); *see generally* the '347 Application & WW000645 (showing an MLD as a "Backup").). The application also attached as appendices portions of Wilson's SBIR application, which also focused on the SLD. (*See id*.) The application was filed more than a year after Martin and Tanner filed the Martin Application. The '848 Application purported to claim the benefit of the filing date of the '347 Application, but the '848 Application was the first time that Wilson specifically pursued protection for a multi-later device. (Doc. No. 462-13.) Wilson admitted to the PTO that "[a]t least some" of the claims of the '848 Application were "copied verbatim" from Corning. (Doc. No. 462-12 at 1.)

distinct" from the claims of the '044 Patent.  (Doc. No. 462-5 at WWDJ0041049-50.)  In response, Wilson filed a terminal disclaimer, giving up any extra patent term for the soon-to-be issued '317 Patent (so that its term would not extend beyond that of the '044 Patent—from which it was "not patentably distinct").  (*Id.* at WWDJ0041072.)[7]  The disclaimer resolved the Examiner's rejection but did not alter the finding that the '317 Patent was patentably indistinct from the '044 Patent.  (*Id.* at WWDJ0041097.)

On August 15, 2017, the '317 Patent issued.  Claims 6, 7, and 9 are at issue in this case.  Claim 6 is independent and claims 7 and 9 depend on claim 6:

> **6.**    A static cell growth apparatus comprising:
> a liquid impermeable housing, the inside of which is able to contain cells and medium and the outside of which is in contact with ambient gas; and
> the housing defining a plurality of gas permeable shelves, each having an inside surface and an outside surface; and
> the inside surface of each shelf having an opposing surface located a distance away and defining a culture space; and
> the culture spaces are located one above the other when the shelves are in a horizontal position; and
> a manifold that connects the culture spaces; and
> projections that make contact with the outside surface of each shelf while leaving a portion of the outside surface in contact with ambient gas;
> **7.**    The apparatus of claim 6, whereby said housing is capable of being completely filled with media for optimal cell-nutrient exchange.
>
> ***
>
> **9.**    The apparatus of claim 6, whereby a uniformity of conditions for cellular growth includes a determined media volume per unit surface area.

---

[7]    A "double-patenting rejection" prevents an inventor from obtaining multiple patents for the same invention and thus improperly extending the life of the invention's patent.

(Doc. No. 448-1 (the "'317 Patent") claims 6, 7, 9.)

***PTAB Decision and Federal Circuit Appeal—(Interference Proceeding)***

Also in 2017, the Patent Trial and Appeal Board ("PTAB") presided over an interference proceeding between Corning's inventors and Wilson, wherein Corning argued that the '044 Patent was anticipated or obvious over the prior art. (Doc. No. 462-6 at n.5.) The PTAB found that one of the key pieces of the prior art (U.S. Patent No. 6,759,245 (the "Toner Patent")) anticipated the '044 Patent, and subsequently denied Wilson's request for rehearing.[8] The PTAB found that the Toner Patent disclosed culturing cells in the presence of ambient gas (it disclosed "static, as well as directional, flow" of the gas and did not require it to be pumped or forced). (*Id.* at 15.) The PTAB concluded that the key claims of the '044 Patent were invalid. (*Id.* at 19.) In October 2017, the Federal Circuit affirmed the PTAB's decision. *See Wilson v. Martin*, 789 F. App'x 861, 868, 872 (Fed. Cir. 2019). The Court refers to the PTAB decision and the Federal Circuit's affirmance together as the "Interference Proceeding."

In the 2013 Lawsuit, Corning argued that the Federal Circuit affirmance of the PTAB decision had become "final" and preclusive, entitling Corning to summary judgment on all of Defendants' claims in that case. The Court declined to enter summary judgment in light of the differences between the state-law contract and trade secret issues in the 2013 Lawsuit and the patent invalidity issues resolved in the Interference Proceeding. *Wilson et al. v. Corning Inc.*, Civ. No. 13-210, 2020 WL 3271508, at *5-7

---

[8]     The parties had disputed whether Toner disclosed the idea of culturing cells in the presence of "ambient gas." (Doc. No. 462-6 at 12-15.)

(D. Minn. June 17, 2020).  The Court also concluded that there was a genuine issue of material fact as to whether invalidated claims in the '044 Patent were synonymous with the confidential information and trade secrets that Wilson had allegedly disclosed to Corning through patent applications that were "not a part of the same patent family as the now-invalidated '044 Patent."  *Id.* at *5.[9]

### Findings in the 2013 Lawsuit

In November and December 2022, the 2013 Lawsuit was tried by the Court, after which the Court issued written findings of fact and conclusions of law and entered final judgment.  Significantly, the Court found that Wilson was not the first to come up with the ideas that he argued are reflected in Corning's HYPERFlask and HYPERStack products.  (2013 FOF ¶¶ 239, 253-54; *see also* 2013 COL ¶ 11.)  Specifically, the Court found that:

- the OptiCell device, which used multiple cartridges for cell growth, each with a thin, gas-permeable film on the top and bottom, was "on the market" before Corning and Wilson interacted in 2004 and 2005 (FOF ¶¶ 99-107);

- the OptiCell device eliminated the gas-liquid interface, with each cartridge entirely filled with liquid media, and spaces between the cartridges allowing oxygen to get to and flow through the membranes to reach the cells (*id.* ¶¶ 109-10);

- the Barbera-Guillem patent described this design, explaining that the individual cartridges could be manifolded together to supply media to multiple chambers at one time (*id.* ¶ 112);

- the Toner patent "disclosed the use of multiple individual cell-culture compartments that contained gas-permeable material on the bottom of each

---

[9]     The current case involves the issue of patent invalidity with respect to the '317 Patent, which is in the same patent family as the now-invalidated '044 Patent.

compartment on which cells would grow in the absence of a gas-liquid interface" (*id*. ¶ 113); and

- the compartments in the Toner patent were manifolded together and could be used in a static state (*id*.).

### The Present Action

On March 9, 2020, Corning brought the present action in response to the Customer Lawsuits, seeking declarations of noninfringement (Counts 1, 4, and 7) or invalidity (Counts 3, 6, and 9) of the patents-in-suit, unenforceability due to inequitable conduct (Counts 2, 5, and 8) as to the patents-in-suit, and claim preclusion (Count 11) and preclusion under the *Kessler* doctrine (Count 12). (*See generally* Doc. No. 73 ("Am. Compl.").)[10]  Finally, Corning brought a state-law claim for tortious interference with prospective economic advantage (Count 13). (*Id.*)  In support of the tortious interference claim, Corning alleges that, having suffered invalidation of the '044 Patent, Defendants launched a retaliatory litigation campaign against Corning's customers. With respect to the '192 and '443 Patents, Corning alleges that Wilson knowingly "submitted materially false and misleading declarations in the prosecution of the related '762 Application" on which "the Patent Examiner relied" in issuing the '192 and '443 Patents. (*Id.* ¶¶ 185,

---

[10]    The Court dismissed Corning's inequitable conduct claim as to the '317 Patent (Count 8) in its entirety and Corning's inequitable conduct claims in Counts 2 and 5, insofar as those claims are based on allegations that Defendants withheld adverse data from the USPTO during prosecution of the '192 and '443 Patents. (Doc. No. 140.)  In addition, the Court granted Corning's motion to voluntarily dismiss its safe harbor claim (Count 10). (Doc. No. 285.)

205).[11]  Corning alleges that the "lawsuits filed against Corning's HYPERStack

customers and end-users constitute sham litigation, in that they are objectively baseless

and were filed without regard to their substantive merits, with the specific intention of

disrupting Corning's relationships with its customers and end-users and with the intent

of wrongfully extorting money from Corning."  (*Id.* ¶ 259.)  Corning argues, for

example, that Defendants filed the Customer Lawsuits knowing that the legal positions

on validity and infringement were mutually exclusive and that "its patents were

wrongfully procured via fraud on the PTO and so are unenforceable" and that a

reasonable litigant "could not have expected success on the merits" because of the

fraudulent procurement.  (*Id.* ¶ 260.)  Corning also included a request for an

"exceptional case" finding for purposes of an award of attorney fees.  (*Id.* ¶ 90.)

### *Markman Rulings*

The parties disputed several claim terms across the patents-in-suit.  In a Markman

Order, the Court provided constructions of various claim terms that impact Defendants'

claims that Corning's customers infringe those patents.  These constructions are:  (1) the

"2.0 cm limitations" of the '192 Patent claims; and (2) the "scaffold/scaffolds"

limitations of the '443 Patent claims.  Specifically, the Court construed the 2.0 cm

limitations to mean "the continuous height of medium residing over the surface where the

---

[11]     The inequitable conduct claims related to the '192 and '443 Patents survived
Defendants' motion to dismiss insofar as they are based on the submission of the Vera
Declaration.  (Doc. No. 43 at 26.)

cells reside for culturing." (Doc. No. 184 at 13.)[12]  The Court construed the "scaffold"

limitation to mean "a platform for cells to reside upon that is separate from the gas-

permeable membrane." (*Id.* at 24.)[13]

The parties also disputed three claim terms in the '317 Patent. (Doc. No. 184

at 26-28.)  Each of the asserted claims requires a "static cell growth apparatus." (*Id.*)

The Court construed this term to mean a "cell growth apparatus that is capable of

functioning in a static mode." (*Id.* at 26-27.)  The asserted claims also recite limitations

that require structures in relation to ambient gas (*i.e.*, that the "outside" of the housing "is

in contact with ambient gas").  The Court construed "ambient gas" to mean "gas of the

environment surrounding and external to the apparatus." (*Id.* at 28.)  Also in its

Markman Order, the Court declined to construe the term "housing" as it appears in the

'317 Patent; instead, the Court found that the term "need not be construed as it is a non-

technical term which the Court believes a lay juror will understand as written within the

context of the plain claim language." (*Id.* at 28.)[14]

---

[12]    Defendants disputed this construction and instead argued that no construction was
necessary.

[13]    Defendants disputed this construction and urged the Court to construe "scaffold"
as "a platform for cells to reside on the top surface of." (Doc. No. 184 at 21.)

[14]    Each of the asserted claims requires "a liquid impermeable housing."  The claims
also require that the inside of the housing "is able to contain cells and medium," that the
outside of the housing "is in contact with ambient gas," and that the housing "defin[es] a
plurality of gas permeable shelves."  Corning had proposed that the term "housing" be
construed as "a liquid impermeable casing that encloses the device." (Doc. No. 184 at
27-28.)  Corning submits that, even though the Court previously declined to construe the
term, it is now clear that the parties disagree about what "housing" means and covers, and
that the term should therefore be construed now.

Given the Court's claim construction rulings, the parties agreed that neither the claims of the '192 Patent nor the claims of the '443 Patent were infringed.  In an Order dated October 23, 2023, the Court granted Corning's Motion for Partial Summary Judgment of Noninfringement of the '192 and '443 Patents (Counts 1 and 4).  (Doc. No. 420.)  Also given the claim construction rulings, the parties filed and the Court entered a stipulation dismissing without prejudice the claims that sought a declaration of invalidity of the '192 and '443 Patents (Counts 3 and 6), as well as Corning's claim preclusion and *Kessler* preclusion claims (Counts 11 and 12) insofar as they pertain to the '192 and '443 Patents.  (Doc. No. 421.)  Thus, the following claims remain pending in this action:

- Count 2:  Declaration of Unenforceability of the '192 Patent (based on Vera Declaration allegations only)
- Count 5:  Declaration of Unenforceability of the '443 Patent (based on Vera Declaration allegations only)
- Count 7:  Declaration of Noninfringement of the '317 Patent
- Count 9:  Declaration of Invalidity of the '317 Patent
- Count 11:  Declaration regarding Claim Preclusion ('317 Patent only)
- Count 12:  Declaration regarding *Kessler* Doctrine ('317 Patent only)
- Count 13:  Tortious Interference (all three patents)

---

Defendants submit that the assembly of stackettes and manifolds of the HYPERStack vessel form a "housing" even though there is no structure that encases or encloses the entire device.  (Cosman Infringement Report Ex. 1 at Ex. C at 4.)  Defendants' technical expert claims that the gas-permeable film across the bottom of each stackette is part of the "housing."  (*Id.*)  Corning contends, however, that if the term "housing" meaningfully distinguishes the '317 Patent from the now-invalidated '044 Patent, then a "housing" cannot be understood to contain a thin film or membrane like the one used in the HYPERStack device.

The Court agrees that the term housing should now be construed and that its proper construction is the following:  a liquid impermeable casing that encloses the device.

*Relevant Patent Reexaminations*

While this lawsuit was pending, Corning requested *ex parte* reexamination by the Patent Office of each of the patents-in-suit.  The grounds and prior art references cited by Corning in its requests are also contained in Corning's expert reports.  The prior art cited and relied on by Corning in these reexaminations include various patents, which are summarized in the chart (provided by Defendants) below:

| Reexam No. | Patent Challenged | Prior Art Cited by Corning |
|---|---|---|
| 90/014,538 (the "'538 Reexamination") | '317 Patent | Toner '245<br>Martin<br>Barbera-Guillem '905 |
| 90/014,540 (the "'540 Reexamination) | '192 Patent | Toner '932<br>Barbera-Guillem '310<br>Barbera-Guillem 2001 |
| 90/019,042 (the "'042 Reexamination") | '192 Patent | Toner '932<br>DiMilla |
| 90/014,541 (the "'541 Reexamination) | '443 Patent | Toner '932<br>Barbera-Guillem '310 |

(Doc. No. 424 at 7.)

Corning requested reexamination of the '317 Patent on the grounds that the claims are unpatentable as anticipated by Toner '245, Martin, and/or Barbera-Guillem '905. (Doc. No. 448-4 at 36-38.)  The Examiner issued a final rejection of seven of nine claims as unpatentable based on Toner (Doc. No. 448-6), but on appeal the PTAB reversed the rejection (Doc. No. 448-7).  The Patent Office then issued a reexamination certificate stating that all claims were found patentable.  (Doc. No. 448-8.)

Corning sought reexamination of the '192 Patent twice.  Initially, the Patent Office rejected the claims of the '192 Patent based on Barbera-Guillem '310 and Toner '932, but subsequently withdrew the rejections.  (Doc. No. 448-11.)  In the second reexamination, Corning argued that claims 1-30 of the '192 Patent are obvious over Toner '932 in combination with a Wilson patent and over DiMilla alone or in view of Toner '932.  (Doc. No. 448-13.)  The Patent office granted reexamination on the DiMilla grounds, ultimately finding that the claims are patentable.  (Doc. No. 448-15.)

Corning also sought reexamination of the '443 Patent on the grounds that the claims are anticipated by Toner '932 and Barbera-Guillem '310, and that the claims are obvious over Toner '932 and Barbera-Guillem '310, alone or in combination.  (*Id.* ¶ 18, Ex. 17 at 32-37.)  The Patent Office granted reexamination on all grounds and, after further reexamination and an appeal to the PTAB, the PTAB found all claims of the '443 Patent to be patentable.  (Doc. No. 448-19.)

The Court will address the various motions below.

## DISCUSSION

## I.   **Defendants' Motion to Dismiss for Lack of Standing**

In Counts 2 and 5, Corning asserts claims for unenforceability due to inequitable conduct as to the Method Patents (the '192 and '443 Patents).  Defendants move to dismiss these claims, arguing that in light of the Court's summary judgment of non-infringement of the Method Patents and the Court's dismissal of Corning's non-infringement claims, Corning's declaratory judgment claims for unenforceability relating

to these same patents were rendered moot.[15]  Defendants argue that the Court should

exercise its discretionary authority to dismiss these claims.

A party has standing to bring an action under the Declaratory Judgment Act, 28

U.S.C. § 2201(a), if an "actual controversy" exists.  This is the same as an Article III

"case or controversy."  *See Arris Grp., Inc. v. British Telecomms. PLC*, 639 F.3d 1368,

1373 (Fed. Cir. 2011).  The Court determines whether an "actual case or controversy"

exists over which the Court has subject matter jurisdiction.  *See Benitec Australia, Ltd. v.*

*Nucleonics, Inc.*, 495 F.3d 1340, 1343-45 (Fed. Cir. 2007) (outlining the basic principles

for determining declaratory judgment jurisdiction in patent disputes).  For jurisdiction

under the Declaratory Judgment Act to attach, the facts alleged must, "under all the

circumstances, show that there is a substantial controversy, between parties having

adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a

declaratory judgment."  *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007)

(citation and quotation omitted).

When a patent infringement claim is resolved on the merits in favor of an accused

infringer, remaining claims related to the patent are not necessarily moot.  *See Cardinal*

*Chem. Co. v. Morton Int'l, Inc*., 508 U.S. 83, 96-98 (1993).  Indeed, in considering

---

[15]     The parties agreed that, given the Court's claim construction of the contested terms of the Method Patents, partial summary judgment on other claims involving the Method Patents was appropriate.  And as noted above, the Court dismissed without prejudice Corning's declaratory judgment claims for invalidity of the Method Patents (Claims 3 and 6), claim preclusion as to the Method Patents (Claims 11), and *Kessler* doctrine preclusion related to the Method Patents (Claim 12).  The parties, however, were unable to agree on a disposition of Corning's remaining declaratory judgment claims related to the unenforceability of the Method Patents due to inequitable conduct.

whether an affirmance by the Federal Circuit that a patent is not infringed is a sufficient reason to vacate a declaratory judgment holding the patent invalid, the Supreme Court explained that "it is perfectly clear that the District Court had jurisdiction to entertain Cardinal's counterclaim for a declaratory judgment of invalidity." *Id*. at 96.  In that case, the Supreme Court concluded:  "The case did not become moot when [the Federal Circuit] affirmed the finding of noninfringement." *Id.* at 98.

Here, the Court exercised jurisdiction over Corning's declaratory judgment claims, which included claims seeking declarations of noninfringement and invalidity and unenforceability of the Method Patents.  And while the Court entered summary judgment of noninfringement with respect to the Method Patents under the Court's claim construction, the parties continue to dispute the enforceability of the Method Patents based on Defendants' alleged inequitable conduct.  The Court concludes that given the parties' positions and the posture of this case, there continues to be a live case or controversy.  Thus, the Court continues to have jurisdiction over the remaining claims related to the '192 and '443 Patents.

At oral argument, counsel for Defendants stressed that they were not arguing that summary judgment of noninfringement automatically divests the Court of jurisdiction. Instead, Defendants urge the Court to dismiss these claims on discretionary grounds even if jurisdiction remains.  The Court has the power to do so.  *See, e.g.*, *SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech. LTD.*, 59 F.4th 1328, 1338 (Fed. Cir. 2023) ("[W]e have repeatedly held that a district court 'faced with an invalidity counterclaim challenging a patent that it concludes was not infringed may either hear the claim or

dismiss it *without* prejudice.'") (emphasis added) (citations omitted).  The Court agrees

with Defendants and finds that the most efficient path forward is to dismiss the

inequitable conduct claims regarding the Method Patents without prejudice.  This will

allow the remaining portions of the case to move forward in a more streamlined fashion.

If the Court's claim construction rulings are affirmed on appeal, the summary judgment

of noninfringement of the Method Patents would settle the dispute between the parties.

And if the Court's claim construction rulings are reversed on appeal, the parties would

have to retry infringement and potentially the inequitable conduct claims.

   The Court acknowledges that Corning's tortious interference claim remains in this

case and that the substance of those allegations are relevant to both the tortious

interference claim and to an anticipated motion for attorney fees under 35 U.S.C. § 285.

Even so, the Court need not maintain the inequitable conduct claims to proceed on the

tortious interference claim or to hear a motion for attorney fees.  *See, e.g.*, *Catch Curve,*

*Inc. v. Integrated Global Concepts, Inc.*, Civ. No. 06-2199, 2012 WL 12540342, at *3

(N.D. Ga. July 27, 2012); *SSI Techs., LLC v. Dongguan Zhengyang Elec. Mech., LTD.*,

559 F. Supp. 3d 821 (W.D. Wis. 2021), *aff'd in relevant part*, 59 F.4th 1328 (Fed. Cir.

2023).  In light of the prior rulings in this case, as well as the complexity and duration of

this litigation, the Court concludes that the most efficient path forward is to wait to

analyze the issue of unenforceability of the Method Patents after a likely appeal.

Conducting further proceedings on Claims 2 and 5 at this point will unnecessarily

consume the parties' and the Court's resources in an already cumbersome litigation

without clarifying or settling legal issues.  Accordingly, the Court grants Defendants'
motion to dismiss on Counts 2 and 5 and dismisses those claims without prejudice.

## II.    Motions for Summary Judgment

Summary judgment is proper if there are no disputed issues of material fact and
the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The
Court must view the evidence and the inferences that may be reasonably drawn from the
evidence in the light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's
of London*, 574 F.3d 885, 892 (8th Cir. 2009); *Bai v. L & L Wings, Inc.*, 160 F.3d 1350,
1353 (Fed. Cir. 1998).  The moving party bears the burden of showing that there is no
genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Enter.
Bank v. Magna Bank of Mo*., 92 F.3d 743, 747 (8th Cir. 1996).  "[A] party opposing a
properly supported motion for summary judgment may not rest upon mere allegation or
denials of his pleading, but must set forth specific facts showing that there is a genuine
issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  As the
United States Supreme Court has stated, "[s]ummary judgment procedure is properly
regarded not as a disfavored procedural shortcut, but rather as an integral part of the
Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive
determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)
(quoting Fed. R. Civ. P. 1.).

A.      **Corning's Motion for Summary Judgment:  Noninfringement and Invalidity of the '317 Patent (Counts 7 and 9)**

Corning submits that the Court should either enter a declaratory judgment invalidating the asserted claims (claims 6, 7, and 9) of the '317 Patent (Count 9) or enter a declaration of noninfringement of those claims (Count 7).  Corning argues that the asserted claims of the '317 Patent are invalid as a matter of law based on both the Court's findings in the 2013 Lawsuit and the invalidation of the '044 Patent in the Interference Proceeding.  Defendants disagree and argue that neither the Court's findings in the 2013 Lawsuit nor the PTAB's and Federal Circuit's invalidity determination mandates summary judgment on the '317 Patent in this case.

In the Eighth Circuit, issue preclusion requires the following:  "(1) the party sought to be precluded in the second suit must have been a party, or in privity with a party, to the original lawsuit; (2) the issue sought to be precluded must be the same as the issue involved in the prior action; (3) the issue sought to be precluded must have been actually litigated in the prior action; (4) the issue sought to be precluded must have been determined by a valid and final judgment; and (5) the determination in the prior action must have been essential to the prior judgment."  *Red Rhino Leak Detection, Inc. v. Anderson Mfg. Co., Inc.*, Civ. No. 18-3186, 2021 WL 22179, at *2 (D. Minn. Jan. 4, 2021) (citation omitted) (applying the Eighth Circuit test in a patent case; noting that criteria governing issue preclusion are not unique to patent issues and thus guided by precedent of the regional circuit).

### 1.    Findings in the 2013 Lawsuit

In the 2013 Lawsuit, the parties went to trial and the Court issued extensive findings of fact and conclusions of law.  Significantly, the Court found that Wilson was *not* the first to invent certain features that he accused Corning of copying in Corning's HYPERStack and HYPERFlask products.  (*See* FOF ¶¶ 105-15, 252-54.)  Corning asserts that the Court's findings are preclusive as a matter of law in this case.  Here, the parties are the same as in the 2013 Lawsuit, the parties "actually litigated" the issue of Wilson's claimed invention during the trial in the 2013 Lawsuit, the Court issued a valid and final judgment, and the Court's findings about Wilson's claimed invention and the prior art were essential to the Court's judgment.  Thus, the first, third, fourth and fifth elements are present.  The remaining element in dispute with respect to the 2013 Lawsuit is the second element—whether the issue sought to be precluded is the same as the issue actually litigated in the prior action.  On this point, the parties sharply disagree.[16]

In the 2013 Lawsuit, the issues involved alleged trade secrets and confidential information related to two different patent applications.  Defendants claim that the issues in the 2013 Lawsuit are not the same as the issues here, underscoring that the validity of the claims of the '317 Patent and '347 Provisional Application (to which the '317 Patent claims priority) were not at issue in the 2013 Lawsuit.  Defendants argue that the Court's findings in the 2013 Lawsuit addressed whether Wilson was the first to use a number of general elements (*i.e.*, gas permeable membrane and multiple shelves) but that these

---

[16]    Defendants maintain that because the issues are not the same, the issues were not actually litigated to a final judgment or essential to any final judgment.

20

findings do not establish the invalidity of the '317 Patent because the Court did not engage in a validity analysis of that patent.[17]  The alleged trade secrets in the 2013 Lawsuit were disclosed in the '651 and '814 Applications, and Defendants point out that the '317 Patent was awarded over these two applications.  Defendants suggest that this proves that the '317 Patent protects inventions that were not disclosed in the '651 and '814 applications.  Defendants also point out that in the 2013 Lawsuit, the Court did not address certain limitations of the asserted claims of the '317 Patent— the "housing," "projections," and "static cell culture device" limitations—thus making preclusion inappropriate.  Defendants further contend that the cited prior art references in the 2013 Lawsuit do not anticipate or render obvious the claims of the '317 Patent because they do not disclose the above limitations.  For example, Defendants argue that the Patent Owner did not assert as trade secrets "a housing defining a plurality of gas permeable shelves" or a "liquid impermeable housing, the inside of which is able to contain cells and medium and the outside of which is in contact with the ambient gas" in the 2013 Lawsuit (which are central issues in this case), and therefore those issues are not subject to claim preclusion.

In this case, Defendants' central allegation is that Wilson invented key features of Corning's HYPERStack technology and that those inventive features are contained in the claims of the '317 Patent.  However, for the reasons discussed below, the Court made

---

[17]     The test for invalidity is a two-step process—interpreting the claim and determining whether the limitations of those claims are met by the prior art.  *See TI Grp. Auto. Sys. (N. Am.), Inc. v. VDO N. Am., LLC*, 375 F.3d 1126, 1139 (Fed. Cir. 2004).

factual determinations in the 2013 Lawsuit that preclude a finding that the '317 Patent is valid.[18]  In the 2013 Lawsuit, Defendants asserted nine "key features" that made up their alleged trade secrets, which included:

- a static device for animal cell culture;

- a liquid impermeable material in a location where it will be in contact with media during the cell culture process, and at least a portion of the gas permeable material that is in contact with media during the cell culture process is also in contact with ambient gas;

- the device can function when it is filled with media and absent a gas/liquid interface;

- the device includes a growth surface that is gas permeable and in contact with ambient gas;

- the device includes growth surfaces that are arranged in vertical succession;

- the device includes a manifold; and

- the device geometry allows media to reside directly above each growth surface that is arranged in vertical succession at a height of 2 millimeters to 3 millimeters.

(FOF ¶ 239.)  The Court found that each of those features was disclosed in the prior art, including that:

- the OptiCell device, which used multiple cartridges for cell growth, each with a thin, gas-permeable film on the top and bottom, was "on the market" before Corning and Wilson interacted in 2004 and 2005 (*id.* ¶¶ 99-107);

---

[18]     While the '317 Patent was not litigated in the 2013 Lawsuit, issue preclusion "bars successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, *even if the issue recurs in the context of a different claim*."  *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (emphasis added) (citation omitted).

- the OptiCell device eliminated the gas-liquid interface, with each cartridge entirely filled with liquid media, and spaces between the cartridges allowing oxygen to get to and flow through the membranes to reach the cells (*id.* ¶¶ 109-10);

- the Barbera-Guillem patent described this design, explaining that the individual cartridges could be manifolded together to supply media to multiple chambers at one time (*id.* ¶ 112);

- the Toner patent "disclosed the use of multiple individual cell-culture compartments that contained gas-permeable material on the bottom of each compartment on which cells would grow in the absence of a gas-liquid interface" (*id.* ¶ 113); and

- the compartments in the Toner patent were manifolded together and could be used in a static state (*id.*).

In short, the Court found:

115.  The building blocks of the HYPERFlask vessel—cells growing on gas-permeable material, no gas-liquid interface, individual cell compartments manifolded together, and air spaces in between cell compartments—were all well known in the art before Corning conceived of the tracheal flask concept and before Corning's interactions with Wilson.

116.  In 2008, Corning began a project to design the HYPERStack product.  The HYPERStack product resulted from a Corning CellStack vessel customer asking if Corning could develop a product that had more layers within the same CellStack vessel volume.

117.  The HYPERStack vessel utilizes the same materials and design features as the HYPERFlask vessel, just in a different vessel format….

(*Id.* ¶¶ 115-17.)

In this case, Defendants assert the elements of independent claim 6 and dependent

claims 7 and 9 of the '317 Patent:

6.    A static cell growth apparatus comprising:
a liquid impermeable housing, the inside of which is able to contain cells and medium and the outside of which is in contact with ambient gas; and

23

the housing defining a plurality of gas permeable shelves, each
    having an inside surface and an outside surface; and
the inside surface of each shelf having an opposing surface located a
    distance away and defining a culture space; and
the culture spaces are located one above the other when the shelves
    are in a horizontal position; and
a manifold that connects the culture spaces; and
projections that make contact with the outside surface of each shelf
    while leaving a portion of the outside surface in contact with the
    ambient gas;

7.      The apparatus of claim 6, whereby said housing is capable of
being completely filled with media for optimal cell-nutrient exchange.

***

9.      The apparatus of claim 6, whereby a uniformity of conditions
for cellular growth includes a determined media volume per unit surface
area.

('317 Patent, claims 6, 7, 9.)

A trial on the '317 Patent would require the comparison of the claimed invention

to the same prior art considered in the 2013 Lawsuit.  Here, as demonstrated below, the

claimed inventive elements of the '317 Patent correspond with features that the Court

previously found to be disclosed in the prior art in the 2013 Lawsuit.  (*See* 2013

FOF ¶¶ 239, 252-53; 2013 COL ¶ 11.)

| '317 Patent, claim 6 | 2013 FOF: features disclosed in the prior art (*see* 2013 FOF & COL) |
| --- | --- |
| a static cell growth apparatus comprising | a static device for animal cell culture (FOF § 239(A)) |

| a liquid impermeable housing, the inside of which is able to contain cells and medium and the outside of which is in contact with ambient gas; and | a … liquid impermeable material in a location where it will be in contact with media during the cell culture process, and at least a portion of the gas permeable material that is in contact with media during the cell culture process is also in contact with the ambient gas (*id.*); |
|---|---|
| the housing defining a plurality of gas-permeable shelves, each having an inside surface and an outside surface; and | . . . at least a portion of the gas permeable material that is in contact with the media during the cell culture process is also in contact with ambient gas (*id.*);<br><br>The device includes growth surfaces that are arranged in vertical succession (*id.* ¶ 239(G)); |
| the inside surface of each shelf having an opposing surface located a distance away and defining a culture space; and | The device geometry allows media to reside directly above each growth surface that is arranged in vertical succession at a height of 2 millimeters to 3 millimeters (*id.* ¶ 239(K)); |
| the culture spaces are located one above the other when the shelves are in a horizontal position; and | The device includes growth surfaces that are arranged in vertical succession (*id.* ¶ 239 (G)); |
| a manifold that connects the culture spaces; and | The device includes a manifold (*id.* ¶ 239(I)); |
| projections that make contact with the outside surface of each shelf while leaving a portion of the outside surface in contact with ambient gas. | The device includes a growth surface that is gas permeable and in contact with ambient gas (*id.* ¶ 239(E));<br><br>The device includes [a] gas permeable material support [] in contact with [a] gas permeable growth surface (*id.* ¶ 239(J)); |
| **'317 Patent, claim 7** | |
| The apparatus of claim 6, whereby said housing is capable of being completely filled with media for optimal cell-nutrient exchange | The device can function when it is filled with media and absent a gas/liquid interface (*id.* ¶ 239(B)); |

| '317 Patent, claim 9 | |
|---|---|
| The apparatus of claim 6, whereby a uniformity of conditions for cellular growth includes a determined media volume per unit surface area | The device geometry allows media to reside directly above each growth surface that is arranged in vertical succession at a height of 2 millimeters to 3 millimeters (*id.* ¶ 239(K)). |

Defendants maintain that in the 2013 Lawsuit, the Court did not consider all of the limitations of the '317 Patent and that three such limitations in particular create a genuine issue of material fact as to the question of invalidity because they distinguish the claimed invention from the prior art. The Court disagrees.

The limitations relied upon by Defendants are—the "housing" limitation, the "static cell growth" with a "plurality of gas permeable shelves" limitation, and the "projections" limitation.

First, with respect to the "housing" limitation, the Court previously determined that Wilson was "not the first to come up with a concept of static cell-culture devices that are gas permeable and oxygenate the cells by way of gas transfer through the device housing." (2013 FOF ¶ 254.) Given that finding of fact, a "housing" cannot be a patentable distinction between claim 6 and the prior art. Defendants argue that the Court did not address whether the prior art disclosed a "housing defining a plurality of gas permeable shelves." However, in order to cover the HYPERStack device, Defendants read "housing" so as to include separate cell-culture compartments (or "spaces") having a gas permeable membrane exposed to the ambient environment that are manifolded together ("connected via manifolds"). (Doc. No. 490 at 41-42.) The Court has already found that structure disclosed in the prior art. (2013 FOF ¶¶ 112-13, 115.) Defendants

26

also argue that Toner does not disclose a "housing" in contact with ambient gas. (*Id*. at

23-25.)  But the Federal Circuit ruled on this issue when it affirmed that Toner disclosed

the "ambient gas" limitation of the '044 Patent using a construction nearly identical to the

construction applied in this case. *See Wilson*, 789 F. App'x at 864, 867, 869 (explaining

that every claim of the '044 Patent requires that the cells are cultured in the presence of

ambient gas; affirming the meaning of "ambient gas" as "gas of the environment

surrounding and external to the multi-shelf apparatus"; affirming the Board's finding that

Toner anticipates the "ambient gas" limitation even though it does not use the word; and

finding substantial evidence to support the Board's determination because the Toner

device allows ambient gas to be in contact with the cell culture compartments).  Further,

Defendants' own expert acknowledges that the OptiCell prior art discloses a "housing."

(Doc. No. 478 at 34-35 (citing Cosman's statement that "[t]he OptiCell device is

comprised of two gas-permeable membranes secured to a rigid frame that performs the

mechanical function of 'housing' the membrane's and elastomeric ports").)  For the

above reasons, the Court concludes that the "housing" limitation does not create a triable

issue of material fact on the issue of patent invalidity.

Second, Defendants argue that there is substantial evidence that Toner, Barbera-

Guillem, and the OptiCell references do not disclose multi-shelf static cell-culture

devices.  (Doc. No. 490 at 26-31.)  The Court again disagrees.  Defendants have made

this argument before and both the Court and the Federal Circuit determined that Toner

discloses a static device.  (FOF ¶ 113 (citing FIG. 8a); *Wilson*, 789 F. App'x at 867.)

Defendants' expert acknowledges the same.  (Doc. No. 490 at 29 (the flow may be static

27

for a time and then resume).)  In addition, the issue of whether the prior art discloses a static cell-culture device with multiple shelves was already decided against Defendants. (FOF ¶¶ 239, 252-54.)

Third, Defendants argue that the Court did not address whether the prior art discloses "projections."  (Doc. No. 490 at 11, 32-34.)  However, the Court has previously determined that a trade secret element that is substantially identical to the "projections" limitation was disclosed in the prior art.  (FOF ¶¶ 239, 252-53.)  In the 2013 Lawsuit, Defendants identified "supports" in contact with gas permeable cell growth surfaces as a trade secret element.  (*Id.* ¶ 239.)  Defendants have not demonstrated how this element is materially different than the "projections" in the '317 Patent.  In addition, Defendants' expert acknowledged that "the Toner patent discloses projections that could make contact with the outside surface of each shelf" and that this element was disclosed by Figure 8a of the Toner Patent.  (Doc. No. 463-2 ("Cosman Dep.") at 120-22.)

For the above reasons, the Court concludes that given the Court's findings in the 2013 Lawsuit, the key features and combinations that Defendants claim in the '317 Patent are anticipated and/or rendered obvious by the prior art as a matter of law.

## 2.   The Interference Proceeding

In the Interference Proceeding, the PTAB concluded, and Federal Circuit affirmed, that material claims of the '044 Patent (the parent of the '317 Patent) are invalid in view of Toner and other prior art at issue in this case.  Defendants contend that the PTAB's and Federal Circuit's determinations do not mandate summary judgment on invalidity

because the scope of the claims of the '044 Patent at issue in the Interference Proceeding are not "essentially the same" as the scope of the claims of the '317 Patent here.

Evaluating the identity of the issues for purposes of preclusion in the invalidity context requires the comparison of the patent claims challenged in each proceeding. While the '317 Patent was not litigated in the Interference Proceeding, the Court reiterates that issue preclusion can bar successive litigation of an issue of fact or law even if that issue appears in the context of a different claim. *See Taylor v. Sturgell*, 553 U.S. at 892. In cases involving issues of patent invalidity, collateral estoppel applies where "'the differences between the unadjudicated patent claims and adjudicated patent claims do not materially alter the question of invalidity.'" *Google LLC v. Hammond Dev. Int'l, Inc.*, 54 F.4th 1377, 1381 (Fed. Cir. 2022); *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1342 (Fed. Cir. 2013). Therefore, here, to avoid summary judgment on invalidity in light of the Interference Proceeding, the differences between the already adjudicated '044 Patent and the '317 Patent must materially alter the question of invalidity.[19]

---

[19]   Defendants argue that the correct test for determining whether collateral estoppel extends the invalidation of the parent '044 Patent to the '317 Patent is whether the patent claims are "essentially the same." The case cited in support, however, involves the issue of claim preclusion, not issue preclusion. *See SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160 (Fed. Cir. 2018). The Federal Circuit has reaffirmed that issue preclusion applies where the differences between the adjudicated and unadjudicated claims "do not materially alter the questions of invalidity." *Google LLC v. Hammond*, 54 F.4th at 1381 (internal quotations and citation omitted). Even so, the Court finds that Corning has made an evidentiary showing that the claims of the '044 Patent and the '317 Patent are essentially the same. (*See generally* Doc. No. 460 at 21-31, Doc. No. 497 at 7-17.)

Corning has provided evidence that the '317 Patent is patentably indistinct from the invalidated '044 Patent.  Corning submits that the chart below demonstrates that claim 6 of the '317 Patent is substantially similar to the invalidated claims 28 and 29 of the '044 Patent:

| '317 Patent, claim 6 | '044 Patent, claims 28 & 29 (invalidated by the PTAB) |
|---|---|
| A **static cell growth apparatus** comprising: | 28. . . . incubating cells in the presence of ambient gas suitable for cell culture, said cells residing in a gas-permeable multi-shelf **cell culture apparatus** wherein said cells reside upon more than one shelf, . . . media is in **static contact** . . . |
| a **liquid impermeable housing**, the inside of which is able to contain cells and medium and the **outside of which is in contact with ambient gas**; and | 28 . . . cells residing in a gas-permeable multi-shelf cell culture apparatus . . . each shelf comprised of gas-permeable, **liquid impermeable material**, . . . said **ambient gas is in contact with the bottom** of each said shelf . . . |
| the housing defining a **plurality of gas-permeable shelves**, each having an inside surface and ana outside surface, and | 28. . . . cells residing in a **gas-permeable multi-shelf** cell culture apparatus wherein said cells reside on **more than one shelf, each shelf comprised of gas-permeable**, liquid impermeable material . . . |
| **the inside surface of each shelf having an opposing surface** located a distance away and defining a culture space; and | 28. . . . **each shelf has an opposing surface** connected to it and residing above it, and media is in static contact with each shelf and its opposing surface. |
| the culture spaces are located **one above the other when the shelves are in a horizontal position**; and | 28. … a shelf support that maintains the shelf **in a horizontal position, said shelves located at differing elevations**, . . . |

| a **manifold that connects** the culture spaces; and | 28. . . . **each shelf connected by a fluid pathway** that is integral to said apparatus, . . |
| **projections that make contact with the outside surface of each shelf** while leaving a portion of the outside surface in contact with ambient gas. | 29. . . . The method of claim 28 wherein **each said shelf support includes projections** that are in contact with said gas-permeable shelf. |

(Doc. No. 460 at 22-23.)

Defendants argue that the evidence does not support a finding that the claims of the '317 Patent are patentably indistinct from the '044 Patent, highlighting the fact that the asserted claims of the '317 Patent are apparatus claims, as opposed to the method claims of the '044 Patent.  Defendants submit that the Patent Office found this distinction important during the prosecution of the '044 Patent.  In addition, Defendants submit that the claims of the '317 Patent are different in scope because they recite limitations that are not present in the claims of the '044 Patent.  For example, Defendants underscore that claims 6, 7 and 9 of the '317 Patent require a "housing defining a plurality of gas permeable shelves."  Defendants claim that Corning concedes that the claims of the '044 Patent do not require that limitation (*see* Doc. No. 460 at 27 ("The Claims of the '044 Patent do not explicitly refer to a housing").)  Defendants further argue that the "fluid pathway" connecting the shelves in claim 28 of the '044 Patent has no connection to a housing, and while claim 28 recites shelves, it does not describe a "housing" that "defines" those shelves.  Therefore, because the method claims of the '044 Patent do not require a "housing," they do not recite the limitation from claim 7 of the '317 Patent that requires a "housing" that is "capable of being completely filled with media."

31

After careful review, the Court concludes that the claims of the patents are substantially similar and that any differences between the unadjudicated patent claims of the '317 Patent do not "materially alter the question of invalidity." The invalidity issue presented here is the same both factually and legally as the invalidity issue resolved by the PTAB with respect to the '044 Patent. The PTAB considered whether the claims of the '044 Patent are anticipated by Toner or rendered obvious by Toner in view of other prior art. The '044 Patent is the parent of the '317 Patent and, significantly, the claims of the two patents are substantially similar.

Defendants correctly point out that the '317 Patent claims an apparatus as opposed to a method. However, there is no per se rule that an apparatus claim is patentably distinct from a method claim. *Kroy IP Holdings, LLC v. Groupon, Inc.*, Civ. No. 17-1405, 2022 WL 17403538, at *7 (D. Del. Dec. 2, 2022) (explaining that the Federal Circuit has held in an analogous context that "system and method claims that 'contain only minor differences in terminology [but] require performance of the same basic process . . . should rise or fall together.'") (citation omitted). The invalidated '044 Patent claimed a method of using the apparatus claimed by the '317 Patent. (*See* '044 Patent, Claim 28 ("A method of culturing cells comprising . . .").) Thus, the fact that the '317 Patent claims an apparatus does not, in and of itself, establish a new question of invalidity or indicate a patentable distinction. In addition, the PTAB and Federal Circuit found that Toner discloses an apparatus that invalidates the '044 Patent claims that recite a method of using that apparatus. (Doc. No. 462-6 at 9) ("Toner teaches cell culturing

device where a key feature appears to be the use of gas permeable, liquid impermeable membranes.").

Defendants rely on a 2010 restriction requirement issued by the Examiner to demonstrate a patentable distinction.  The original patent application (the '848 application) included both the method claims that resulted in the '044 Patent and the apparatus claims that defined a cell culture apparatus that could be used to perform the methods.  During the prosecution of that application, the Examiner required Defendants to separate the apparatus claims from the method claims.  This requirement was based on the determination that the claims that became the '317 Patent are distinct from the claims that became the '044 Patent.  (Doc. No. 448-23 (Non-final Office Action).)  However, in a subsequent office action, the Examiner issued a double patenting rejection over the '044 Patent reasoning that the claims were indistinct from those of the '044 Patent.  (Doc. No. 491-5 (Non-final Office Action) at 9-11.)  At the time of this rejection, the proposed patent claims recited a cell growth apparatus.  Again, the fact that Defendants filed a terminal disclaimer constitutes strong evidence that there is no patentable distinction between the claims of the '317 Patent and the '044 Patent.  Similarly, in the *ex parte* reexamination, the Examiner found that the fact that the '317 Patent recites apparatus claims does not create a patentable distinction over the '044 Patent.  (Doc. No. 491-2 at 4-7.)  While the Examiner later withdrew its interference estoppel rejection, it did so on the narrow ground that the application of the estoppel rejection required that the applicant lose the interference.  (Doc. No. 448-6 at 3.)  Notably, the Patent Office did not revisit the Examiner's determination that there was no patentable distinction between the

'044 Patent and the '317 Patent.  (*Id.*; Doc. No. 448-8.)  And in any event, the

Examiner's findings in an *ex parte* reexamination proceeding (in which Corning was not

involved and had no ability to challenge Defendants' arguments) are not binding.  *See*

*Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007); *Purdue Pharma L.P. v.*

*Faulding Inc.*, 230 F.3d 1320, 1329 (Fed. Cir. 2000).[20]

Defendants also argue that the '317 Patent's "housing" limitation creates a

patentable distinction from the '044 Patent.  Defendants, however, have not demonstrated

how the "housing" limitation creates claims that are meaningfully different than the

claims of the '044 Patent under a reading where the HYPERStack would infringe

the '317 Patent.  Defendants argue that the "housing" limitation is met by the

HYPERStack's "outer structure" that includes each stackette's gas permeable membrane,

remaining non-gas permeable walls, and the manifolds that connect them.  (Doc. No. 490

at 41-42.)  However, as correctly pointed out by Corning, if the HYPERStack's

manifolded cell-culture compartments constitute a "housing" per the '317 Patent's

limitation, then the media-filled, fluidly connected, gas-permeable shelves of the '044

Patent and the manifolded, gas-permeable cell-culture compartments of Toner, would

also constitute a "housing."[21]  Defendants have not demonstrated how the HYPERStack's

---

[20]    The Court also notes that the issue of infringement was not before the Patent
Office, so in making its arguments supporting the validity of the '317 Patent, Defendants
did not address the incompatibility of its infringement and invalidity positions.

[21]    In order for Defendants to argue validity, they must maintain that the "housing"
does not include the outsides of stacked and manifolded compartments.  However, should
Defendants make this argument, then such a claimed device would not be infringed by

manifolded compartments can satisfy the '317 Patent's housing limitation while Toner's manifolded compartments would not. Therefore, the Court finds that the "housing" limitation does not materially alter the invalidity issue and, thus, does not prevent collateral estoppel from invalidating the '317 Patent. *See, e.g.*, *Ohio Willow Wood*, 735 F.3d at 1343 (affirming summary judgment based on issue preclusion where patent owner did not offer "any explanation regarding how" a differently worded limitation in the claims of a child patent was "patentably significant") (emphasis omitted).

In sum, having considered the evidence in the record and the arguments of the parties, and for the reasons discussed above, the Court concludes that the test for issue preclusion is satisfied by both the Court's findings in the 2013 Lawsuit and the Interference Proceeding. Therefore, the issue of the invalidity of the '317 Patent is resolved and the claims of the '317 Patent are invalid as a matter of law. Thus, the Court finds that summary judgment on Count 9 is properly granted in favor of Corning. Because Corning prevails on the issue of invalidity, the Court need not reach the issue of noninfringement. The Court denies Corning's motion with respect to Count 7 as moot.

---

the HYPERStack products, wherein Defendants argue the "housing" includes the outsides of stacked and manifolded compartments.

**B.     Defendants' Motion for Partial Summary Judgment**

Defendants move for summary judgment on Corning's claims for tortious

interference (Count 13) and claim preclusion and *Kessler* doctrine claims as to the '317

Patent (Counts 11 and 12).[22]

**1.     Tortious Interference (Count 13)**

In Count 13, Corning alleges that Defendants interfered with Corning's

prospective economic advantage by filing the Customer Lawsuits while knowing that the

lawsuits were objectively baseless.  (Am. Compl. ¶ 259.)  "As a general rule, 'the act of

filing a lawsuit is immune from antitrust or tort liability unless it is found to be a mere

sham intended to disguise tortious or anticompetitive liability."  *Polaris Indus. Inc. v.*

*Arctic Cat Inc.*, Civ. No. 15-4475, 2017 WL 1180426, at *5 (D. Minn. Mar. 29, 2017)

(quoting *Datascope Corp. v. Vascular Sols., Inc.*, 165 F. Supp. 2d 933, 936 (D. Minn.

2001) (citations omitted)).  However, while state tort claims against a patent holder

(including tortious interference) are preempted by federal patent laws, federal patent law

allows a plaintiff to sustain state tort law claims when a jury finds by clear and

convincing evidence that a defendant litigated objectively baseless patent infringement

claims with subjective bad faith.  *See 800 Adept, Inc. v. Murex Secs., Ltd.*, 539 F.3d 1354,

1369 (Fed. Cir. 2008) *cert. denied*, 555 U.S. 1175 (2009); *Globetrotter Software, Inc. v.*

---

[22]     Defendants also moved for summary judgment on Corning's inequitable conduct
claims (Counts 2 and 5).  Because the Court granted Defendants' motion to dismiss
above, Defendants' summary judgment motion on those claims is moot.

*Elan Comput. Grp., Inc.*, 362 F.3d 1367, 1374, 1377 (Fed. Cir. 2004) (adopting the *Noerr-Pennington* standard for sham litigation).

Here, the Court must determine whether Corning (the non-moving party) has presented sufficient facts that, if believed, could lead a reasonable jury to find that Defendants litigated objectively baseless patent infringement claims with subjective bad faith. *See 800 Adept, Inc.*, 539 F.3d at 1369.[23]  To satisfy the objective component, Corning must make a factual showing that Defendants' allegations in the Customer Lawsuits are "objectively baseless." *See Globetrotter Software, Inc.*, 362 F.3d at 1375. Infringement allegations are objectively baseless if "no reasonable litigant could realistically expect success on the merits." *See 800 Adept, Inc.*, 539 F.3d at 1369 (citation omitted).  To succeed in demonstrating that Defendants' claims were objectively baseless, Corning must offer clear and convincing evidence that Defendants had no reasonable basis to believe that the patent claims were valid or that they were infringed by Corning's customers. *Id.* (citation omitted).  This is a heavy burden. *Id.*

Corning argues that the record evidence permits a reasonable jury to conclude that the Customer Lawsuits rely on objectively baseless claims.  In support, Corning argues that:  (1) Wilson's invalidity and noninfringement positions are irreconcilable; (2) Wilson

---

[23]     To satisfy the subjective component, Corning must make a factual showing that in enforcing its patents, Defendants exhibited subjective bad faith. *See 800 Adept*, 539 F.3d. at 1370.  Defendants do not appear to dispute that there is a fact issue with respect to the issue of bad faith and instead focus on whether Corning can demonstrate that Defendants' patent claims are "objectively baseless." "Absent a showing that the infringement allegations are objectively baseless, it is unnecessary to reach the question of the patentee's intent." *Id.*

obtained the Method Patents through inequitable conduct; and (3) claim preclusion and

the *Kessler* doctrine prevent Wilson from asserting the patents-in-suit after this Court's

and the PTAB's findings on patentably indistinct patents—namely, the '426, '427, and

'044 Patents (the "Earlier Patents").  Corning further relies on the following evidence:

- during an August 21, 2007, conversation secretly recorded by Wilson, Wilson "admitted that Corning's concept of cell-growth compartments separated by tracheal spaces was a 'powerful' idea contributed by Corning" (2013 COL ¶ 48);

- in the 2013 Lawsuit, the Court found this statement was relevant evidence undercutting Wilson's inventorship claim (*id.*);

- Wilson continued to tape the conversation when he left the room while "the Corning employees had private, attorney-client privileged communications" (FOF ¶ 344);

- during the conversation, Wilson and Corning employees discussed the results of Corning's prototype testing (of Wilson's prototype) (FOF ¶ 367), and that Wilson acknowledged that it was "fair, [and] intellectually honest" to admit that his prototypes' tests were inconclusive when Corning tested them (FOF ¶ 368); and

- Wilson also acknowledged that the key feature of Corning's HYPERFlask vessel (a "tracheal space in between two gas permeable cell culture chambers") was "pretty powerful."  (*Id.* ¶ 369.)

Defendants dispute that Corning is able to meet its heavy burden to show that the

substantive issues raised in the Customer Lawsuits were objectively baseless.  Defendants

argue that the undisputed facts in the record show that their claims with respect to the

patents-in-suit are not objectively baseless and, separately, that Corning's tortious

interference claim fails because Corning has not alleged, and cannot prove, an

independent tort or violation of the law by the Patent Owner.  In support, Defendants rely

heavily on the Patent Office's findings during the reexamination of the relevant patents,

wherein the Patent Office ultimately issued the patents.  In sum, Defendants maintain that

it was not baseless to assert that the patents-in-suit were infringed by Corning's Customers.

To prevail on the patent infringement claims, Defendants must have a good-faith claim that the asserted patents were *both* valid and infringed. Corning's primary argument for why the Customer Lawsuits are objectively baseless rests on the assertion that Defendants' positions on infringement and validity with respect to all of the patents-in-suit are "mutually exclusive" and contradictory.

### i.    '317 Patent

Defendants assert that the facts in the record demonstrate that its position that the '317 Patent claims are valid and infringed by Corning's Customers is not objectively baseless. Defendants submit that its infringement claims remain viable under the Court's claim constructions, that the Patent Office has confirmed the patentability of the asserted claims of the '317 Patent in the face of Corning's invalidity contentions, and that the asserted claims of the '317 Patent are patentably distinct from those of the Earlier Patents.[24]

As explained above, in the 2013 Lawsuit, the Court found that elements identical to those in the '317 Patent were "already known in the prior art." (*See, e.g.*, 2013 COL ¶ 11; 2013 FOF ¶¶ 105-15.) This prior art included the Toner patent, the Barbera-Guillem patent, the DiMilla patent, the OptiCell device, and the Martin Application. (*Id.*) The Martin Application, in particular, was filed two years before Wilson's application

---

[24]    Defendants also point out that no claims of inequitable conduct are asserted against the '317 Patent.

and discloses the invention of the technology underlying the HYPER products.  These

facts alone support a finding of invalidity of the '317 Patent.  *See, e.g.*, *Vanmoor v. Wal-*

*Mart Stores, Inc.*, 201 F.3d 1363, 1366 (Fed. Cir. 2000) (an accusation that a prior art

device infringes is enough to satisfy the burden to invalidate the patent).

        In addition, as explained above, for the '317 Patent to survive the invalidation of

the '044 Patent, the '317 Patent must be in some way materially distinguishable.  In an

attempt to make a distinction, Defendants point to Claim 6 of the '317 Patent:  claiming a

cell-culture device that has a "liquid impermeable housing," which in turn "defin[es] a

plurality of gas permeable shelves."  The '044 Patent describes a multi-shelf device, each

having gas-permeable material, and the shelves being connected by a fluid pathway (or a

manifold), and notably, does *not* explicitly refer to a housing.  Defendants argue that the

'317 Patent's "housing" requires something more than stacked cell-culture shelves having

gas-permeable material that are manifolded together.  In fact, Defendants' expert testified

that manifolding together separate cell-culture compartments does *not* meet the "housing"

limitation.  (Doc. No. 467 at 116-18.)

        Despite having made those arguments in support of the validity of the '317 Patent,

Defendants make the *opposite* argument in support of its infringement claims.

Specifically, Defendants' expert states that the HYPERStack's assembly of stackettes

(including the gas-permeable film across the bottom of each stackette) and connecting

manifolds *do* constitute a housing.  (Doc. No. 462 Ex. C at 4.)  There is no dispute,

however, that the HYPERStack does *not* have any other kind of exterior casing or

housing to protect the films.  (Doc. No. 462-1 ("Martin Tr.") at 96-98.)  Thus, the

evidence shows that the HYPERStack product does not have the "housing" element as that element was defined by Defendants to avoid an invalidity finding.

Based on the above, it appears that Defendants' positions on invalidity and infringement are fundamentally in conflict. And because the Court determined in the 2013 Lawsuit that the HYPERStack vessel is a collection of individual stackettes, each with a gas permeable film exposed to the outside, coupled together using manifolds (FOF ¶¶ 117-18), Defendants' reading of the '317 Patent to cover the HYPERStack product would render the '317 Patent invalid—as it would then be indistinguishable from prior art and its invalid parent—the '044 Patent.[25] This evidence is enough to lead a reasonable jury to conclude that Defendants' '317 Patent claims were objectively baseless.

In arguing that their position on the validity of the '317 Patent is not objectively baseless, Defendants rely on the history of that patent's reexamination, which ultimately resulted in the Patent Office issuing a reexamination certificate stating that all claims were patentable. Defendants' reliance on the reexamination of the '317 Patent, however, is not determinative. First, the reexamination, as noted above, took place in an *ex parte* proceeding. Second, the Examiner's conclusions in that reexamination were filed after Defendants initiated the Customer Lawsuits. Thus, Defendants could not have relied on the reexamination. Third, the Examiner did not consider the potential conflict between the positions Defendants have taken on infringement and validity. Finally, in the separate

---

[25]    Said another way, either the "housing" limitation encompasses the same gas-permeable surfaces that the HYPERStack contains (rendering the '317 Patent invalid) or the "housing" limitation requires something that the HYPERStack does not have (rendering the HYPERStack non-infringing).

Interference Proceeding regarding the '044 Patent, the PTAB held that the central ideas in Defendants' patents are invalid as anticipated or made obvious in light of the prior art. This decision was filed and affirmed by the Federal Circuit before the Customer Lawsuits were filed.[26]

For the above reasons, the Court concludes that there are genuine issues of material fact as to whether Defendants' claims were objectively baseless. The Court therefore denies Defendants' motion for summary judgment on Corning's tortious interference claim insofar as it pertains to the '317 Patent.[27]

### ii.    Method Patents

Defendants maintain that Corning cannot prove by clear and convincing evidence that Defendants' assertion that the claims of the Method Patents are valid and infringed by Corning's Customers was not objectively baseless. First, Defendants argue that Corning cannot show that Defendants' proposed claim constructions were objectively baseless. Defendants maintain that, despite the fact that the Court did not agree with their proposed constructions, those constructions were supported by evidence, and that the

---

[26]    Because the Court concludes that Corning has pointed to sufficient evidence in the record that could convince a reasonable juror that the '317 Patent claims were baseless, it does not reach the additional arguments brought by Corning, *i.e.*, that under Defendants' claim construction, the claims of the '317 Patent are patentably indistinct from those of the patents asserted and dismissed with prejudice in the 2013 Lawsuit, such that under the *Kessler* doctrine, the HYPERStack device has the status of a non-infringing product.

[27]    Importantly, the Court notes that denial of summary judgment at this stage does not suggest that Corning will ultimately prevail on this claim at trial, as the evidentiary burden is heavy, as noted above.

reasonableness of their proposed constructions are supported by the reexaminations of both the '192 Patent and the '443 Patent.

Corning again argues that the evidence in the record could lead a reasonable jury to conclude that Defendants' assertion of the Method Patents in the Customer Lawsuits was objectively baseless because Defendants' arguments relating to the Method Patents are mutually exclusive, that the Method Patents were obtained via inequitable conduct, and that the Customer Lawsuits are barred by claim preclusion and the *Kessler* doctrine.

Again, Corning's primary argument is that Defendants' have asserted infringement of the Method Patents under a theory that invalidates the patents.  Specifically, Corning maintains that Defendants' theory of infringement relied on broad, unsupported claim constructions that would arguably bring the HYPERStack device within the scope of the Method Patents.  In particular, Wilson submitted proposed claim constructions for "media height" and "scaffold" limitations that the Court declined to adopt.  Defendants submit that the intrinsic record contains some support for his proposed constructions and, therefore, his infringement claims are not objectively baseless.  Whether or not Defendants' proposed claim constructions were reasonable, however, is not enough.  That is because even if the Court had adopted Defendants' proposed instructions, the asserted claims of the Method Patents are invalid over at least the Toner, Barbera-Guillem, and the OptiCell prior art.  (Doc. No. 452-1 ("Chalmers Opening Report") ¶¶ 101-287; Doc. No. 452-4 ("Chalmers Reply Report") ¶¶ 69-201.)  In short, and similar to the reasoning with respect to the '317 Patent above, reading the Method Patents onto the HYPERStack

device could also read the Method Patents directly onto the prior art, which would render the patents invalid.

Based on the evidence in the record, the Court agrees with Corning that a reasonable jury could conclude that Defendants' theories of infringement and validity are contradictory and mutually exclusive. Therefore, a reasonable jury could find that the infringement claims based on the Method Patents were objectively baseless. For this reason, the Court denies Defendants' motion for summary judgment for tortious interference based on the asserted infringement of the Method Patents.[28]

### iii. Independent Tort

Defendants also move for summary judgment on Corning's tortious interference claim for failure to prove an independent tort of violation of the law. Under Minnesota law, Corning must prove that Defendants engaged in conduct that was "independently tortious or in violation of a state or federal statute or regulation." *See Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc.*, 844 N.W.2d 210, 219 (Minn. 2014) (listing the elements of tortious interference, including the third element requiring intentional interference that is "either independently tortious or in violation of a state or federal statute or regulation"). Defendants maintain that the act of filing the Customer

---

[28]     Corning argues that Wilson's assertions of the Method Patents in the Customer Lawsuits are baseless for the additional reason that they are unenforceable because they were obtained through inequitable conduct and because they were barred by claim preclusion and the *Kessler* doctrine. The Court does not consider the parties' remaining arguments related to inequitable conduct. However, because Defendants also move for summary judgment on the claim preclusion and *Kessler* doctrine claims below, the Court discusses those claims below.

Lawsuits does not satisfy this requirement, while Corning asserts that the Customer

Lawsuits constitute bad-faith litigation and that under the patent statute, the act of filing

the lawsuits meets the requirement.

The Court has carefully considered the parties arguments and concludes that bad-

faith infringement claims violate the patent statute.  *See, e.g.*, 35 U.S.C. § 271 & § 285.

And should a reasonable jury conclude that Defendants filed the Customer Lawsuits in

bad faith, that would satisfy the third element of Minnesota's tortious interference with

prospective economic advantage claim.  *See Energy Heating, LLC v. Heat On-The-Fly,*

*LLC*, 889 F.3d 1291, 1305 (Fed. Cir. 2018) (affirming jury finding that the defendant

asserted a patent in bad faith); *see also, e.g.*, *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d

1340, 1354 (Fed. Cir. 1999).  Therefore, Defendants' motion for summary judgment on

this point is denied.

## 2.  Claim Preclusion and Kessler doctrine

The Court previously dismissed without prejudice the portion of Count 11 (claim

preclusion) and Count 12 (*Kessler* doctrine) as to the Method Patents.  Still pending is

Corning's claims of claim preclusion and the *Kessler* doctrine as to Defendants' claim of

infringement of the '317 Patent.  In short, Corning asserts that the '317 Patent is

patentably indistinct from the '044 Patent, and also from the patents that were asserted

and dismissed in the 2013 Lawsuit (the '426 and '427 Patents), such that under the

*Kessler* doctrine, the HYPERStack device has the status of a noninfringing product.

Defendants argue that it is undisputed that the scope of the claims of the '317

Patent is *not* "essentially the same as" those of the Earlier Patents and, therefore, that the

Court should enter summary judgment in Defendants' favor and dismiss Counts 11 and 12 of the Amended Complaint.  In support, Defendants argue that Corning's allegations that the scope of the relevant claims of the '317 Patent are "essentially the same" are based on Corning's expert's comparison of the claims of the patents-in-suit to combinations of the claims of the Earlier Patents and certain prior art references and that this comparison is not permissible under the Federal Circuit's *SimpleAir* test.

With respect to the '317 Patent, the Court held that the '317 Patent is patentably indistinct from the '044 Patent under Defendants' infringement position.  (*See infra* § 2.A.2.)  Corning has also pointed to record evidence that could support a jury finding that the '317 Patent is patentably indistinct from the Earlier Patents.  (Doc. No. 452 ¶¶ 173-193.)  The Court finds that this evidence creates a genuine issue of fact for trial. Therefore, the Court denies summary judgment in favor of Defendants as to the remaining portions of the claim preclusion and *Kessler* doctrine counts relating to the '317 Patent.

To the extent that the jury finds that Defendants' claims are barred by claim preclusion or the *Kessler* doctrine, the jury could also conclude that no reasonable litigant could expect to win infringement claims on patents that are indistinct from patents that are barred under those doctrines.  Thus, claim preclusion and the *Kessler* doctrine could provide grounds to support Corning's tortious interference claim.

46

III.   *Daubert* Motions[29]

Both parties have filed motions to exclude certain expert testimony under

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  Before accepting the

testimony of an expert witness, the trial court is charged with the "gatekeeper" function

of determining whether an opinion is both relevant and reliable.  *Id.* at 589-90; *Aviva*

*Sports, Inc. v. Fingerhut Direct Mktg., Inc.*, 829 F. Supp. 2d 802, 820 (D. Minn. 2011).

The Eighth Circuit has a three-part test to determine whether the testimony of an expert is

admissible under *Daubert* and Rule 702.  *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681,

686 (8th Cir. 2001).  First, the evidence must be based on scientific, technical, or other

specialized knowledge that is useful to the fact finder in determining the ultimate fact

issue.  *Id.*  Second, the testimony must be from an expert qualified to assist the fact

finder.  *Id.*   Third, the evidence must be reliable or trustworthy such that it assists the fact

finder, if believed.  *Id*.  The third requirement aligns with the requirements of Rule 702 of

the Federal Rules of Evidence.[30]

---

[29]   Due to the complex nature of the case and the Court's rulings on the motions
above, the Court addresses many, but not all, of the parties' arguments on *Daubert* issues.
To the extent that there is an evidentiary issue that remains relevant that is left
unaddressed by the Court, the parties can raise the issue via a motion in limine.

[30]   Under Rule 702, a duly qualified expert may testify "if the proponent
demonstrates to the court that it is more likely than not that":  (1) "the expert's scientific,
technical, or other specialized knowledge will help the trier of fact to understand the
evidence or to determine a fact in issue"; (2) "the testimony is based on sufficient facts or
data"; (3) "the testimony is the product of reliable principles and methods"; and (4) "the
expert's opinion reflects a reliable application of the principles and methods to the facts
of the case."  Fed. R. Evid. 702; *see also Lauzon*, 270 F.3d at 686.  The language of this
rule changed in December 2023, but the substantive law did not.

The Court also notes that "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony," and it favors admissibility over exclusion. *Id.* at 686 (internal quotations and citation omitted). When examining an expert opinion, a court applies a general rule that "the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (quoting *Hose v. Chicago Nw. Transp. Co.*, 70 F.3d 968, 974 (8th Cir. 1995)). "[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury," then it must be excluded. *Id.*

### A.     Defendants' Motions

Defendants move to exclude certain expert testimony offered by Corning's technical experts, Drs. Corey Neu and Jeffrey Chalmers. (Doc. No. 431.) Dr. Neu offers opinions and testimony on the '317 Patent and Dr. Jeffrey Chalmers offers opinions and testimony on the Method Patents. Because some of the arguments overlap, the Court addresses the admissibility of certain opinions together.

#### 1.     Dr. Neu

Dr. Neu was retained by Corning. Relevant to the present motion, Dr. Neu's report contains the following opinions: (1) that the asserted claims of the '317 Patent are patentably indistinct from the claims of the '426 and '427 Patents; (2) that the asserted claims of the '317 Patent are patentably indistinct from the claims of the invalidated '044 Patent; (3) that the asserted claims of the '317 Patent are invalid as "anticipated and/or obvious over various prior art references; and (4) that Martin conceived of the multi-

48

compartment invention described and claimed in the Martin Application (2007/0026516) at least as early as September 9, 2004.  (Doc. No. 452 ("Neu Report") ¶¶ 20, 222.)  Dr. Neu's Reply Report addressed the above opinions and the additional relevant opinion that the '317 Patent is subject to the America Invents Act ("AIA"), rather than the pre-AIA Patent Act.  (Doc. No. 452-3 ("Neu Reply Report").)

First, Defendants move to exclude Dr. Neu's opinion that the '317 Patent is subject to the AIA, rather than the pre-AIA Patent Act.  Defendants argue that Corning was required to disclose this basis for its invalidity contentions in its Prior Art Statement. Specifically, Defendants argue that Dr. Neu did not opine that the '317 Patent is subject to the provisions of the AIA until he submitted his Reply Report.  Before that, Defendants submit that both Drs. Neu and Chalmers asserted that the '317 Patent was subject to the pre-AIA Patent Act and that it is prejudicial for Corning to introduce this new invalidity contention after the close of discovery and the parties' initial expert reports.

The Scheduling Order in this case required Corning to provide a Prior Art Statement that contains "a complete and detailed explanation of . . . how [the] prior art invalidates the claim(s)."  (Doc. No. 61 at 6.)  And more specifically, the Scheduling Order required Corning to include the following information:

> (i) which claim(s) alleged to be infringed are invalid; (ii) which prior art, if any, invalidates each claim; (iii) where in such prior art each element of the allegedly invalid claims may be found; and (iv) whether a basis for invalidity other than prior art is alleged, specifying what the basis is and whether such allegation is based upon 35 U.S.C. 101, 102, 103, and 112, and any other statutory provision.

(*Id.*)

In its Prior Art Statement, Corning stated that "[t]he citations herein should be understood to refer to the version of 35 U.S.C. § 101 *et seq*. applicable to the Asserted Patents, which *generally* will be the pre-America invents Act ("AIA") version of the patent statute." (Doc No. 484 ("Corning PAS") at 3 n.1) (emphasis added).) Corning also discloses the substance of Dr. Neu's opinions based on the AIA, including that (1) the application that led to the '317 Patent claimed new matter beyond what was in the earlier applications (Neu Reply Report ¶¶ 115-16); (2) that the introduction of new matter breaks the chain of priority to the continuing applications such that the '317 Patent is entitled only to the filing date of its own application; and (2) and that the patents or publications (such as those disclosing Martin and Corning's HYPERFlask device) dated before the filing date of the application resulting in the '317 Patent are prior art.

The Court concludes that this disclosure is sufficient. The Scheduling Order required Corning to provide a statutory basis for the theories of invalidity, which Corning did, but it did not require that Corning specify whether the AIA or pre-AIA applied to its invalidity allegations. Even so, Corning stated that its citations referred *generally* to the pre-AIA version of the patent statute. In making this general statement, Corning did not disavow or preclude reliance on theories of invalidity under the AIA. In addition, the Court finds that the Prior Art Statement adequately discloses the substance of Dr. Neu's opinions based on the AIA; namely that the application that led to the '317 Patent claimed new matter beyond that claimed in the earlier applications, the introduction of this new matter breaks the chain of priority, entitling the '317 Patent only to filing date of

its own application, and making patents and publications before that filing date prior art. (*See id.* ¶¶ 114-19.)

Based on the above, the Court concludes that Corning complied with its disclosure obligations and Dr. Neu can rely on the prior art disclosures under his AIA analysis.[31] Thus, Defendants' motion to exclude this testimony is denied.

Second, Defendants move to exclude Dr. Neu's opinion that Martin conceived of the invention claimed in the Martin reference at least as early as September 9, 2004. Defendants argue that Corning was required to, and did not, disclose this basis for its invalidity contentions in its Prior Art Statement.  After careful review of the parties' arguments and the record, the Court concludes that Dr. Neu's opinions about Martin's conception date are admissible.  In its Prior Art Statement, Corning disclosed that it would rely on "the prior . . . invention of the subject matter of Claims 1-9 by Corning employees, including but not limited to Allison Tanner and Greg Martin."  (PAS at 335-56.)  Corning also incorporated Tanner's and Martin's testimony and other evidence from the 2013 Lawsuit "regarding their prior art conception."  (*Id.*)  Tanner and Martin testified in the 2013 Lawsuit and in this case that they conceived of their invention in July 2004.  (Doc. No. 485 at 192; Doc. No. 486 at 47, 92, 110-11, 182; Doc. No. 487 at 8, 14-15.)  The Court finds this contention broad, but sufficient.  *See Bombardier Rec. Prods.*

---

[31]     The Court also notes that the Scheduling Order also required that "[a]ll non-dispositive motions . . . which relate to expert discovery [] be filed and served on or before **June 30, 2023**."  (Doc. No. 356 at 7 (emphasis in original).)  Defendants did not file a motion challenging Dr. Neu's AIA-based opinions by this deadline, which further supports the Court's decision not to exclude the opinions now.

*Inc. v. Arctic Cat Inc.*, Civ. No. 12-2706, 2017 WL 690186, at *3-4 (D. Minn. Feb. 21,

2017) (finding that a reorganization of accused products and an addition of measurements

did not constitute a change in infringement theory); *Arctic Cat, Inc. v. Bombardier Rec.*

*Prods. Inc.*, Civ. No. 12-2692, 2018 WL 654218, at *6-7 (D. Minn. Jan. 2, 2018) (finding

an infringement contention "broad, but sufficient").  Moreover, the record demonstrates

that this contention is neither a surprise nor prejudicial.  (*See, e.g.*, Doc. No. 129

("Defendants' Answer") ¶ 18 (admitting that the PTAB invalidated the '044 Patent in

light of prior art) & 155 (acknowledging that the priority of the Martin prior art was

discussed).)

For the above reasons, the Court denies Defendants' motion to exclude this

testimony.

### 2.      Drs. Neu and Chalmers' Obviousness Opinions

Dr. Chalmers was retained by Corning.  Relevant to the present motion, Dr.

Chalmer's report contains the following opinions:  (1) that there is no reasonable basis to

assert that the claims of the '192 and '443 Patents are valid "under Wilson Wolf's

proposed claim construction;" and (2) that the asserted claims of the '192 and '443

Patents are patentably indistinct from the claims of the '426 and '427 Patents.  (Doc.

No. 452-1 ("Chalmers Report").)  Dr. Chalmers' Reply also addressed the above topics.

(Doc. No. 452-4 ("Chalmers Reply Report").)  These opinions overlap with those of Dr.

Neu's opinions on the obviousness of the '317 Patent.  In particular, Defendants move to

exclude both Drs. Neu and Chalmers's opinions on obviousness, arguing that that neither

expert conducted a proper obviousness analysis.

First, Defendants argue that Dr. Neu's opinion that the '317 Patent is invalid "as anticipated and/or obvious" over eight prior art references is conclusory and generic. For example, Defendants contend that Dr. Neu's treatment of the Toner reference is inadequate, making only a single statement regarding obviousness—"to the extent Toner does not explicitly disclose one or more limitations of the Asserted Claims, Toner may be combined with the other prior art references discussed in my report. A POSA [person of ordinary skill in the art] would have had a motivation and reasonable expectation of success in combining these teachings to achieve the claimed invention." (Doc. No. 452 ¶ 196.) Defendants contend that Dr. Neu used the same conclusory statement with the other prior art references and, for the same reason, used a flawed and insufficient analysis. More specifically, Defendants argue that Dr. Neu did not identify or analyze any specific combination of prior art references, did not provide analysis to support his bald conclusion that a POSA would have motivation and a reasonable expectation of success in combining the teachings to achieve success, and did not conduct any analysis with respect to the opinion that the '317 Patent is invalid as obvious over a single prior art reference.

The Court has reviewed Dr. Neu's opinions on obviousness. In his reports, Dr. Neu analyzes eight prior art references and addresses each limitation, most of which do not rely on combinations. For each prior art reference, Dr. Neu points to specific disclosures in each reference that correspond to each claim element (*see, e.g.*, *id.* at ¶¶ 194-220, 262-440) making a limitation-by-limitation obviousness analysis for each individual reference. This is sufficient to support an obviousness opinion. *See Arendi*

*S.A.R.L. v. Apple Inc.*, 832 F.3d 1355, 1361 (Fed. Cir. 2016) ("[A] patent can be obvious in light of a single prior art reference if it would have been obvious to modify that reference to arrive at the patented invention."). Dr. Neu also offers the opinion that if Defendants dispute that a particular prior art reference discloses or renders obvious a particular claim limitation, then the asserted prior art reference can be combined with another prior art reference (all of which he analyzes limitation-by-limitation) that does. In addition, in his Reply Report, Dr. Neu clarified the "other prior art references" that are to be combined in this analysis are those "discussed in detail in [his] Opening Report. (Neu Reply Report ¶ 52.) The Court concludes that while Dr. Neu cross-references his opinions regarding the prior art references, he provides a sufficiently detailed analysis of each prior art reference and how each reference disclosed or rendered obvious the claimed invention, including those that he discusses as combinations.

Defendants also argue that Dr. Neu failed to conduct a proper obviousness analysis because he failed to properly consider why a POSA would have the motivation to combine the teachings of Toner with any other prior art reference or whether there would have been a reasonable expectation of success. Defendants argue that Dr. Neu's opinion on this is conclusory, generic, and lacking analysis. Defendants claim that Dr. Neu admitted as such during his deposition.

The test for obviousness is "whether a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention." *Polygroup Ltd. MCO v. Willis Elec. Co., Ltd.*, 780 F. App'x 880, 884 (Fed. Cir. July 1, 2019) (citation omitted). Here, Dr. Neu analyzes the teachings of prior art references that

are in the same field and relate to cell culture devices. Dr. Neu explains that a POSA would have had a motivation and reasonable expectation of success in combining the teachings to achieve the claimed invention "[a]t least because all of these prior art references relate to cell culture devices." (Neu Reply Report ¶ 52.) Further, in his deposition, Dr. Neu noted that while there is nothing written on the motivation analysis "a person skilled in the art would have had access to all of the prior art" (Doc. No. 448-30 at 218). Because "[e]vidence of motivation to combine need not be found in the prior art references themselves, but rather may be found in the knowledge of one of ordinary skill in the art, or in some cases, from the nature of the problem to be solved," *Polygroup Ltd. MCO*, 780 F. App'x at 884, the Court finds this opinion useful and reliable so as to allow it to be introduced at trial.

Defendants' arguments go to the sufficiency of Dr. Neu's opinions and analysis and Defendants are free to explore the sufficiency of that analysis on cross-examination at trial.

Dr. Chalmers offers two opinions on obviousness—that under Defendants' theory of infringement, the asserted claims of both the '192 Patent and the '443 Patent are invalid as obvious. In his report, Dr. Chalmers presents "additional prior art references" that disclose specific aspects of the claimed inventions. (Chalmers Report ¶¶ 190-91, 286-87.) These are the opinions that Defendants challenge. Specifically, Defendants argue that Dr. Chalmers does not provide analysis to support a finding of obviousness because he does not analyze any of these "additional" prior art references. (Doc. No. 434 at 17-18, Doc. No. 452-1 ¶¶ 190-91, 286-87.) Defendants submit that Dr. Chalmers does

not describe the subject matter of these references, does not compare these references to the '192 Patent, does not analyze combinations thereof, and does not provide any motivation to combine.

In this section of his report, Dr. Chalmers opines that "[a] POSA would understand from numerous prior art references that cell culture devices comprising a non-porous gas permeable membrane and media heights of at least 2.0 cm for us[e] in static cell culture were well known in the art." (Chalmers Report ¶ 190.) Dr. Chalmers then identifies six claimed concepts that are taught by these prior art references with citations to the relevant passages of each. (*Id.* ¶¶ 190, 114-35.) Dr. Chalmers does the same with respect to his opinions on the '443 Patent. (*Id.* ¶¶ 114-35, 286.) With respect to his opinion on motivation to combine, Corning points out that Dr. Chalmers refers to other detailed sections wherein he explains the motivation to combine (*id.* ¶¶ 188-89, 285) and that Defendants do not object to the referenced analysis.

The Court has considered the parties' arguments and determines that Dr. Chalmer's above opinions are useful and reliable so as to allow them to be introduced at trial. Defendants' arguments again go to the sufficiency of the opinions and analysis. Defendants are free to explore the sufficiency of that analysis on cross-examination at trial.

### 3.    Drs. Neu and Chalmers' Patentable Distinction Analysis

Defendants also move to exclude both (1) Drs. Neu's opinions that the claims of the '317 Patent are patentably indistinct from the claims of the '426 Patent, the '427 Patent, and the '044 Patent; and (2) Dr. Chalmers's opinions that the asserted claims of

the '192 Patent and the '443 Patent are patentably indistinct from the claims of the '426,

'427 Patents.  The '426 Patent and the '427 Patent were litigated in Plaintiffs' favor and

the '044 Patent was invalidated.  In support of their motion to exclude, Defendants argue

that both Drs. Neu and Chalmers applied the wrong legal test for determining a

patentable distinction and did not conduct a proper obviousness analysis.

Defendants contend that in determining whether two claims are patentably

indistinct in the context of a claim preclusion analysis, the inquiry is whether the claims

are "essentially the same."  *See Simple Air*, 884 F.3d at 1167.  Defendants also argue that

it is not appropriate to consider "the relevant prior art" when doing so.  Defendants

submit that both Drs. Neu and Chalmers improperly considered unrelated prior art,

making their analysis unhelpful to the trier of fact.  As Corning correctly points out,

however, Defendants made and lost this argument at the motion to dismiss stage.  (Doc.

No. 140 at 22 n.12 (explaining that it is appropriate to look to the doctrine of obviousness

when considering whether claims are patentably indistinct).)  Corning's experts will be

permitted to present testimony related to their consideration of prior art at trial.

The Court has reviewed the opinions of Drs. Neu and Chalmers and finds that

their opinions on obviousness and patentable distinction are sufficient to help the trier of

fact.  Thus, they will be permitted to offer these opinions at trial and Defendants' motion

on this point is denied.

### 4.    Dr. Green

Philip Green was retained by Corning as an expert on damages. (Doc. No. 452-6

("Green Report").)  Green offers opinions that quantify the loss that Corning suffered

from the alleged tortious interference and baseless assertion of patent infringement against Corning's customers and end-users.  In particular, Green opines that the unfounded Customer Lawsuits cost Corning $31.3 million in lost profits for the period from 2021 through 2024.  His damages calculation includes lost profits on (1) sales that Corning expected to make to customers who had an existing Master Supply Agreement ("MSA") with Corning, under which the customers promised to make certain purchases in the future through purchase orders and Corning promised to be able to satisfy those orders; and (2) damages that would have likely occurred through one of Corning's largest distributors—Thermo Fisher—with which Corning did not have an MSA.

Defendants move to exclude Green's expert testimony, arguing that he failed to account for obvious alternative causes of alleged decreases in HYPERStack sales. Defendants assert that Green assumed that the Customer Lawsuits were the sole cause of Corning's reduced sales and that Green did not talk to Corning's customers to assess their risk tolerance for patent litigation or ask how the Customer Lawsuits impacted their decisions.  (Doc. No. 452-5 ("Green Dep.") at 52-53.)  Defendants further point out that during the relevant time period, other patent litigation implicating the HYPERStack was pending and argue that Green failed to consider this litigation or other potential factors that could have impacted the reduction of HYPERStack sales.

After careful consideration, the Court denies Defendants' request to exclude this testimony.  Upon review, Green did consider obvious potential alternative reasons for Corning's decrease in HYPERStack sales.  (Green Report ¶¶ 139-46 (addressing, for example, HYPERStack vessel capacity constraints, the potential effect of COVID-19,

58

alternative cell culture processes, sales trends, etc.).)  To the extent that Defendants maintain that Green's testimony carries less weight because, for example, he did not adequately account for these (or other) alternative causes for the alleged loss of sales, Defendants can cross-examine Green at trial.  *See Lauzon v. Senco*, 720 F.3d at 693 (explaining that an expert's opinion should not be excluded because he or she failed to consider every possible alternative cause); *In re Pork Antitrust Litig.*, 665 F. Supp. 3d 967, 991 (D. Minn. 2023) (explaining that the "failure to account for each and every possible . . . variable is not grounds for excluding [expert] testimony").

Defendants argue further that Green's testimony should be excluded as irrelevant because Corning cannot prove certain elements of its causes of action.  In this vein, Defendants submit that there is no evidence that Defendants knew of Corning's prospective contracts, that there is no evidence of causation—specifically that the record shows that the Customer Lawsuits were not an impediment to contract renewals—and that there is no evidence that customers were interested in contract renewals.  The Court concludes that all of these topics go to the weight and not the sufficiency of Green's opinions.  Therefore, Defendants can cross-examine Green on these points at trial.

    **B.**    **Corning's Motions**

        **1.**    **Ludington**

Defendants retained Carol A. Ludington ("Ludington") as a damages expert. (Doc. No. 433 ("Ludington Report").)  In this case, Corning seeks damages in the form of lost profits; namely, $31 million in lost profits caused by Defendants' baseless customer lawsuits.  (*See* Green Report.)

Relevant to the present motion, Ludington intends to testify that Corning's calculation for lost profits should be reduced to zero.  Her report contains the following opinions:  (1) Corning should not be able to recover lost profits associated with customers who have supply agreements in place with Corning  (Ludington Report ¶¶ 12, 55 (for a reduction of $8,787,204)); (2)  Corning should not be able to recover lost profits that go beyond its existing supply agreements (*id.* ¶¶ 12, 43-50 (for a reduction of $22,466,000); (3) Corning should not be able to recover profits associated with customers who were not named specifically in the Customer Lawsuits (*id.* ¶¶ 12, 68-70) (for a reduction of $22,064,194); and (4) that HYPERStack Sales may have resulted from causes other than Defendants' allegedly baseless lawsuits (*id.* ¶ 79).  Corning seeks an order limiting the scope of Ludington's testimony by excluding the above four areas of testimony.

First, the Court addresses Ludington's testimony that the decrease in Corning's HYPERStack sales may have resulted from causes other than Defendants' alleged baseless lawsuits, such as low inventory or out-of-stock situations, a dehumidification project remediation project at a Corning facility, a three-month shutdown in production in Q1 of 2022, the COVID-19 pandemic, and a "shift to suspension products."  (Ludington Report ¶¶ 113-34.)  As to all of these suggested alternative reasons for a decrease in sales, Corning points to Ludington's deposition, wherein she acknowledges that she does not have evidence that these causes impacted HYPERStack sales.  After careful consideration, the Court denies Corning's motion on this point as premature.  While it may be that this testimony is insufficiently supported by facts or data, to the extent that Defendants offer evidence at trial that is properly supported by foundation and that would

support any of the alternative reasons for a decrease in sales, the Court will reconsider the parties' arguments on this motion at trial.

Second, Corning argues that Ludington's opinions on the following topics should be excluded because they constitute improper legal argument—opinions about the reduction for lost profits associated with sales to customers with supply agreements; opinions about reductions for lost profits that go beyond the existing supply agreements; and opinions that Corning's lost profits should be reduced to exclude customers not named in Defendants' suits. For example, Ludington argues that lost profit damages associated with sales to customers with supply agreements are not available to Corning because Corning did not plead a claim for tortious interference with contract (*id.* ¶ 55); that Corning's asserted damages should be reduced insofar as the calculation goes beyond the terms of existing agreements because lost profits must be cut off based on the expiration of the existing MSAs and none of the contracts produced by Corning had a 5-year term or were under an obligation to renew or enter into future contracts; and that lost profits should be reduced to exclude customers not named in the Customer Lawsuits because such profits might be limited by "legal considerations."

The Court agrees with Corning that Ludington's opinions on these points stray into legal argument over what proof the Court should admit at trial as evidence of damages that is allowed for a particular legal claim. Expert testimony on legal matters is not admissible. *S. Pine Helicopters, Inc. v. Phoenix Aviation Managers, Inc.*, 320 F.3d 838, 841 (8th Cir. 2003). However, the Court also considers the present motion on these points to be premature. While this testimony, as it stands, constitutes improper legal

analysis, should the parties offer a valid legal basis for the inclusion of Ludington's

calculations at trial, the Court will reconsider the parties' arguments on this motion.

### 2.    Technical Experts

Defendants have disclosed two technical experts:  John Wilson and Dr. Maury

Cosman.  Corning objects to various portions of their proposed testimony as being

insufficiently disclosed, unsupported, unhelpful, and unreliable.  The Court discusses the

arguments below.

### a.    John Wilson

Wilson has submitted two expert disclosure statements ("EDS") indicating his

intent to offer expert testimony.  (Doc. No. 453-6 ("Wilson EDS"); Doc. No. 453 ("Sec.

Wilson EDS").)  In his first EDS, Wilson indicates that he intends to testify about

infringement of the '317 Patent.[32]  After receiving Corning's expert reports, Wilson

served his second EDS in rebuttal, wherein he indicates that he will also testify about

validity of all of the patents-in-suit as well as secondary considerations of non-

obviousness.  On the issue of validity, the disclosure states as follows:

> Mr. Wilson is expected to testify that the claims of the '317, '192 and '443
> Patents are not invalid as anticipated by and/or obvious over the prior art
> references cited by Dr. Neu and Dr. Chalmers.  His testimony will be based
> on his knowledge of his patents and the technology and his knowledge and
> understanding of the prior art.  The facts and opinions to which Mr. Wilson
> is expected to testify with respect to this subject are set forth in:  1) the
> Wilson Expert Report, which is hereby incorporated by reference herein in
> its entirety, and in which Mr. Wilson discusses the teachings of the prior art

---

[32]    The Court has already determined that the issue of infringement of the '317 Patent
is moot based on its decision on invalidity.  However, because this testimony might be
relevant as to the tortious interference claim, the Court addresses the motion.

reference cited by Dr. Neu and Dr. Chalmers (Ex. 1); and [2] Defendants'
Responsive Prior Art Statement, March 15,2021, which is hereby
incorporated herein by reference , and in which each of the prior art
references cited by Dr. Neu and Dr. Chalmers is discussed.

(Doc. No. 453 at 3.)  In addition, Wilson intends to testify to various "secondary

considerations of non-obviousness," including that Corning's products that purportedly

are covered by Defendants' patents have enjoyed commercial success, which Wilson

opines was driven by the advantages attributable to Defendants' technology.  (*Id.* at 3-4.)

Corning argues that Wilson has not adequately disclosed the content or basis of

any opinions on the prior art and, thus, that he should be barred from giving testimony on

that subject.  Corning submits that Wilson merely refers to his expert report from 2013

and to the validity contentions prepared by counsel as his opinions.  Corning argues that

this submission is improper, insufficient, and unfair as it amounts to hundreds of pages of

documents without detailing which specific portions Wilson intends to offer expert

opinions.  Defendants disagree and argue that Wilson's disclosure under Rule 26(a)(2)(C)

properly identified the subject matter and summarized the facts and opinions on which

Wilson intends to testify.  More specifically, Defendants point out that the portion of the

report that discusses prior art references to which Wilson refers is 25 pages long.  (*Id.* at

Ex. 1 at 59-84.)  In addition, the report cited contains a section summarizing Wilson's

opinions on the same prior art references to which Drs. Neu and Chalmers cite.

The Court is mindful of Corning's objection to Wilson's wholesale adoption of his

report in the 2013 Lawsuit as an insufficient summary of the facts and opinions relevant

in this case.  *See, e.g.*, *Emerson Elec. Co. v. Suzhou Cleva Elec. Appliance Co., Ltd.*, Civ.

No. 13-1043, 2015 WL 8770712, at *3 (E.D. Mo Dec. 15, 2015) (granting a motion to exclude).  However, in light of the extensive history of this case, the Court notes that Corning cannot be surprised by Wilson's intended testimony.  To strike a middle ground, the Court offers Defendants an opportunity to submit an amended disclosure outlining with more specificity the opinions on prior art that Wilson intends to offer in this case. *See, e.g.*, *id.* (allowing an opportunity to submit an amended disclosure).  The Court will then entertain remaining, unaddressed objections to Wilson's testimony via a motion in limine.

Corning also argues that Wilson's opinion regarding the commercial success of the HYPERStack device should be excluded.  In support of this opinion, Wilson offers a single paragraph that reads:

> The products that are covered by the Wilson Wolf Patent have enjoyed significant commercial success.  That success is driven by the advantages and benefits that are attributable to the technology of the Wilson Wolf patents, including greater productivity and efficiency.  The fact that the infringing HYPERStack and HYPERFlask products have resulted in approximately $139 million in revenue through mid-2022 provides evidence supporting a finding that the Wilson Wolf Patents are not obvious.

(Doc. No. 453 at 3-4.)  Defendants submit that the "products that are covered by the Wilson Wolf Patents" were summarized in detail in Wilson's ESD.  (ESD at 7 & Ex. B (stating that "[a]ll models/versions of Corning's HYPERStack product infringe claims 6, 7, and 9 of the '317 [Patent]" and attaching an infringement chart as Ex. B).)  Defendants further submit that Wilson discusses the benefits of "greater productivity" and efficiency led to the HYPERStack's commercial success and ties those benefits to his invention in the '317 Patent.  (Doc. No. 453 at 4.)

64

For the commercial success of a product to be relevant to the issue of obviousness, there must be a nexus between the commercial success and the claimed feature. *Brown & Williamson Tobacco Corp. v. Philip Morris Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000). A nexus is presumed when the product embodies and is coextensive with the claimed feature. *Id*. When a products' commercial success is a due to an unclaimed feature or a feature known in the prior art, then that success is not relevant to validity. *SightSound Techs., LLC v. Apple Inc.*, 809 F.3d 1307, 1319 (Fed. Cir. 2015).

The Court concludes that Wilson's explanation regarding the opinion on commercial success lacks sufficient analysis that would make the underlying opinion helpful to the jury. In particular, Wilson does not specify or demonstrate any nexus between Corning's alleged commercial success of the HYPERStack product and Wilson's claimed inventions, such as a connection to any specific feature claimed by Wilson's patents. Nor does Wilson assert that Corning's HYPERStack is coextensive with the claimed inventions. Instead, Wilson simply states that the nexus exists, while ignoring whether any unclaimed features of the HYPERStack product materially impact its functionality and contribute to its commercial success. The Court finds that Wilson's conclusory statements attributing unidentified features of "products covered by Wilson Wolf Patents" to greater productivity and efficiency without any identification of a specific feature driving the success *or* of other factors that could contribute to the success creates too wide of an analytical gap, such that cross-examination could not cure the deficiencies of Wilson's opinion. *See Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 758 (8th Cir. 2006) (affirming preclusion of opinion because of analytical flaws).

Therefore, Wilson will not be permitted to offer expert opinion on the commercial success of Corning's products.  *See Wonderland Nurserygoods Co. v. Thorley Indus. LLC*, Civ. No. 13-387, 2015 WL 5021416, at *14 (W.D. Pa. Aug. 21, 2015) (excluding expert opinion regarding commercial success for failure to establish a sufficient nexus between commercial success and the alleged novel technology).

### b.   Dr. Maury Cosman

Defendants also disclosed expert opinions from Dr. Maury Cosman on infringement and invalidity and in a rebuttal to Drs. Neu and Chalmers.  (Doc. No. 448-27 ("Cosman Infringement Report"); Doc. No. 453-2 ("Cosman Rebuttal"); Doc. No. 453-4 ("Cosman Rebuttal Reply").)  Corning seeks to exclude certain portions of his testimony.

Dr. Cosman provides an infringement opinion.  In support of that opinion, Dr. Cosman relies on dictionary definitions for the claim terms "shelf," "projections," and "compartmentalized."  In addition, Dr. Cosman offers an opinion that the "housing" claimed in the '317 Patent must be "irreversible."  The Court finds that the use of the dictionary definitions and the "housing" testimony is improper.  To the extent that the issue of the meaning of these claims remains relevant (i.e., to the remaining tortious interference claim), the use of dictionary definitions and the opinion that the "housing" must be "irreversible" constitute claim construction arguments.  These opinions will be unhelpful and confusing for the jury.  *See, e.g.*, *Philips v. AWH Corp.*, 415 F.3d 1303,

1318 (Fed. Cir. 2005); *Ravo v. Ethicon Endo-Surgery, Inc*, Civ. No. 04-617, 2005 WL

6217118, at *3 (W.D. Pa. Nov. 17, 2005).  Thus, this evidence is properly excluded.[33]

In addition, like Wilson, Dr. Cosman gives an opinion on the commercial success

of the Corning's products:

> For example, I understand that products covered by the claims of at least
> the '317 Patent have enjoyed considerable commercial success.  I have
> reviewed evidence establishing that sales of Corning's HYPERStack
> product—which infringes at least claims 6, 7, and 9 of the '317 Patent—
> and a related product called HYPERFlask have totalled approximately $139
> million mid-way through 2022. . .  It is my understanding that sales of
> HYPERStack represent the majority of those sales.

(Doc. No. 453-2 ¶ 341.)  Also like Wilson, this opinion is contained in a single paragraph

that lacks analysis that would make the opinion helpful to the jury.  In particular, the

opinion does not show a connection between Corning's alleged commercial success and

Wilson's claimed inventions, such as a connection to any feature claimed by Wilson's

patents.

Because there is too much of an analytical gap between the data and the opinion,

such that cross-examination could not cure the deficiencies, *see Marmo*, 457 F.3d at 758,

this opinion is properly excluded.

## CONCLUSION

Due to the complex and protracted nature of this litigation, and in light of the

Court's resolution of the above motions, the Court believes it would be in the best

interests of the parties to attempt a global resolution of their disputes.  The Court

---

[33]    In addition, the Court construed the term "housing" above.  That is the definition
that will be presented to the jury.

encourages the parties to discuss the possibility of settlement and contact the Chambers of Magistrate Judge Leung for any assistance to that effect.

**ORDER**

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants' Motion to Dismiss Remaining Claims of the Amended Complaint Relating to the '192 and '443 Patents (Doc. No. [439]) is **GRANTED** and Counts 2 and 5 of the Amended Complaint (Doc. No. [73]) are **DISMISSED WITHOUT PREJUDICE**;

2.     Corning's Motion for Summary Judgment on Claims VII and IX: Noninfringement and Invalidity of the '317 Patent (Doc. No. [458]) is **GRANTED IN PART** and **DENIED IN PART** in that the motion is **GRANTED** as to invalidity (Claim 9) and **DENIED AS MOOT** as to noninfringement (Count 7);

3.     Defendants' Motion for Partial Summary Judgment (Doc. No. [422]) is **DENIED**;

4.     Defendants' Motion to Exclude Certain Expert Testimony (Doc. No. [431]) is **DENIED**;

5.     Corning's Motion to Exclude Expert Testimony (Ludington) (Doc. No. [426]) is **DENIED** as premature;

6.      Corning's Motion to Exclude Expert Testimony (Wilson and Dr. Cosman)

(Doc. No. [446]) is **GRANTED IN PART** and **DENIED IN PART** as explained in the

order.

Dated:  August 7, 2024                          s/Donovan W. Frank
                                                DONOVAN W. FRANK
                                                United States District Judge